## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SHELL ENERGY NORTH AMERICA
(US), L.P.,

                *Petitioner*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

                *Respondent*.

No. 22-1116

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b) and Rule 15(a) of the Federal Rules of Appellate Procedure, Shell Energy North America (US), L.P. ("Shell Energy") hereby petitions this Court for review of the following order issued by the Federal Energy Regulatory Commission ("FERC" or "Respondent") on April 22, 2022, a copy of which is attached hereto:

> Order on Justification Filings and Directing Refunds, *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61,034 (2022)

Shell Energy has standing to bring this petition. Shell Energy was a party to the FERC proceeding below. The April 22 Order ordered Shell Energy to pay certain refunds on transactions at issue in the underlying FERC proceeding. Shell Energy timely requested rehearing of the April 22 Order. FERC did not act on the petition

within 30 days of Shell Energy's request for rehearing; therefore, Shell Energy's request "may be deemed to have been denied."  16 U.S.C. § 825*l*(a).  This court has subject matter jurisdiction under 16 U.S.C. § 825*l*(b).

Shell Energy respectfully requests that this Court set aside the April 22 Order and grant such other relief as appropriate.

Date:  June 21, 2022

Respectfully submitted,

 /s/  Britt Cass Steckman

Ann Stephens (Texas Bar #00790849)
SHELL OIL COMPANY
150 North Dairy Ashford Road
Building F
Houston, TX 77079
Telephone:  (832) 337-4625
Email:  ann.stephens@shell.com

Britt Cass Steckman (D.C. Bar #1003389)
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone:  (202) 828-5831
Facsimile:  (800) 404-3970
Email:   britt.steckman@bracewell.com

*Counsel for Petitioner*
*Shell Energy North America (US), L.P.*

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SHELL ENERGY NORTH AMERICA
(US), L.P.,

        *Petitioner*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

        *Respondent*.

No. 22-1116

## PETITIONER'S RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Shell Energy North America (US), L.P. hereby submits the following Disclosure Statement:

Non-Governmental Corporate Party to this Action:  Shell Energy North America (US), L.P. ("Shell Energy")

Parent Companies: Shell Energy is directly owned by Shell (US) Gas & Power M&T Holdings, Inc.; BG Energy Merchants, LLC; Tejas Coral Holding, LLC; and Tejas Coral GP, LLC.

Publicly Held Company that Owns 10% or More of Party's Stock:  Shell plc, which is publicly held, indirectly owns 100% of Shell Energy.

Party's General Nature and Purpose:  Shell Energy is the primary operating entity for Shell's North American gas and power marketing and trading business.

Date:  June 21, 2022

Respectfully submitted,

 /s/  Britt Cass Steckman

Ann Stephens (Texas Bar #00790849)
SHELL OIL COMPANY
150 North Dairy Ashford Road
Building F
Houston, TX 77079
Telephone:  (832) 337-4625
Email:  ann.stephens@shell.com

Britt Cass Steckman (D.C. Bar #1003389)
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone:  (202) 828-5831
Facsimile:  (800) 404-3970
Email:   britt.steckman@bracewell.com

**Counsel for Petitioner**
**Shell Energy North America (US), L.P.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of June 2022, pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), I electronically filed the foregoing *Petition for Review* and *Corporate Disclosure Statement* with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, and copies of the foregoing via first-class mail, postage prepaid, on the following:

Federal Energy Regulatory Commission
c/o Kimberly D. Bose, Secretary
888 First Street, N.E.
Washington, DC 20426
kimberly.bose@ferc.gov

Matthew Christiansen, General Counsel
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
matthew.christiansen@ferc.gov

Robert Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
robert.solomon@ferc.gov

and by email on all members of the attached service list(s) in Federal Regulatory Commission Docket Nos. ER21-57-000 and ER21-57-001.

 /s/  Britt Cass Steckman
Britt Cass Steckman (D.C. Bar #1003389)
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone:  (202) 828-5831
Email:   britt.steckman@bracewell.com

*Counsel for Petitioner*
*Shell Energy North America (US), L.P.*

**FERC SERVICE LIST**
**Docket Nos. ER21-57-000 and ER21-57-001**
**U.S. Court of Appeals for the District of Columbia Circuit**
**June 21, 2022**

| PARTY | | |
|---|---|---|
| **El Paso Electric Company** | Cynthia Henry<br>El Paso Electric Company<br>P.O. Box 982<br>El Paso, TX 79960<br>Cynthia.Henry@epelectric.com | |
| | | |
| **Pacific Gas & Electric Company** | Charles Middlekauff<br>Attorney<br>Pacific Gas and Electric Company<br>PO Box 7442<br>San Francisco, CA 94120-7442<br>crmd@pge.com | |
| | | |
| **Public Citizen, Inc** | Tyson Slocum<br>Director<br>Public Citizen's Energy Program<br>215 Pennsylvania Ave SE<br>Washington, DC 20003<br>tslocum@citizen.org | |
| | | |
| **Public Utilities Commission Of The State Of California** | Christopher Clay<br>Assistant Chief Counsel<br>Public Utilities Commission of<br>  The State of California<br>505 Van Ness Avenue<br>San Francisco, CA 94102<br>christopher.clay@cpuc.ca.gov | |
| | | |

| PARTY | | |
|---|---|---|
| **Salt River Project Agricultural Improvement And Power District** | Karilee Ramaley<br>Principal Senior Attorney<br>Salt River Project Agricultural<br>   Improvement and Power District<br>P.O. Box 52025<br>Phoenix, AZ 85072<br>karilee.ramaley@srpnet.com | Andrea Sarmentero<br>Jennings, Strouss & Salmon<br>1300 I Street NW, Ste. 1120<br>Washington, DC 20005<br>asarmentero@jsslaw.com |
| | | |
| **San Diego Gas & Electric Company** | Jonathan Newlander<br>Attorney<br>San Diego Gas & Electric<br>Company<br>8330 Century Park Ct<br>San Diego, CA 92123<br>JNewlander@sdge.com | Pamela Mills<br>Regulatory Affairs Mgr<br>San Diego Gas & Electric<br>Company<br>8330 Century Park<br>San Diego, CA 92122<br>pmills@sdge.com |
| | | |
| **Southern California Edison Company** | Rebecca Furman<br>Attorney<br>Southern California Edison<br>Company<br>PO Box 800<br>Rosemead, CA 91770<br>rebecca.furman@sce.com | FERC Case Administration<br>Southern California Edison<br>Company<br>2244 Walnut Grove Avenue<br>Rosemead, CA 91770<br>ferccaseadmin@sce.com |
| | | |
| **TransAlta Energy Marketing (U.S.) Inc.** | Daryck Riddell<br>Manager Trading Compliance<br>TransAlta Corporation<br>110-12 Ave SW<br>Calgary, ALBERTA T2P 2M1<br>CANADA<br>daryck_riddell@transalta.com | |

# Attachment A

179 FERC ¶ 61,034
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                        James P. Danly, Allison Clements,
                        Mark C. Christie, and Willie L. Phillips.

Shell Energy North America (US), L.P.                Docket Nos. ER21-57-000
                                                                 ER21-57-001

ORDER ON JUSTIFICATION FILINGS AND DIRECTING REFUNDS

(Issued April 22, 2022)

1.      On October 7, 2020, Shell Energy North America (US), L.P. (Shell Energy) filed its justification for spot market sales that exceeded the Western Electric Coordinating Council (WECC)[1] soft price cap of $1,000/MWh during the summer months of 2020 (October 2020 Filing).  On June 17, 2021, the Commission provided additional guidance on justification for sales exceeding the WECC soft price cap and granted filing parties 30 days from the date of the order to supplement or amend their filings consistent with the Guidance Order.[2]  On July 19, 2021, Shell Energy submitted a supplemental filing to the Report (July 2021 Supplemental Filing).  As discussed below, we find that Shell Energy has justified sales at the Palo Verde and Four Corners trading hubs up to the amount of the Palo Verde index price, but has failed to justify certain other sales that exceeded the WECC soft price cap.  Accordingly, we direct Shell to:  (1) issue refunds for those sales above the average index price; and (2) file a refund report within 30 days of the refunds being issued.

---

[1] *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 93 FERC ¶ 61,121 (2000); *W. Elec. Coordinating Council*, 133 FERC ¶ 61,026 (2010) (October 2010 Order).  The reference to WECC is to the non-California Independent System Operator Corporation (CAISO) portion of the wholesale spot electricity market in the United States portion of the Western Interconnection, and not to the regional reliability entity.  Spot markets consist of sales that are 24 hours or less in duration and that are entered into the day of or the day prior to delivery.

[2] *ConocoPhillips Co.*, 175 FERC ¶ 61,226 (2021) (Guidance Order).

# I.    Background

## A.    WECC Soft Price Cap

2.    The Commission adopted the WECC soft price cap in response to the 2000-2001 Western energy crisis.[3]  In July 2002, in response to CAISO's Comprehensive Market Redesign Proposal, the Commission established a $250/MWh offer cap for the CAISO markets and a $250/MWh price cap for all spot market sales in WECC.[4]  The Commission stated that the $250/MWh offer cap, together with the other mitigation measures, was a careful balance of the need to provide an incentive for market entry by new generation with the need to protect markets from potential market power abuse.[5] The Commission subsequently clarified that the $250/MWh WECC cap is a "soft" cap and that offers and prices above the cap will be subject to justification and refund, which must be filed within seven days after the end of the month in which the sale in excess of the soft offer cap or energy price cap occurred.[6]

3.    The energy offer cap in CAISO and the WECC soft price cap were ultimately increased to $1,000/MWh, effective April 1, 2011.[7]  In doing so, the Commission referenced the interdependency of the CAISO and WECC markets and found that it was unjust and unreasonable to have inconsistency between the CAISO offer cap and the WECC soft price cap, while noting the potential for market distortions created by differences between the CAISO and WECC caps.[8]

4.    In August and September 2020, the western United States experienced extreme heat, with temperatures significantly above normal.  This heat wave significantly affected the demand for and supply of electric generation throughout the Western Interconnection. This extreme heat event culminated in energy transactions that exceeded the

---

[3] *See Final Rep. on Price Manipulation in W. Mkts*, Docket No. PA02-2-000 (issued Mar. 26, 2003).

[4] *Cal. Indep. Sys. Operator Corp.*, 100 FERC ¶ 61,060, at P 46 (July 2002 Order), *order on reh'g and compliance*, 101 FERC ¶ 61,061, at P 17 (2002) (October 2002 Order).

[5] July 2002 Order, 100 FERC ¶ 61,060 at P 51.

[6] *E.g.*, October 2002 Order, 101 FERC ¶ 61,061 at P 17; *see also* October 2010 Order, 133 FERC ¶ 61,026 at PP 14, 16.

[7] October 2010 Order, 133 FERC ¶ 61,026 at P 15.

[8] *Id.* P 14.

$1,000/MWh WECC soft price cap.  Following the western heat events in August and September 2020, 21 sellers submitted filings to justify their sales that exceeded the WECC soft price cap.

### B.    Guidance Order

5.      In June 2021, the Commission provided guidance for justification filings pending before the Commission and any prospective filings that include a justification for sales above the $1,000/MWh WECC soft price cap.[9]  The Commission explained that justifications for sales above the $1,000/MWh soft price cap may be based on, but are not limited to, demonstrations from at least one of three frameworks:  (1) a production cost-based framework; (2) an opportunity cost-based framework; and (3) an index-based framework.  The Commission also provided guidance regarding justification for sleeve transactions.[10]  The Commission stated that sellers are required to include detailed information to support each transaction above the WECC soft price cap, and that this support could include documentation such as affidavits, purchase confirmations, and invoices.  In addition, the Commission stated that it did not intend to preclude sellers from seeking to justify their transactions under approaches different from the ones identified, but that if a seller used a different approach, the seller must clearly demonstrate how the alternative approach justifies its transaction.[11]  For justification filings that were pending before the Commission, the Commission granted the entities that filed them 30 days from the date of the order to supplement or amend their filings consistent with the guidance.

## II.    Filings

### A.    October 2020 Filing

6.      Shell Energy reports that 13 of its bilateral spot market sales exceeded the WECC soft price cap.  Shell Energy states the sales involve standard peak energy products,

---

[9] Guidance Order, 175 FERC ¶ 61,226.

[10] In a sleeve transaction, an entity acts as an intermediary counterparty to accomplish a sale between two other counterparties who may not be set up to transact with each other using common enabling agreements (such as the Western Systems Power Pool or Edison Electric Institute agreements) or who may not meet credit requirements. *Id.* P 10 (citing Exelon Generation Co., LLC, Filing, Docket No. ER21-43-000 at 3 (filed Oct. 7, 2020)).

[11] *Id*. P 13.

commonly traded bilaterally and on the Intercontinental Exchange (ICE), or hourly energy sales.

7.      Shell Energy explains that nine of these sales were peak energy products entered into the day prior to delivery for volumes ranging from 25 MW to 50 MW at the following trading hubs: Mead, Palo Verde, Four Corners, and Mona.  Shell Energy explains that on August 18 and 19, 2020, the prices of the ICE-traded peak products associated with those hubs were well in excess of $1,000/MWh.  Thus, Shell Energy asserts that the prices of these nine sales were consistent with prices trading on ICE for the analogous products.  Shell Energy reports that two of these nine sales were priced at index plus an adder, the adder being the determinant on whether or not to execute the transactions.  Shell Energy notes that ICE has the authority to cancel trades that are not representative of market value but did not cancel the Mead and Palo Verde trades of peak energy products cleared on August 18 and 19, suggesting that ICE deemed prices to be representative of market value.  Therefore, Shell Energy asserts that the prices of these nine sales were justified.[12]

8.      Shell Energy states that the other four of the 13 sales were real-time hourly energy sales made on August 18 at Mona, Four Corners, and Mid-C.  Shell Energy contends that the price of these hourly sales at Mona and Four Corners was consistent with Mead and Palo Verde prices for the day, and that the sale at Mid-C reflected the costs, including transmission, to move the power south to sell it into the CAISO market, where it would have been subject to $1,000/MWh hard bid cap.  Further, Shell Energy explains that when those sales are executed as "fixed price" transactions at times of scarcity and high volatility, the price reflects the risk that a marketer takes in committing to deliver the energy product on the operating day when there is still significant uncertainty as to what supply may be available and what actions balancing authorities and reliability coordinators may take that could affect delivery.[13]  Therefore, Shell Energy argues that the prices for these four real-time hourly energy sales at Mid-C were also justified.

9.      Shell Energy explains that these sales were transacted pursuant to the WSPP Agreement and are the kind of short-term bilateral power sale contracts that both the Supreme Court and the Commission have found are subject to the *Mobile-Sierra*

---

[12] October 2020 Filing at 7-9.

[13] *Id.* at 9.

presumption regarding contract modifications.[14]  Therefore, Shell contends that the prices for the reported sales are presumed to be just and reasonable.

## B.    July 2021 Supplemental Filing

10.    On July 19, 2021, Shell Energy filed supplemental information for its August 2020 wholesale sales that exceeded the WECC soft price cap.  Shell Energy explains that its justification is consistent with the index-based framework in the Guidance Order and requests that the Commission find Shell Energy's sales above the $1,000/MWh WECC soft price cap to be just and reasonable and terminate this proceeding without further action.[15]

11.    Shell Energy argues that the *Mobile-Sierra* presumption applies to the reported sales and therefore no further inquiry is necessary regarding the justness and reasonableness of these sales.  Shell Energy states that under the *Mobile-Sierra* doctrine, "FERC must presume that a rate set by 'a freely negotiated wholesale-energy contract' meets the statutory 'just and reasonable' requirement."[16]  Such presumption "may be overcome only if FERC concludes that the contract seriously harms the public interest."[17]  Shell Energy explains that high prices do not reverse the *Mobile-Sierra* presumption.  According to Shell Energy, the Supreme Court has explained that parties enter into wholesale-power contracts to hedge against price volatility and market imperfections.[18]  Shell Energy again notes that the Commission has previously found that the *Mobile-Sierra* presumption applies to the WECC spot market sales at issue here.[19]

---

[14] *Id.* at 9-10 (citing *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity*, 137 FERC ¶ 61,001, at P 20 (2011) (finding that the *Mobile-Sierra* presumption applies to spot market sales *under* the WSPP Agreement).

[15] July 2021 Supplemental Filing at 2, 8.

[16] *Id.* at 4 (citing *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 167 (2010)).

[17] *Id.*

[18] *Id.* at 4-5 (citing *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 547 (2008)).

[19] *Id.* at 5.  Shell Energy also requests that the Commission modify its guidance and expressly identify the *Mobile-Sierra* presumption as an additional framework to justify sales in excess of the soft cap.  *Id.* at 7.

12.     Shell Energy explains that sales meet the index-based framework for justification. Shell Energy justifies the sales by reference to the ICE price indices for the Palo Verde Physical Peak (bilateral) (Palo Verde) product and the Mead 230 Physical Peak (bilateral) (MEAD230) product.  Shell Energy relies on the MEAD230 index price to justify its six sales at Mead.  Shell Energy reports that two of these sales were peak energy sales priced at the ICE MEAD230 index plus a $50/MWh adder.  Shell Energy states that the use of an adder protects the seller and ensures that the transaction remains profitable if curtailments or disruptions require the seller to purchase replacement power or pay liquidated damages prices at an index.  Shell Energy states that, in this case, the $50/MWh adder represents approximately 3.6% of the applicable index price, and that even with the use of the adder the price of those transactions remained below the highest ICE exchange cleared at that trading hub that day.  Shell Energy states that the remaining seven peak energy sales were fixed price transactions.  Shell Energy states that three of those sales were at prices below the weighted average of the relevant index, (i.e., the      Palo Verde index), and the other four were executed at a price above the published index at the MEAD230.[20]

13.     Additionally, Shell Energy reports three real-time hourly energy sales made on August 18, 2020, each for two consecutive hours, at the Mona, Four Corners, and Mid-C trading hubs.  Shell Energy uses the Palo Verde index to justify its sale for these real-time hourly energy sales.  At Mona, there was a 1 MW sale at a price lower than the applicable ICE peak Palo Verde weighted average index price; at Four Corners, the sale prices were above the weighted average for the ICE peak Palo Verde; and at Mid-C, the prices were lower than the applicable ICE peak Palo Verde weighted average index price.[21]

14.     Shell Energy states that the Commission has accepted the use of Palo Verde index prices in the jurisdictional tariffs that use ICE indices for electricity products traded in the Southwest region.[22]  Shell Energy also asserts that both the ICE Palo Verde index and the ICE MEAD230 index meet the Commission's liquidity standards for use in a jurisdictional tariff.

---

[20] *Id.* at 9-10.

[21] *Id.* at 10-11.

[22] *Id.* at 8 (citing *El Paso Elec. Co.*, 148 FERC ¶ 61,051 (2014) (accepting tariff revisions to price imbalances using ICE Palo Verde index prices)).

### III.    Notice and Responsive Pleadings

15.    Notice of the Report was published in the *Federal Register*, 85 Fed. Reg. 65,397 (Oct. 15, 2020), with interventions and protests due on or before October 28, 2020.

16.    Timely motions to intervene were filed by TransAlta Energy Marketing (U.S.); Salt River Project Agricultural Improvement and Power District (Salt River Project); and El Paso Electric Company.  The California Public Utilities Commission filed a notice of intervention.  Timely motions to intervene and comments or protests were filed by Pacific Gas and Electric Company (PG&E), Public Citizen, Inc. (Public Citizen), Southern California Edison Company (SoCal Edison), and the CAISO Department of Market Monitoring (DMM).  Public Citizen filed an amendment to correct its protest. San Diego Gas & Electric Company (SDG&E) filed a motion to intervene out-of-time. Shell Energy filed an answer to the protests.

17.    Notice of the July 2021 Supplemental Filing was published in the *Federal Register*, 86 Fed. Reg. 40,203 (July 27, 2021), with interventions and protests due on or before August 9, 2021.  A joint protest was filed by SoCal Edison and PG&E.  Salt River Project filed comments.  Shell Energy filed an answer to the protests.

### A.    October and November 2020 Comments, Protest, and Answer

### 1.    October 2020 Comments and Protests

18.    DMM urges the Commission to consider the wider implications of how the Commission decides cost justifications for bilateral sales above the WECC soft price cap, which DMM says provides market power mitigation in the non-CAISO WECC markets.[23]  DMM also notes that the two days on which the Palo Verde hub's average index price exceeded $1,000/MWh on ICE (August 18-19, 2020) had lower trade volumes than the preceding or following days.  DMM contends that this reflects lower liquidity on ICE at the Palo Verde trading hub, drawing attention to the liquidity levels at that trading hub that formed the average on-peak power prices there.[24]  DMM urges the Commission to consider how it evaluates cost justifications based on index prices in light of this because of the implications of WECC indices for market power mitigation in CAISO and WECC.[25]

---

[23] DMM October 2020 Protest at 4.

[24] *Id.* at 11-12.

[25] *Id.* at 13.

19.     SoCal Edison argues that the Commission must reject Shell Energy's filing because Shell Energy has failed to provide adequate justification for its transactions that exceeded the $1,000/MWh soft price cap.  SoCal Edison, citing Shell Energy, claims that the transaction prices were consistent with prevailing market conditions and that the transactions were bilateral power sales subject to the *Mobile-Sierra* doctrine, argues that Shell Energy's attempted justification and arguments fail for several reasons.[26]  SoCal Edison asserts that simply pointing to a market price without a consideration of the underlying costs, even a CAISO market price, effectively eliminates the protections provided by the Commission's soft price cap and cost verification rules.[27]  SoCal Edison requests that the Commission rule that sales at prices exceeding the WECC soft price cap are unjustified and all costs exceeding the WECC soft price cap be refunded to buyers for such sales.[28]

20.     PG&E argues that the Commission should reject the cost justification included in the October 2020 Filing.  PG&E asserts that Shell Energy fails to provide information concerning actual, verifiable operating costs incurred to supply electricity or to demonstrate any cost basis to justify its sales prices.  Further, PG&E contends that approving risk-associated costs as sufficient justification would in effect transfer the business risk of Shell Energy to consumers without proving the original purchase price was justified under the Commission's guidelines.  Finally, PG&E disputes Shell Energy's contention should excuse it from the obligation to demonstrate why recovery of costs above the soft price cap is justified.  PG&E argues that, due to the lack of a sufficient cost justification – such as documentation of physical operating costs, fuel costs, opportunity costs, or other verifiable costs – the Commission should direct Shell Energy to refund sales over the $1,000/MWh WECC soft price cap.[29]

21.     Public Citizen requests that the Commission, among other things:  (1) consolidate all of the justification filing dockets;[30] and (2) require sellers to update their filings to include details of cost estimates for entities that control generation.[31]

---

[26] SoCal Edison October 2020 Protest at 4.

[27] *Id*. at 6.

[28] *Id*. at 1, 10.

[29] PG&E October 2020 Protest at 1-4.

[30] Nineteen filings had been submitted at the time that Public Citizen filed its protest.  Additional submissions have since been filed.

[31] Public Citizen October 2020 Protest at 1-2.

## 2.     Shell Energy November 2020 Answer

22.     In its answer, Shell Energy explains that all of its sales were freely negotiated bilateral transactions executed under the WSPP Agreement, and reiterates that the *Mobile–Sierra* presumption that the sale prices are just and reasonable applies.  Shell Energy states that none of the intervenors challenges or discusses the Commission's findings regarding sales under the WSPP Agreement and none of the intervenors alleges, let alone demonstrates, that the public interest requires price mitigation.  Shell Energy states that SoCal Edison and PG&E's arguments that the *Mobile–Sierra* doctrine does not apply here, lack merit.  Shell Energy explains that the essence of the *Mobile–Sierra* doctrine is that a freely negotiated contract does in fact provide protection from contract modifications or rate revisions, except "in circumstances of unequivocal public necessity," which do not exist, and have not been alleged, here.[32]

23.     Shell Energy also explains that the DMM's recommendation that only generation costs should justify sale prices in excess of the WECC soft price cap raises potential concerns.  Shell Energy States that this proceeding is not about organized markets or offers submitted into organized markets and governed by ISO tariff provisions.  Instead, it is a limited compliance filing made with respect to bilateral transactions executed outside CAISO, governed by terms and conditions that the parties had the ability to negotiate.  Shell Energy explains that to argue that only generation costs could justify sales in excess of the soft cap raises potential concerns.  For example, Shell Energy argues that marketers that do not own generation would be prohibited from relying on actual incurred costs, let alone other justifications.  Shell Energy explains that a rule that disregards the actual or anticipated cost of purchased power when high prices are driven by scarcity and relies solely on costs of generation could result in marketers buying power for $1,500/MWh or $2,000/MWh without being able to resell it for more than $1,000/MWh.  From a legal perspective, such rule would arguably adopt impermissible confiscatory rates and be unduly discriminatory against marketers.[33]

24.     Finally, Shell Energy argues that the Commission should not consolidate this proceeding with those of other sellers that had sales in excess of the soft cap in August 2020.  Shell Energy states that the transactions at issue in these proceedings are bilateral transactions with different counterparties and subject to different agreements.  Because the analysis of the various justifications, including the threshold question of whether the *Mobile–Sierra* presumption applies to a particular sale, and would be

---

[32] Shell November 2020 Answer at 3-4.

[33] *Id.* at 5-7.

conducted on a transaction-by-transaction basis, Shell Energy contends that consolidation is not appropriate and would not result in any greater efficiency.[34]

B.     **August 2021 Protest and Answer**

1.     **August 2021 Comments and Protest**

25.     Salt River Project argues that Shell's filing should be rejected as a matter of law because, instead of providing a justification for prices that exceed the soft price cap, Shell Energy relies on the *Mobile-Sierra* presumption to contend that the Commission must presume that the rates in those sales are just and reasonable.  Salt River Project asserts that Shell Energy's *Mobile-Sierra* argument is flawed because this line of argument effectively renders the Commission's price cap orders a nullity.  Salt River Project notes that none of the *Mobile-Sierra* precedent cited by Shell Energy opines on the price caps and related refund requirements established by the Commission in WECC. Salt River Project contends that, if Shell Energy believed that *Mobile-Sierra* prevents the Commission from requiring refunds for sales above the soft price cap in WECC, it should have requested rehearing of the price cap orders.[35]

26.     SoCal Edison and PG&E argue that index liquidity cannot be determined over a 90-day period.  SoCal Edison and PG&E state that sellers should be required to demonstrate index liquidity at the actual time of the transactions because the purpose of the justification filing is to justify specific transactions over a specific time period (and not to justify general transactions over a 90-day term).  SoCal Edison and PG&E argue that without such a showing, sellers' transactions are not justified under the index-based framework and should be rejected.[36]

27.     SoCal Edison and PG&E assert that using averaged data over 90 days can mask liquidity and pricing aberrations on specific days when demand is uncharacteristically high and market power abuse may be prevalent.  SoCal Edison and PG&E further state that the existence of this "loophole" means the prices at issue could be the result of market power and manipulation of the market and pricing on the actual days of the transaction (without satisfying the daily volume, daily number of transactions, and daily number of counterparties requirements on those days), thereby undermining the role of

---

[34] *Id.* at 7.

[35] Salt River Project August 2021 Comments at 4-7.

[36] SoCal Edison and PG&E August 2021 Protest at 4.

the WECC soft price cap and justification filings to protect customers from market abuse.[37]

28.     SoCal Edison and PG&E also argue that the 90-day liquidity window fails to address how the prices at issue compare to average index pricing over the 90-day period. SoCal Edison and PG&E state that average on-peak ICE pricing at Palo Verde, which most sellers cite, was approximately $90/MWh from June 1, 2020 to August 31, 2020 ($52/MWh if the transactions exceeding the WECC price cap on August 18 and 19, are excluded).  SoCal Edison and PG&E argue that while the Commission may have a basis to conclude that average prices during periods of liquidity are reasonable, there is no basis to conclude that outlier prices up to 30 times greater than average are likewise reasonable.  SoCal Edison and PG&E contend that if sellers are allowed to use a 90-day period to show liquidity without regard to pricing over that 90-day period (which in turn allows them to sell at any price they want during extraordinary circumstances on specific days), the WECC soft price cap rules essentially become meaningless.[38]

## 2.     Shell Energy August 2021 Answer

29.     Shell Energy asserts that SoCal Edison's and PG&E's objections to Shell Energy's liquidity demonstration is without merit.  Shell Energy argues that the Guidance Order did not require sellers to apply liquidity standards only with respect to the specific time period in which a transaction occurs.  Further, Shell Energy argues that SoCal Edison's and PG&E's challenge is moot when applied to Shell Energy's sales because each of the indices that Shell Energy relied on to justify the sales had a volume of trades of at least 2,000 MWh, had at least five transactions, and had at least five counterparties.  Thus, Shell Energy contends that these indices met all three standards set forth by the Commission for index liquidity.[39]

30.     Shell Energy asserts that Salt River Project does not challenge, comment on, or even mention Shell Energy's demonstration that its sales met the index-based framework set forth in the Guidance Order.  Shell Energy contends that Salt River Project's comments consist mainly of generic statements on the *Mobile-Sierra* doctrine that do not expressly take a position on whether the *Mobile-Sierra* doctrine applies to the sales at issue.  Shell Energy denies that soft price cap prescribes terms and conditions of general applicability binding on all customers in WECC, but merely creates a reporting obligation for a seller to justify, on a case-by-case basis, prices in excess of the soft price cap.  Shell Energy maintains that the prices at issue are contract rates subject to

---

[37] *Id.* at 3.

[38] *Id.* at 4.

[39] Shell August 2021 Answer at 3-5.

*Mobile-Sierra* protection and Salt River Project provides no basis for the Commission to find that the presumption does not apply.[40]

## IV.   **Discussion**

### A.   **Procedural Matters**

31.   Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2021), the timely, unopposed motions to intervene and notice of intervention serve to make the entities that filed them parties to this proceeding.

32.   Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d), we grant SDG&E's late-filed motion to intervene given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

33.   Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2021), prohibits an answer to a protest unless otherwise ordered by the decisional authority.  We accept the answers submitted by Shell Energy because they have provided information that assisted us in our decision-making process.

34.   We reject Public Citizen's request to consolidate all of the justification filing dockets.  Each justification filing includes unique facts and circumstances involving different parties, different transactions, and different prices.  We therefore conclude that there are not common issues that warrant consolidation.

### B.   **Substantive Matters**

35.   We find that Shell Energy has justified making some of the identified August 2020 spot market sales at the relevant average index price, but it has not justified the premiums added to the index price and has not demonstrated the relevance of the Palo Verde index price for certain sales, as discussed below.  Accordingly, we direct Shell Energy to refund the premium above the average index price for the sales at issue, and also for amounts over the WECC soft price cap for certain sales within 30 days of the issuance of this order, as discussed below.  We further direct Shell Energy to file a refund report within 30 days of the refunds being issued.[41]

---

[40] *Id.* at 5-6.

[41] Shell Energy should file its refund report in this docket using Type of Filing Code 1190 – Refund Report.

## 1. *Mobile-Sierra*

36.     As an initial matter, we respond to Shell Energy's argument regarding the *Mobile-Sierra* presumption.  Although we agree with Shell Energy that the *Mobile-Sierra* presumption applies to Shell Energy's sales in this proceeding,[42] we also find that the presumption does not prevent the Commission from enforcing the requirement that sales in excess of the WECC soft price cap must be justified and are subject to refund.  While the *Mobile-Sierra* presumption applies to these contract sales, this fact is not dispositive as to the question of whether Shell Energy's sales that exceeded the WECC soft price cap were justified, or whether the Commission can order refunds if it finds that the prices for those sales are not justified.  In reviewing Shell Energy's justification filings, the Commission is not modifying the contracts, as would trigger application of the *Mobile-Sierra* presumption.  Instead, the Commission is enforcing requirements incorporated into the contracts via the Commission orders establishing the price cap[43] and provisions in Shell Energy's market-based rate tariff.

37.     As the Commission has previously determined, the WECC soft price cap applies to spot market sales in the WECC outside of CAISO.[44]  The Shell Energy sales at issue here were conducted pursuant to Shell Energy's market-based rate authority,[45] and those sales are therefore governed by Shell Energy's market-based rate tariff and the requirements established therein.[46]  Shell Energy's market-based rate tariff states, in relevant part, that Shell Energy must comply with "orders concerning seller's market-based rate authority, including orders in which the Commission authorizes the seller to engage in affiliate sales under this tariff *or otherwise restricts or limits the seller's market-based rate authority*."[47]  We find that the WECC soft price cap, which

---

[42] *See Puget Sound Energy, Inc. v. All Jurisdictional Sellers*, 137 FERC ¶ 61,001, at P 20 (2011), *order on reh'g*, 143 FERC ¶ 61,020 (2013) (citing *Morgan Stanley*, 554 U.S. at 543-548) (determining that short-term bilateral contracts (e.g., spot market sales) "are a type of agreement to which the Supreme Court has found that the *Mobile-Sierra* presumption generally applies.").

[43] July 2002 Order, 100 FERC ¶ 61,060; October 2002 Order, 101 FERC ¶ 61,061; October 2010 Order, 133 FERC ¶ 61,026.

[44] October 2010 Order, 133 FERC ¶ 61,026 at PP 1, 14-15.

[45] *Shell Energy North America (US), L.P.*, Docket No. ER08-656-004 (Apr. 17, 2009) (delegated order).

[46] *See* Shell Energy North America (US), L.P., Market-Based Rate Tariff (5.0.0).

[47] *Id*. § 5 (emphasis added).

applies to all jurisdictional sellers transacting in the WECC outside of CAISO,[48] is a restriction or limit on Shell Energy's market-based rate authority established via Commission orders, as contemplated by Shell Energy's market-based rate tariff.[49]

38.    Because we find that Shell Energy's argument regarding the *Mobile-Sierra* presumption is not dispositive as to the question of whether Shell Energy's sales that exceeded the WECC soft price cap were justified, we turn next to other considerations that are relevant to answering that question.

## 2.    Justification Under Index-Based Framework

39.    Shell Energy seeks to justify its sales above the WECC soft price cap using the index-based framework discussed in the Guidance Order. As established in the Guidance Order, a seller relying on the index framework to justify sales above the WECC soft price cap must provide the following: (1) reference to a price index at a specific hub; (2) an explanation of the relevance of the specified price index to the transaction requiring justification, including locational and temporal relevance and published index price; and (3) a demonstration that the price index met conditions for adequate liquidity at the location based on the Commission's index liquidity standards, described further below, during the time period relevant to the transaction.[50] To rely on a specific hub, sellers must demonstrate their ability to transact near those hubs during the time periods in which the prices of those published indices were above $1,000/MWh.[51] Sellers must also provide sufficient information about their own transactions to allow the Commission to evaluate how a particular seller's sales contributed to index formation.[52] We find that Shell Energy's justification filing provides a demonstration that is generally consistent with this guidance, with certain exceptions as discussed in greater detail below.

---

[48] *See* July 2002 Order, 100 FERC ¶ 61,060; October 2010 Order, 133 FERC ¶ 61,026.

[49] The dissent focuses on the offer price to support the position that we are modifying the contracts here. But this ignores the market-based rate tariff, under which Shell Energy undisputedly made the sales at issue here and which obligates sellers who voluntarily seek market-based rate authority (like Shell Energy) to abide by restrictions in Commission orders. One of these restrictions is the WECC soft price cap, which has been in place for 20 years.

[50] Guidance Order, 175 FERC ¶ 61,226 at P 22.

[51] *Id.* P 23.

[52] *Id.* P 25.

40.    With regard to the relevance of the specified price index to the transactions at issue, we find that Shell Energy has demonstrated that the Palo Verde index price is relevant to sales at Palo Verde and Four Corners due to the geographic proximity and that MEAD230 is an appropriate benchmark for its sales at Mead that is representative of Shell Energy's market opportunities at the time of the sale.  Accordingly, we find that Shell Energy has demonstrated its ability to transact near the Palo Verde and MEAD230 hubs during the time periods in which the prices were above $1,000/MWh.  We also find that it was reasonable for Shell Energy to use the Palo Verde hub as the most appropriate price benchmark for the two transactions that were delivered at nearby Four Corners, because Palo Verde is physically proximate to Four Corners and a more liquid trading hub than Four Corners.  Therefore, we find that Shell has justified its sales at Palo Verde and Four Corners up to the amount of the Palo Verde index price.[53]

41.    However, we find that Shell Energy has not demonstrated the relevance of Palo Verde index prices for its sales at Mona and Mid-C.  Given the physical distance between Palo Verde and these two hubs, in addition to potential constraints that could limit the ability to deliver energy between these points, we find that Shell Energy has not explained why the Palo Verde index price is the most appropriate benchmark for these sales or why Shell Energy selected Palo Verde in favor of other possibly more appropriate indices.  For example, the Mid-C transactions were located at a liquid trading hub where there was a relevant index price.  Shell Energy did not explain its choice to use the geographically distant Palo Verde index rather than the Mid-C index to justify its transactions at Mid-C and Mona.  Therefore, we find that Shell Energy has not satisfied the requirements set forth in the Guidance Order for justifying prices above the $1,000/MWh soft price cap for the sales at the Mona and Mid-C trading hubs and direct Shell Energy to refund amounts that exceed the soft price cap within 30 days of the date of this order.

42.    With regard to whether the referenced price index met conditions for adequate liquidity, we find that Shell Energy demonstrates that the Palo Verde and MEAD230 indices meets the Commission's liquidity standards over the 90-day review period preceding August 20, 2020.  For this time period, the average daily trading volume at Palo Verde was 8,760 MWh, the average daily number of trades at Palo Verde was 18 and the average daily number of counterparties was 11.  As for the MEAD230 index, the average daily volume traded was 8,185 MWh, the average number of counterparties was 10.66, and the average number of transactions was 16.58.[54]

---

[53] *See* July 2021 Supplemental Filing at 8-9 & n.29.

[54] *Id*. at 9 n.31.

43.    We disagree with SoCal Edison's and PG&E's argument that sellers should be required to demonstrate index liquidity at the actual time of the transactions. The requirement for demonstrating index liquidity under the index-based framework is consistent with longstanding Commission precedent, under which the Commission has adopted a 90-day period for establishing the liquidity of indices.[55] We note that high index prices are not necessarily evidence of unreasonable prices, and that indices are surveilled for potential market power and manipulation. Furthermore, as set forth in the Guidance Order, the Commission requires that a seller provide more than a demonstration of index liquidity to apply the index-based framework to a justification filing, which provides additional evidence to enable the Commission to assess the appropriateness of the relevant index price.[56] We continue to find that requirements for the index-based framework in the Guidance Order may be used to justify a sale above the WECC soft price cap, and we will not require sellers to demonstrate index liquidity for the specific time period of the transactions. Nonetheless, Shell Energy does demonstrate that three of the Commission's thresholds for liquidity were met at the Palo Verde and MEAD230 hubs for transactions on August 18 and 19, 2020.[57]

44.    Although we find that Shell Energy has shown the appropriateness of the Palo Verde and MEAD230 price indices as representative of its market opportunities at the time of certain of its sales, we find that Shell Energy has not justified the premiums added to the index prices. The Guidance Order noted that, "[t]o the extent a seller transacted at a price including a markup of the index price (e.g., *index + $25/MWh*), the Commission may either require refunds for the markup or may consider justifications for the markup under a separate framework."[58]

45.    Shell Energy's rationale for prices above the published index price at MEAD230 to include an adder is that "[s]uch an adder protects the seller and ensures the transaction remains profitable if curtailments or other disruptions require the seller to purchase replacement power or pay liquidated damages priced at index. Often, adders such as this are included to cover any replacement losses charges if wheeling across the transmission system."[59] However, the MEAD230 index already reflects scarcity conditions, evident based on a comparison of the index prices on the days of Shell Energy's sales to the

---

[55] *Price Discovery in Nat. Gas and Elec. Mkts.*, 109 FERC ¶ 61,184, at P 66 (2004).

[56] Guidance Order, 175 FERC ¶ 61,226 at PP 20-25.

[57] July 2021 Supplemental Filing at 9.

[58] Guidance Order, 175 FERC ¶ 61,226 at P 20 n.33 (emphasis in original).

[59] July 2021 Supplemental Filing at 10.

index prices for other days in August 2020.  In these circumstances, the index-based framework only justifies prices up to the index price and, as noted above, any premiums above the index must be justified in other ways, which Shell Energy has failed to do.  Similarly, Shell Energy has not provided a sufficient justification for the prices in its fixed price transactions to include premiums above the index price.  Accordingly, we find that Shell Energy has provided inadequate justification for the premiums above the MEAD230 index price, and, therefore, direct Shell Energy to refund any amount above the average index price for the sales at issue within 30 days of the date of this order.  We further direct Shell Energy to file a refund report within 30 calendar days of the refunds being issued.

46.     Finally, we reject Public Citizen's argument that sellers should update their filings to include details of cost estimates for entities that control generation.  The Commission did not require this type of demonstration in the Guidance Order, and we find that Public Citizen has not justified imposing this requirement.

The Commission orders:

        (A)     The sales identified in the Shell Energy justification filings are hereby found to be justified in part, as discussed in the body of this order.

        (B)     Shell Energy is hereby directed to issue refunds within 30 days of the issuance of this order, as discussed in the body of this order.

        (C)     Shell Energy is hereby directed to file a refund report within 30 days of the refunds being issued, as discussed in the body of this order.

By the Commission.  Commissioner Danly is dissenting with a separate statement attached.

( S E A L )

                              Debbie-Anne A. Reese,
                              Deputy Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Shell Energy North America (US), L.P.          Docket Nos.     ER21-57-000
                                                                               ER21-57-001

(Issued April 22, 2022)

DANLY, Commissioner, *dissenting*:

1.      The legal question in this case is whether the Commission can abrogate a contract to sell electricity pursuant to market-based rate authority when the contract price is above a Commission-imposed "soft" price cap absent a finding that the public interest so demands.  The answer is no.  I therefore dissent from today's order.[1]  I would apply the *Mobile-Sierra* presumption to the contract sale at issue and not require Shell Energy North America (US), L.P. (Shell Energy) to pay refunds for the "premium" amount above the price index that Shell Energy and the willing buyers freely negotiated because no showing has been made that the public interest is seriously harmed by the contract rate.[2]

2.      California suffered rolling blackouts in August 2020, largely caused by the poor design of the markets administered by the California Independent System Operator (CAISO), sustained artificially low power prices, insufficient generation, an over-reliance on unreliable renewable resources, and continuous government and regulatory meddling.[3]  Since August 2020, CAISO has sought and obtained stopgap relief on an emergency

---

[1] *Shell Energy N. Am. (US), L.P.*, 179 FERC ¶ 61,034 (2022).

[2] *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

[3] *See Transcript of the 1073rd Meeting*, FERC, at 31 (Dec. 17, 2020) https://www.ferc.gov/news-events/events/december-17-2020-virtual-open-meeting-12172020 ("Overall, the August heat storm brought to life several potential shortcomings associated with the California planning processes, operating protocols, and market design.") (December 2020 Meeting Transcript); *see also Cal. Indep. Sys. Operator Corp.*, 176 FERC ¶ 61,159 (2021) (Danly, Comm'r, dissenting at P 1) ("CAISO seeks this latest emergency relief because of the ongoing and persistent failure of its markets to attract and retain adequate resources to maintain reliability."); *id.* (Danly, Comm'r, dissenting at PP 16-18).

basis in numerous proceedings,[4] but the majority of the Commission rejected my call for a section 206 investigation,[5] and real market reforms have not been proposed.  Now the Commission acts by requiring individual generators—who helped prevent further blackouts by selling emergency power at prevailing market prices that happened to be in excess of a "soft" cap imposed by the Commission—to refund amounts the majority now deems to be too high.  In so ordering, the majority does nothing to remedy California's

---

[4] *See, e.g.,* Dep't of Energy, Order No. 202-21-2 (issued Sept. 10, 2021) (emergency order issued pursuant to Federal Power Act (FPA) section 202(c), 16 U.S.C. § 824a(c), determining that an emergency exists in California due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes and authorizing specific electric generation resources located within California to test and operate at their maximum generation output levels when directed to do so by CAISO notwithstanding air quality or other permit limitations through Nov. 9, 2021); Dep't of Energy, Order No. 202-20-2 (issued Sept. 6, 2020) (FPA section 202(c), 16 U.S.C. § 824a(c), emergency order was issued to CAISO authorizing specific electric generating units located within the CAISO balancing authority area to operate at their maximum generation output levels due to an ongoing "Extreme Heat Event" and to preserve the reliability of bulk electric power system through Sept. 13, 2020); *see also Cal. Indep. Sys. Operator Corp.*, 176 FERC ¶ 61,159 (granting waiver to allow CAISO to immediately interconnect two generating units to address potential capacity shortfalls and maintain reliability); *Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,245 (2021) (order accepting tariff revisions subject to further compliance filing to modify load, export, and wheeling priorities in the day-ahead and real-time optimization process and establish related market rules); *Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,168 (2021) (order on tariff revisions to enhance CAISO's resource adequacy rules by: (1) adopting a minimum state of charge requirement for storage resources that provide resource adequacy capacity; (2) requiring substitute capacity for all maintenance outages of resource adequacy resources; (3) clarifying that extending the scope or duration of an existing outage requires a new outage request; and (4) updating the local capacity technical study criteria and permitting CAISO to designate capacity under the backstop capacity procurement mechanism if there are deficiencies relative to the revised criteria); *Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,167 (2021) (order on tariff revisions regarding the import capability allocation process); *Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,160 (2021) (order on tariff revisions to ensure CAISO has the appropriate operational tools and market rules to address tight supply conditions).

[5] *See* December 2020 Meeting Transcript at 47 (FERC Secretary Bose stated "[a]ccordingly, Item E-3 [CAISO Show Cause Proceeding] is not approved by the Commission."); *see also Staff Presentation on California Independent System Operator* (EL21-19-000), FERC (Dec. 17, 2020), https://www.ferc.gov/news-events/news/staff-presentation-california-independent-system-operator-el21-19-000.

ongoing electricity crisis except to now introduce contract uncertainty into the mix and to cause even greater price suppression.

3.     But this is merely context.  The issue whether Shell Energy's sales prices should be abrogated is a legal question.  Market-based rate sales are subject to the *Mobile-Sierra* doctrine which means that the Commission "must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law.  The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest."[6]  Sales pursuant to market-based rate authority, such as Shell Energy's in this case, thus enjoy the *Mobile-Sierra* presumption.

4.     The majority correctly finds that "the *Mobile-Sierra* presumption applies to Shell Energy's sales in this proceeding,"[7] but then incorrectly rules that it "is not dispositive"[8] because by ordering Shell Energy to refund portions of the contract price "the Commission is not modifying the contracts, as would trigger application of the *Mobile-Sierra* presumption.  Instead, the Commission is enforcing requirements incorporated into the contracts via the Commission orders establishing the price cap."[9]

5.     *First*, it is incorrect that "the Commission is not modifying the contracts."  The Commission in fact modifies the first element of any contract, the *offer*, which in this case was that Shell Energy would sell electricity to the buyer at a premium above the index price.  The Commission modifies the offer by "direct[ing] Shell Energy to refund any amount above the average index price for the sales at issue."[10]  There is no more fundamental modification of a contract than to change the sales price.

6.     *Second*, the majority is wrong that a Commission-imposed soft cap is all it takes to eliminate an entire class of market-based rate contracts from the *Mobile-Sierra* presumption.  The majority reasons that sellers with market-based rate authority must comply with any "restriction" the Commission places on market-based sales, and thus

---

[6] *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n*, 558 U.S. 165, 174 (2010) (citing *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 530 (2008)).

[7] *Shell Energy*, 179 FERC ¶ 61,034 at P 36.

[8] *Id.*

[9] *Id.* (citation omitted).

[10] *Id.* P 45.

sales above the Commission-imposed soft cap do not enjoy contract law protections.[11]  If that were the case, the Commission could order that any rate above zero in any contract is subject to a "soft" cap, and *just like that*, the pesky *Mobile-Sierra* doctrine would be gone forever, and the Commission could simply dictate all seller offers.  Happily, contract law is not so easily circumvented.  There are limits to the "restrictions" the Commission can attach to market-based rate tariffs.

7.      We should remember what the "soft" cap purports to be.  It allows sellers to offer at prices above the cap in recognition that market prices will sometimes exceed the cap.  This could happen, for example, during a period of extreme scarcity and rolling blackouts, which is exactly what was happening in California in August 2020.  Under a hard cap, sales above the cap are prohibited, and no contract above the cap is enforceable.  *Mobile-Sierra* never comes into play for an unenforceable contract.

8.      Under the soft cap, however, parties are free to negotiate contracts above the cap.  Unlike with a hard cap, the soft cap regime expressly contemplates a seller's ability to justify the offered price.  Those contracts above the soft cap, like all market-based rate sales, enjoy the *Mobile-Sierra* presumption.  There is no precedent to suggest otherwise.  The majority certainly fails to cite any.  The freely negotiated contractual offer price above the cap cannot be modified unless it seriously harms the public interest.

9.      The Commission of course could do away with the soft cap and instead prohibit sales above a hard cap of $1,000 or any other amount found to be just and reasonable.  But when market prices exceed the cap, some available electricity would not be sold.  During August 2020, the likely result would have been more extensive blackouts and an even more severe reliability crisis.  The Commission thus reasonably allows sellers to sell at prices higher than the cap if the prices are justified, but the *Mobile-Sierra* presumption still must apply.  The Commission can adopt "guidance" for how to analyze the justification,[12] but the final burden is on protesters to demonstrate that the contract rate harms the public interest.

10.      When we apply the correct *Mobile-Sierra* standard to Shell Energy's price justification, the question is whether the contract price seriously harms the public interest.  Shell Energy fully explained its contract price.[13]  Buyers willingly purchased power during a reliability crisis at a modest premium above prevailing market index prices.

---

[11] *Id*. PP 36-37.

[12] *See ConocoPhillips Co.*, 175 FERC ¶ 61,226 (2021) (Danly, Comm'r, concurring).

[13] *See Shell Energy*, 179 FERC ¶ 61,034 at PP 6-14, 22-24, 29-30 (recounting Shell Energy's evidence).

There is no showing in the record that these prevailing market prices seriously harmed the public interest. Any such argument appears absurd on its face, particularly when internal CAISO prices are capped at levels much higher than the Shell Energy contract price. It probably is because the *Mobile-Sierra* presumption so easily defeats contract modification in this case that the majority grasps for any means to bypass it.

11.    I conclude with a final observation. It is not like Shell Energy has a real choice not to sell excess power during a reliability crisis. If it does not sell, the Commission will investigate it for physical or economic withholding and attempt to levy sanctions for manipulating the markets. It is of course in everyone's interest for all available power to be available during a crisis. So the *de facto* result is that we require Shell Energy to sell, and then we require them to sell at our preferred price. No wonder there seems to be no end in sight to the supply shortage in California and (increasingly) the western United States.

For these reasons, I respectfully dissent.

_____
James P. Danly
Commissioner