No. 22-1116, *et al.*

*In the*

# United States Court of Appeals

*for the*

# District of Columbia Circuit

―――――――――――――――

SHELL ENERGY NORTH AMERICA (US), L.P., *et al.*,
*Petitioners*,

― v. ―

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

―――――――――――――――

On petition for review of orders of the
Federal Energy Regulatory Commission

―――――――――――――――

**FINAL JOINT BRIEF FOR SELLER-MARKETER INTERVENORS**

―――――――――――――――

DAVID C. FREDERICK
SCOTT H. ANGSTREICH
COLLIN R. WHITE
  *Kellogg, Hansen, Todd, Figel*
  *& Frederick, P.L.L.C.*
  *1615 M Street, NW*
  *Suite 400*
  *Washington, DC 20036*
  *(202) 326-7900*

*Counsel for Shell Energy North*
*America (US) L.P.*

PAUL W. HUGHES
DAVID G. TEWKSBURY
NEIL L. LEVY
ANDREW A. LYONS-BERG
CONNOR J. SUOZZO
  *McDermott Will & Emery LLC*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Tenaska Power Ser-*
*vices Co.*

KENNETH M. IRVIN
BRIAN P. MORRISSEY
  *Sidley Austin LLP*
  *1501 K Street, NW*
  *Washington, DC 20005*
  *(202) 736-8000*

*Counsel for Brookfield Renewable
Trading and Marketing LP*


SUEDEEN GIBBONS KELLY
JOHN N. ESTES III
  *Jenner & Block LLP*
  *1099 New York Avenue, NW*
  *Suite 900*
  *Washington DC  20001*
  *(202) 539-6055*

*Counsel for El Paso Electric Company*


CHRISTOPHER R. JONES
  *Troutman Pepper Hamilton
  Sanders LLP*
  *401 9th Street, NW*
  *Suite 1000*
  *Washington DC  20004*
  *(202) 662-2181*

*Counsel for Public Service Company of New Mexico, PacifiCorp, and Tucson Electric Power Company*


VINCENZO FRANCO
  *Rock Creek Energy Group
  LLP*
  *1 Thomas Circle, NW*
  *Suite 700*
  *Washington, DC 20005*
  *(202) 220-1200*

*Counsel for Brookfield Renewable Trading and Marketing LP*


MARK R. HASKELL
  *Blank Rome LLP*
  *1825 Eye Street, NW*
  *Washington DC  20006*
  *(202) 420-2654*

*Counsel for bp Energy Company*


BRIAN B. BELL
  *Dorsey & Whitney LLP*
  *50 South Sixth Street*
  *Suite 1500*
  *Minneapolis, MN 55402*
  *(612) 492-6178*

*Counsel for Tri-State Generation and Transmission Association, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Seller-Marketer Intervenors certify as follows:

### A.    Parties and Amici

All parties, intervenors, and amici appearing in this court are listed in the Initial Brief of Petitioners California Public Utilities Commission & Southern California Edison Company.

### B.    Rulings Under Review

References to the rulings at issue appear in the Initial Brief of Petitioners California Public Utilities Commission & Southern California Edison Company.

### C.    Related Cases

The following cases pending in this Court are related to this case: Tenaska Power Services Co. v. FERC (No. 23-1101), Macquarie Energy LLC v. FERC (No. 23-1082), and Shell Energy North America (US), L.P. v. FERC (No. 23-1178).

i

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Seller-Marketer Intervenors respectfully submit the following corporate disclosure statements:

**bp Energy Company.** bp Energy Company ("bp Energy") is organized and existing under the laws of Delaware. bp Energy is a marketer of natural gas and electric power. bp Energy is wholly owned by BP Company North America Inc. BP Company North America Inc. is wholly owned by BP Corporation North America Inc. BP Corporation North America Inc. is wholly owned by BP America Inc. BP America Inc. is wholly owned by BP America Limited. BP America Limited is wholly owned by BP Holdings North America Limited. BP Holdings North America Limited is wholly owned by BP p.l.c., an entity publicly traded on the New York Stock Exchange.

**Brookfield Renewable Trading and Marketing LP.** Brookfield Renewable Trading and Marketing LP is a Delaware limited partnership that is a wholly owned indirect subsidiary of Brookfield Power US Holding America Co. ("BPUSHA"). BPUSHA is a wholly owned indirect subsidiary of Brookfield BRP Holdings (US) Inc. ("Brookfield BRP Holdings (US)"). BEP Subco Inc. ("BEP Subco") directly owns all of the voting

shares in Brookfield BRP Holdings (US). BEP Subco is a wholly-owned direct subsidiary of Brookfield Renewable Corporation ("BEPC").

BEPC is a corporation organized under the laws of British Columbia, Canada. BEPC has two classes of voting securities, Class A exchangeable subordinate voting shares ("BEPC Exchangeable Shares") and Class B shares. By their terms, the BEPC Exchangeable Shares in the aggregate represent 25% of BEPC's voting securities regardless of the number of BEPC Exchangeable Shares outstanding from time to time. BEPC's Class B shares in the aggregate represent 75% of its voting securities regardless of the number of Class B shares outstanding from time to time.

Brookfield Renewable Energy L.P. ("BRELP") indirectly owns 100% of BEPC's Class B shares.[1] BRELP is owned by BREP Holding L.P. ("BREP Holding") (GP interest) and Brookfield Renewable Partners L.P. ("BEP") (LP interest).[2] BREP Holding is a wholly-owned indirect subsidiary of Brookfield Asset Management ULC ("BAM ULC"), which is owned

---

[1]  BRELP also indirectly owns 100% of BEPC's Class C shares, which are non-voting except in limited circumstances prescribed by applicable law.

[2]  Brookfield Renewable Power Inc. ("BRPI") and Brookfield Energy Marketing LP also own redeemable exchangeable partnership units in BRELP, which are exchangeable for BEP LP Units (as defined herein).

by Brookfield Corporation (75%)[3] and Brookfield Asset Management Ltd. ("BAM Ltd.," and together with Brookfield Corporation, "Brookfield") (25%).

BEP is a Bermuda limited partnership. The non-voting limited partnership interests in BEP ("BEP LP Units") are publicly traded on the Toronto Stock Exchange and New York Stock Exchange, under the symbols BEP.UN and BEP, respectively. Brookfield Renewable Partners Limited, a wholly owned direct subsidiary of BRPI, which in turn is a wholly owned indirect subsidiary of Brookfield Corporation, owns the 0.01% general partnership interest in BEP and has sole responsibility and authority for the management and control of BEP. The BEP LP Units are held by Brookfield Corporation (approximately 26% indirectly through subsidiaries) and public investors (approximately 74%).[4] No

---

[3]   Brookfield Corporation directly owns approximately 73.23% of BAM ULC and indirectly owns 1.76% of BAM ULC through its wholly owned indirect subsidiary BRPI.

[4]   On a "fully-exchanged" basis (*i.e.*, assuming exchange of 100% of all outstanding securities convertible for BEP LP Units), Brookfield Corporation would indirectly beneficially own approximately 47% of the BEP LP Units, and the public would own the remaining approximately 53%. If only such convertible securities owned by Brookfield Corporation and its affiliates, but not public shareholders, were converted into BEP LP Units, then Brookfield Corporation would indirectly beneficially own approximately 59.3% of the BEP LP Units, and the public would own the remaining approximately 40.7%.

individual public investor (in aggregate together with its associate or affiliate companies) holds 10% or more of the BEP LP Units.

The BEPC Exchangeable Shares are publicly traded on the Toronto Stock Exchange and New York Stock Exchange under the symbol BEPC.[5] A portion of the BEPC Exchangeable Shares is held by public investors, none of which holds (in aggregate together with its associate or affiliate companies) 10% or more of the outstanding voting securities of BEPC. Affiliates of Brookfield Corporation indirectly own the remaining BEPC Exchangeable Shares, which represent approximately 25% of the outstanding BEPC Exchangeable shares as of August 1, 2023. As a result, Brookfield indirectly currently controls approximately 81.2% of the voting securities of BEPC.

Brookfield Corporation ("BN") is an Ontario corporation with its principal place of business in Toronto, Ontario, Canada. The outstanding Class A Limited Voting Shares of BN and the outstanding Class A

---

[5]   Each BEPC Exchangeable Share is exchangeable at the option of the holder for one BEP LP Unit (subject to adjustment to reflect certain capital events) or its cash equivalent (the form of payment to be determined at the election of BEPC). BEP may elect to satisfy its exchange obligation by acquiring such tendered BEPC Exchangeable Shares for an equivalent number of BEP LP Units (subject to adjustment to reflect certain capital events) or its cash equivalent (the form of payment to be determined at the election of BEP).

Limited Voting Shares of BAM Ltd. are each publicly traded on the Toronto Stock Exchange and New York Stock Exchange under the symbols BN and BAM, respectively.

The outstanding Class B Limited Voting Shares of BN and the outstanding Class B Limited Voting Shares of BAM Ltd. are each held by the BAM Partnership, a trust constituted under the laws of the Province of Ontario, held directly or indirectly by certain longstanding senior leaders of Brookfield. The beneficial interests in the BAM Partnership, and the voting interests in its trustee, are held one-third by Jack L. Cockwell and one-third by Bruce Flatt. No other person or entity owns or controls (directly or indirectly and together with its affiliates) a 10% or greater economic or voting interest in the BAM Partnership or its trustee.

**El Paso Electric Company.** El Paso Electric Company ("EPE") is a wholly owned subsidiary of Sun Jupiter Holdings LLC ("Sun Jupiter"). Through Sun Jupiter, EPE is affiliated with electric generation, natural gas storage facilities and distribution companies. Sun Jupiter is a wholly owned subsidiary of IIF US Holding 2. IIF US Holding 2 is a private investment vehicle managed and controlled by its general partners, IIF US Holding 2 GP, LLC ("IIF 2 GP"), which hold all of the general partnership interests (which are non-economic) in IIF US Holding 2. IIF 2 GP is privately held and no publicly held corporation directly or indirectly owns or controls 10%

vi

or more of the outstanding voting securities (in aggregate with any of its affiliates) of IIF US Holding 2.

**PacifiCorp.** PacifiCorp is a business incorporated in the State of Oregon. PacifiCorp is a subsidiary of PPW Holdings, LLC. PPW Holdings, LLC, is a subsidiary of Berkshire Hathaway Energy Company, which in turn is a consolidated subsidiary of Berkshire Hathaway, Inc. Other than Berkshire Hathaway, Inc., there are no publicly held corporations that own any common stock of, or any other voting interests in, PacifiCorp.

**Public Service Company of New Mexico.** Public Service Company of New Mexico ("PNM") is a New Mexico corporation. PNM Resources ("PNMR"), its parent corporation, is a publicly-traded New Mexico corporation. PNMR owns 100% of the common stock of PNM. From time to time, certain institutional investors acting in a passive, non-controlling capacity may acquire more than 10% of the outstanding shares of PNM and other utilities pursuant to FERC-granted blanket authorizations. As of the date of this brief, PNM believes that BlackRock and Vanguard may each own more than 10 percent of the outstanding shares of PNM.

**Shell Energy North America (US), L.P.** Shell Energy North America (US), L.P. ("Shell Energy") is directly owned by Shell (US) Gas & Power M&T Holdings, Inc.; BG Energy Merchants, LLC; Tejas Coral Holding, LLC; and Tejas Coral GP, LLC. Shell plc, which is publicly held, indirectly

owns 100% of Shell Energy. Shell Energy is the primary operating entity for Shell's North American gas and power marketing and trading business.

**Tenaska Power Services Co.** Tenaska Power Services Co. ("TPS") is a wholly owned subsidiary of Tenaska TPS, Inc., which is in turn a wholly owned subsidiary of Tenaska Energy, Inc. The equity interests in Tenaska Energy, Inc. are owned by private individuals and trusts formed for the benefit of their family members. Only two individuals, Howard L. Hawks and Thomas E. Hendricks, own an ownership interest of 10% or more in Tenaska Energy, Inc. No publicly held corporation owns an interest of 10% or more in TPS or any of its parents.

**Tri-State Generations and Transmission Association, Inc.** Tri-State Generations and Transmission Association, Inc. ("Tri-State") has no parent company and no publicly held company has a 10% or greater ownership interest in Tri-State. Tri-State is a not-for-profit generation and transmission electric cooperative that supplies wholesale electricity to its member owners, which include 42 distribution cooperatives and public power districts in Colorado, Nebraska, New Mexico, and Wyoming.

**Tucson Electric Power Company.** Tucson Electric Power Company ("Tucson Electric") is a direct, wholly-owned subsidiary of UNS Energy Corporation ("UNS Energy"). Tucson Electric and UNS Energy are each incorporated in Arizona and have no publicly traded stocks; Tucson Electric

does have publicly traded debt. UNS Energy is a direct, wholly-owned subsidiary of FortisUS Inc., which is a direct, wholly-owned subsidiary of FortisUS Holdings, Nova Scotia Limited, which is a direct, wholly-owned subsidiary of Fortis Inc. (the ultimate parent company), a Canadian corporation which is publicly traded on the Toronto Stock Exchange and New York Stock Exchange (symbol: FTS).

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ..................................i

    A.   Parties and Amici .......................................................i

    B.   Rulings Under Review .............................................i

    C.   Related Cases ..........................................................i

Corporate Disclosure Statements .................................................. ii

Table of Authorities ..........................................................xi

Glossary .......................................................................... xv

Introduction ....................................................................1

Statutes and Regulations ........................................................4

Statement of Facts ..............................................................4

Summary of Argument ..........................................................4

Argument.......................................................................8

  I.   Petitioners lack standing to challenge FERC's decision not to refund prices at or up to the relevant index price. ...........................8

    A.   Petitioners were not directly harmed by the orders at issue. .9

    B.   Petitioners' claimed risk of future injury is not cognizable or redressable.................................................... 13

  II.  Petitioners' challenge is an impermissible collateral attack on FERC's earlier decision. ..................................................24

  III. Seller-Marketers' sales at or up to the relevant index price were justified. ..........................................................30

    A.   FERC's use of price indices that were calculated in part using sales for which it later ordered refunds was not arbitrary or capricious. ................................................... 31

    B.   FERC adequately considered Petitioners' arguments. ..........37

Conclusion .....................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) ......................................................... 9, 12

*Ameren Servs. Co. v. FERC,*
  893 F.3d 786 (D.C. Cir. 2018) ................................... 30, 36, 40

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ......................................... 19

*Blumenthal v. FERC,*
  552 F.3d 875 (D.C. Cir. 2009) ....................................... 35

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ....................................................... 36

*City of Nephi v. FERC,*
  147 F.3d 929 (D.C. Cir. 1998) ....................................... 27

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ....................................................... 16

*Consumers Energy Co. v. FERC,*
  367 F.3d 915 (D.C. Cir. 2004) ....................................... 31

*Crowley Caribbean Transp., Inc. v. Pena,*
  37 F.3d 671 (D.C. Cir. 1994) ..................................... 14, 16

*Dominion Res., Inc. v. FERC,*
  286 F.3d 586 (D.C. Cir. 2002) ....................................... 25

*El Paso Nat. Gas Co. v. FERC,*
  50 F.3d 23 (D.C. Cir. 1995) ........................................... 17

*Elec. Consumers Res. Council v. FERC,*
  747 F.2d 1511 (D.C. Cir. 1984) ................................. 31, 35

## Cases—continued

*Elec. Priv. Info. Ctr. v. FAA,*
  892 F.3d 1249 (D.C. Cir. 2018) ................................................. 18

*Elizabethtown Gas Co. v. FERC,*
  10 F.3d 866 (D.C. Cir. 1993) ............................................. 33, 37

*Georgia Indus. Grp. v. FERC,*
  137 F.3d 1358 (D.C. Cir. 1998) ............................................... 27

*Haaland v. Brackeen,*
  143 S. Ct. 1609 (2023) ........................................................... 9

*Ineos USA LLC v. FERC,*
  940 F.3d 1326 (D.C. Cir. 2019) ...................................... 5, 10, 12

*Kansas Corp. Comm'n v. FERC,*
  881 F.3d 924 (D.C. Cir. 2018) ................................................ 18

*California ex rel. Lockyer v. FERC,*
  383 F.3d 1006 (9th Cir. 2004) ................................................ 33

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .............................................................. 10

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ............................................................... 9

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1,*
  554 U.S. 527 (2008) .......................................................... 30, 37

*N.Y. Regional Interconnect, Inc. v. FERC,*
  634 F.3d 581 (D.C. Cir. 2011) ................................................ 10

*New England Power Generators Ass'n, Inc. v. FERC,*
  707 F.3d 364 (D.C. Cir. 2013) ...................................... 5, 14, 16

*NRG Power Mktg., LLC v. Maine Pub. Utilities Comm'n,*
  558 U.S. 165 (2010) .............................................................. 37

*Pac. Gas & Elec. Co. v. FERC,*
  533 F.3d 820 (D.C. Cir. 2008) .................. 2, 6, 25, 26, 27, 28, 29

**Cases—continued**

*Panhandle E. Pipe Line Co. v. FERC*,
    613 F.2d 1120 (D.C. Cir. 1979) ................................................. 39

*PNGTS Shipper's Grp. v. FERC*,
    592 F.3d 132 (D.C. Cir. 2010) ...........................................17, 18

*Process Gas Consumers Grp. v. FERC*,
    177 F.3d 995 (D.C. Cir. 1999) ..............................3, 7, 22, 31, 33

*Process Gas Consumers Grp. v. FERC*,
    912 F.2d 511 (D.C. Cir. 1990) ................................................. 25

*Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*,
    422 F. Supp. 2d 75 (D.D.C. 2006) ........................................... 21

*Renal Physicians Ass'n v. U.S. Dep't of Health*
    *& Hum. Servs.*,
    489 F.3d 1267 (D.C. Cir. 2007) .........................6, 20, 21, 22, 23

*S. Co. Servs. v. FERC*,
    416 F.3d 39 (D.C. Cir. 2005) ............................................25, 28

*Sam Rayburn Dam Elec. Coop. v. FPC*,
    515 F.2d 998 (D.C. Cir. 1975) ................................................. 25

*Scenic Am., Inc. v. United States Dep't of Transportation*,
    836 F.3d 42 (D.C. Cir. 2016) ................................................... 21

*Shell Oil Co. v. FERC*,
    47 F.3d 1186 (D.C. Cir. 1995) ..........................................14, 17

*TC Ravenswood, LLC v. FERC*,
    741 F.3d 112 (D.C. Cir. 2013) ................................................. 36

*Tejas Power Corp. v. FERC*,
    908 F.2d 998 (D.C. Cir. 1990) ................................................. 37

*Transcon. Gas Pipe Line Corp. v. FERC*,
    518 F.3d 916 (D.C. Cir. 2008) ............................................7, 36

**Cases—continued**

*Twin Rivers Paper Co. LLC v. SEC*,
   934 F.3d 607 (D.C. Cir. 2019) ...................................................................11

*Union of Concerned Scientists v. United States Dep't of Energy*,
   998 F.3d 926 (D.C. Cir. 2021) ...................................................................16

*United States v. Juv. Male*,
   564 U.S. 932 (2011) ...................................................................................14

*Villages of Chatham & Riverton v. FERC*,
   662 F.2d 23 (D.C. Cir. 1981) .....................................................................29

*W. Area Power Admin. v. FERC*,
   525 F.3d 40 (D.C. Cir. 2008) .....................................................................24

*Williams v. Lew*,
   819 F.3d 466 (D.C. Cir. 2016) ...................................................................18

*Wisconsin Pub. Power, Inc. v. FERC*,
   493 F.3d 239 (D.C. Cir. 2007) ...............................8, 10, 14, 15, 16, 17, 20

**Constitutions and Statutes**

U.S. Const. art. III ..................................................................2, 8, 13, 17, 20

16 U.S.C.
   § 825*l* ...........................................................................................................8
   § 825*l*(a).............................................................................................25, 30
   § 825*l*(b)..........................................................................8, 24, 25, 29, 30

**Administrative Decisions**

*Cal. Indep. Sys. Operator Corp.*,
   172 FERC ¶ 61,262 (2020).........................................................................19

*Price Discovery in Natural Gas and Electric Markets*,
   109 FERC ¶ 61,184 (2004)...................................................................34, 39

**Other Authorities**

California ISO, *The ISO Grid* .......................................................................11

xiv

## GLOSSARY

| | |
|---|---|
| CAISO | California Independent System Operator-Corporation |
| FERC or Commission | Federal Energy Regulatory Commission |
| Guidance Order | *ConocoPhillips Co. et al.*, 175 FERC ¶ 61,226 (2021) |
| MWh | megawatt-hour |
| Rehearing Order | Order Addressing Arguments Raised on Rehearing, *Shell Energy North America (US), L.P.*, 180 FERC ¶ 61,182 (2022) |
| Shell Energy Order | Order on Justification Filings and Directing Refunds, *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61,034 (2022) |
| WECC | Western Electricity Coordinating Council |

## INTRODUCTION

These consolidated cases concern Federal Energy Regulatory Commission orders relating to spot-market wholesale energy sales made in the Western Energy Coordinating Council ("WECC") region during an extreme weather event in the summer of 2020. Because of enormous demand generated by the weather event, these freely negotiated, arms-length transactions were made at sales prices above the so-called "soft cap" applicable in the market, triggering FERC review of those prices.

FERC described several frameworks under which sellers could seek to justify prices above the soft cap, including an index-based framework: sellers could justify their sales prices with reference to index prices relevant to the locations where the sales were made, since such an index price is "representative of the seller's market opportunities at the time of the sale." *ConocoPhillips Company et al.*, 175 FERC ¶ 61,226 at P 20 (2021) ("Guidance Order") (JA261). After reviewing these submissions, FERC required sellers to issue refunds to their contractual counterparties (*i.e.*, the buyers of energy) to the extent the sales price was above the relevant index price. To the extent the sales price was at or up to relevant index price, FERC did not require refunds.

Two sets of petitioners sought judicial review. On one side, Seller-Marketer Petitioners, who were parties to those transactions, contend that

1

FERC should not have ordered them to pay refunds to the counterparties at all. On the other side, the California Public Utilities Commission ("CPUC") and Southern California Edison Company ("SCE") think FERC should have ordered additional refunds. Unlike the Seller-Marketer Petitioners and Intervenors,[1] CPUC and SCE were not parties to the transactions, and neither were CPUC's constituents.

The Court should dismiss or deny the CPUC and SCE petitions. *First*, both petitioners lack Article III standing. They have not suffered injury from FERC's decision not to order additional refunds to the contractual counterparties (none of whom are CPUC or SCE). And the theory of injury they do assert—that FERC *might* utilize the same legal reasoning in future cases in different markets, in which they *might* be harmed—is one this Court has soundly rejected as a legal matter and is too speculative and attenuated to support standing in any event. Even setting those problems aside, CPUC and SCE cannot satisfy the redressability prong, as future sellers could still use other means to justify above-soft-cap sales even if FERC's index-based framework were invalidated.

---

[1] Certain of the Seller-Marketer Intervenors—bp Energy, EPE, PacifiCorp, PNM, Tucson Electric, and Tri-State—are not also Seller-Marketer Petitioners.

2

*Second*, Petitioners' challenges constitute an "impermissible collateral attack" "over which [this Court has] no jurisdiction." *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 825 (D.C. Cir. 2008). FERC adopted the index-based framework Petitioners seek to challenge in an earlier order in these same agency proceedings, and Petitioners failed to seek either rehearing or judicial review of that order. Under this Court's precedents, therefore, their current challenge is improper.

*Third*, Petitioners' challenge fails on the merits. CPUC and SCE cannot overcome the deferential arbitrary-and-capricious standard: FERC's index-based framework ensures that only reliable and geographically appropriate indices are used, achieving FERC's goal of verifying whether spot sales are representative of market prices. And if they are, those sales prices are justified, because market prices are inherently reasonable in the absence of market power. *See, e.g.*, *Process Gas Consumers Grp. v. FERC*, 177 F.3d 995, 1003 (D.C. Cir. 1999). As no market power has been alleged (let alone proven) here, FERC reasonably found that prices at or up to the relevant index price were justified. And the agency also adequately responded to arguments raising these same points in the proceedings below.

At bottom, CPUC and SCE's demand that prices above the soft price cap be excluded from the calculation of index prices would eviscerate the index-based framework and convert the soft price cap into a hard one. That

approach would preclude justification of market-based sales during extreme weather conditions, when prices are reasonably driven higher by supply and demand. And it would destabilize the WECC spot market because it would effectively eliminate the most rational and natural justification for market-based sales made during periods of system stress, creating market uncertainty that could take years for FERC to resolve. Petitioners thus seek to establish an unprecedented presumption that competitive market prices are unreasonable. But artificial constraints controlling prices up to the competitive level are antithetical to innovation, are commercially destabilizing, and ultimately harm consumers. CPUC and SCE's petitions should be dismissed or denied.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Initial Brief of Petitioners California Public Utilities Commission & Southern California Edison Company.

## STATEMENT OF FACTS

Seller-Marketer Intervenors incorporate the Statement of Facts contained in the Joint Brief for Seller-Marketer Petitioners.

## SUMMARY OF ARGUMENT

The petitions by CPUC and SCE fail multiple times over, on both jurisdictional and substantive grounds: Petitioners lack standing; their

4

petitions are an impermissible collateral attack on earlier FERC orders; and FERC's decision not to order additional refunds was not arbitrary and capricious.

**I.** Petitioners lack standing to challenge FERC's decision because they failed to demonstrate a cognizable injury-in-fact or an injury that is likely to be redressed.

**A.** Petitioners were not counterparties to any of the transactions at issue and therefore would not benefit from any additional refunds. Because they are not the "object[s] of the government action" in question, standing is "'substantially more difficult' to establish" (*Ineos USA LLC v. FERC,* 940 F.3d 1326, 1329 (D.C. Cir. 2019))—particularly as they lack any direct monetary injury.

**B.** Nor are Petitioners' alleged future injuries cognizable or redressable. *First*, Petitioners claim potential future injury from FERC's legal rationale, not the actual action taken by the agency in refusing to order additional refunds—but "neither a FERC decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact." *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013). *Second*, the alleged injuries are highly speculative and not imminent. Petitioners offer

5

no concrete allegations explaining when the alleged risk of harms arises or how much it will cost. *Third*, even if Petitioners' alleged injuries were cognizable, they would not be redressable: Even if Petitioners were to prevail on the merits, Seller-Marketers could still sell electricity above the soft price cap in equivalent conditions; they would simply seek to justify those sales "through other methods" apart from the index-based framework. *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1270 (D.C. Cir. 2007).

**II.** Petitioners are also barred from challenging the index-based framework because they failed to challenge the Guidance Order announcing that framework when it was issued in June 2021, or to seek judicial review of that order. Petitioners had clear notice at that time of the index-based approach that they attempt to challenge in the current petitions. That makes their petitions challenging the refund orders, issued beginning on April 22, 2022, an "impermissible collateral attack" on the earlier Guidance Order "over which [this Court has] no jurisdiction." *Pac. Gas & Elec. Co.*, 533 F.3d 820, 825 (D.C. Cir. 2008).

**III.** As argued in the Joint Brief for Seller-Marketer Petitioners, on the merits, the Court should conclude that the freely negotiated sale prices at issue were just and reasonable under the *Mobile-Sierra* doctrine—so FERC erred in ordering any refunds. Such a holding would obviate the need

6

to decide the questions CPUC and SCE's petitions present, even if they have standing. Regardless, FERC's decision to find sales at prices at or up to the relevant index price justified was not arbitrary and capricious.

**A.** Competitive market rates are presumptively reasonable (*see, e.g.*, *Process Gas Consumers Grp. v. FERC*, 177 F.3d 995, 1003 (D.C. Cir. 1999)), and FERC's index-based framework successfully allows sellers to use a reliable index as a proxy for market rates. There is no allegation (much less proof) that the markets here were not competitive or that the indices were manipulated. FERC's approval of Seller-Marketers' use of indices was therefore reasonable. Petitioners' central "circularity" argument misses the point: Index prices are reflective of the market opportunities available to sellers regardless of whether the prices constituting the index are subject to automatic review for being above the soft cap. Indeed, if Petitioners are right, no above-soft-cap price could *ever* be justified by reference to an index price.

**B.** FERC also provided a reasoned explanation in response to Petitioners' objections. The APA requires that the agency's logical "path may reasonably be discerned" (*Transcon. Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 922 (D.C. Cir. 2008)), and that standard is easily met here. FERC explained that sales subject to justification are not presumptively unreasonable if they are at market rates. And excluding such sales from the

7

calculation of an index price would thwart efforts to approximate market rates. Additionally, FERC explained that it selected the factors used by the index-based framework, including a 90-day window for measuring liquidity, to ensure that indices used were reliable. FERC was not required to consider liquidity levels on the day of a given sale because that would not address whether the index was reliable generally.

Accordingly, the petitions should be dismissed or denied.

## ARGUMENT

## I.    Petitioners lack standing to challenge FERC's decision not to refund prices at or up to the relevant index price.

Petitioners cannot show that they have Article III standing to challenge the refund orders. The Court therefore lacks both constitutional and statutory jurisdiction. *See* 16 U.S.C. § 825*l*(b) (judicial review available only to an "aggrieved" "party"); *Wisconsin Pub. Power, Inc. v. FERC*, 493 F.3d 239, 267, 269 (D.C. Cir. 2007) (per curiam) (dismissing petitions for review because petitioners could not "satisfy either Article III's standing requirements, or 16 U.S.C. § 825*l*'s requirement that a party seeking review of a FERC order be 'aggrieved' by that order.").

Petitioners fail to demonstrate standing for three reasons. First, FERC's decision not to order additional refunds did not injure Petitioners. Neither they nor any California ratepayer were counterparties to any

transactions at issue. They would not directly benefit from any refunds. Nor do SCE or CPUC show that additional refunds to the counterparties would indirectly flow, in whole or in part, to them. Second, the alleged future injuries—that FERC's reasoning may lead to a diversion of energy sales from the California Independent System Operator ("CAISO") market to the bilateral WECC spot market and higher energy prices in California—are not cognizable because they follow from FERC's legal rationale and are far too speculative to satisfy constitutional standards. Third, a favorable ruling would not redress any alleged injuries because Petitioners have not shown that invalidating the index-based framework would prevent market participants from justifying sales priced above the soft cap under other methodologies, including other frameworks outlined in the Guidance Order.

### A.  Petitioners were not directly harmed by the orders at issue.

To begin, Petitioners—a California regulatory agency and a California utility—suffered no harm from FERC's decision not to order additional refunds be paid to counterparties under transactions to which they and CPUC's constituents were not parties.[2]

---

[2]  CPUC cannot stand in the shoes of California citizens in order to demonstrate standing. *See* Pet'rs' Br. 22 (claiming CPUC "represents itself and the people of the State of California" and alleging "Californians are aggrieved").

**1.** A constitutional injury must be "concrete," "particularized," and "actual or imminent." *Wisconsin Pub. Power*, 493 F.3d at 267. Petitioners' stakes in the refund proceedings fail to satisfy these classic injury-in-fact requirements. Indeed, "[w]hen the plaintiff is not … the object of the government action or inaction [the plaintiff] challenges," standing is "'substantially more difficult' to establish." *Ineos USA LLC v. FERC,* 940 F.3d 1326, 1329 (D.C. Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)); *cf., e.g.*, *N.Y. Regional Interconnect, Inc. v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011) ("[A] party does not acquire such a 'direct stake in a litigation' simply by participating in the antecedent administrative proceedings whence the litigation arises.").

CPUC and SCE do not contend that they suffered concrete, particularized, and actual (or imminent) *monetary* harm from FERC's failure to order refunds to third parties. Pet'rs' Br. 21-25. Nor could they. *See*

---

It is black-letter law that "a State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)); *see Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923). And even if CPUC could act in a *parens patriae* capacity, it cannot show that its constituents—California consumers—suffered a cognizable or redressable injury because there is no allegation, much less any evidentiary showing, that any of the purchasers serve California consumers or that any of the power purchased was ultimately resold to California consumers. *See infra*, pages 11-12.

10

*Wisconsin Pub. Power*, 493 F.3d at 267-268 (where FERC's orders assessed charges on certain power providers, but not on the purchasers transacting with them, the orders "therefore d[id] not inflict any injury" on the purchasers).

**2.** Moreover, Petitioners offer no evidence that either SCE or the Californians allegedly represented by CPUC would receive refunds, directly or indirectly. California consumers did not pay the prices at issue; wholesale energy buyers operating in the many other states that comprise the non-CAISO WECC market did.[3] Petitioners have not even alleged, much less made an evidentiary showing, that additional refunds to those counterparties would have to be shared—through some (unspecified) chain of events—

---

[3]    These states include (among others) Arizona, Colorado, Idaho, Nevada, Oregon, Utah, and Washington. Although WECC encompasses the CAISO market, here, as in the refund orders, "WECC" refers to the non-CAISO part of the wholesale spot market in the United States portion of the Western Interconnection. Shell Energy Order P 1 n.1 (JA584). "[T]he WECC soft price cap applies to spot market sales in the WECC outside of CAISO." *Id.* P 37 (JA597). Buyers in the many states constituting the WECC market may buy power at freely negotiated prices and are not under California's jurisdiction. CAISO, meanwhile, encompasses 80 percent of California and some of Nevada. CAISO, *The ISO Grid*, perma.cc/52G7-H4KU. Nearly all the balancing authorities and transmission operators managing the remaining portions of California's wholesale electricity grid have their own tariffs and price caps, and none of the transactions at issue occurred in any of those markets.

with either SCE or any Californian.[4] Indeed, Petitioners do not claim (or show) that any of the purchasers under the transactions at issue serves California consumers or that any of the power purchased was ultimately resold to California consumers. Thus, even if CPUC could invoke *parens patriae* standing to protect the interests of Californian consumers in a case against a federal agency (it cannot, *see supra*, page 9 n.1), CPUC exceeds any authority granted by that doctrine in seeking to act on behalf of the populations of Arizona, Colorado, Nevada, Utah, and the many other western states within the WECC market that are outside California's border. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) ("[T]he State must articulate an interest apart from the interests of particular private parties.").

At bottom, unlike the Seller-Marketers or the counterparties to the transactions at issue, Petitioners are not themselves "the object of the government action" and are unable to satisfy the "substantially more difficult"

---

[4]   It is too late for petitioners to make this—or any other—showing relevant to standing. *See Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (on review of agency decision, petitioner "must either identify in [the administrative] record evidence sufficient to support its standing to seek review or … submit additional evidence to the court of appeals," and it "must make this evidentiary presentation no later than when it files the opening brief").

threshold for standing faced by entities in that position. *Ineos*, 940 F.3d at 1329.

> **B.    Petitioners' claimed risk of future injury is not cognizable or redressable.**

Unable to demonstrate standing based on the counterparties' injuries, CPUC and SCE assert that FERC's index-based framework may affect pricing and sales in the CAISO market in the future. But this theory fails for three reasons. *First*, the alleged injuries flow from FERC's legal rationale, rather than from the actual effect of the challenged orders, and are therefore not cognizable under Article III. *Second*, the alleged injuries are highly speculative and rely on extended chains of contingencies. And *third*, it is similarly speculative that rejection of FERC's index-based framework would redress the alleged injuries, because market participants will continue to make sales above the soft-cap that they may justify through other methods.

> **1.    The alleged risk of future injury flows from FERC's legal rationale rather than the refund orders, and it is therefore not a cognizable injury-in-fact.**

Petitioners' claims of injury—that the "outcome of this proceeding … may have a direct impact on the future function of the western markets," which "may also" affect prices paid by Californians in the CAISO market (Pet'rs' Br. 21, 24)—are rooted in "[h]ow FERC rules on justification filings,"

specifically, FERC's allegedly "unreasoned application of its index-based methodology" (Pet'rs' Br. 23-24). That is, Petitioners do not allege injury from what FERC *did*—it found that Seller-Marketers have "justified sales … up to the amount of the [relevant] index price" and directed them to "issue refunds for those sales above the average index price." Shell Energy Order P 1 (JA584). Instead, Petitioners ground their theory of injury in *why* FERC did it. But such injuries are not cognizable under Article III.

This Court has explained that "neither a FERC decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact." *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013); *see also Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 674 (D.C. Cir. 1994) (a litigant's "interest in [an agency's] legal reasoning and its potential precedential effect does not by itself confer standing where, as here, it is 'uncoupled' from any injury in fact caused by the substance of the [agency's] adjudicatory action").

Thus, an alleged "risk of injury" that "flows from the legal rationale" expressed in a FERC order cannot support standing. *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1201 (D.C. Cir. 1995). Even if a reversal would result in a "useful precedent" for Petitioners, "this possible, indirect benefit in a future lawsuit" cannot make their claims justiciable (*United States v. Juv. Male*,

14

564 U.S. 932, 937 (2011)), "no matter how foreseeable the future litigation" (*Wisconsin Pub. Power*, 493 F.3d at 268).

*Wisconsin Public Power* is illustrative. There, a group of utilities that purchased power from providers at grandfathered rates challenged FERC's decision to charge the providers—not the purchasers—to recover administrative costs. 493 F.3d at 267. The Court agreed with intervenors that the orders "do not inflict any injury" on the purchasers because the charges were assessed only on the providers. *Id.* at 268. Undeterred, the purchasers asserted a potential future injury that "charges from [the] providers" would "pass-through … to customers like themselves," based on FERC's determination that "both [grandfathered] providers *and* [grandfathered] customers" benefited from the new market rules paid for by the challenged administrative costs. *Id.* at 267-268. But this was "insufficient to establish standing," this Court held, even on the assumption that "FERC's reasoning … would govern subsequent proceedings on a pass-through." *Id.* at 268.

Similarly, because FERC's decision here not to issue additional refunds to the counterparties "d[id] not inflict any injury" on the non-counterparty Petitioners, they are left alleging hypothetical future injuries. 493 F.3d at 268. But those do not confer standing because FERC's "legal reasoning and its potential precedential effect does not by itself confer standing." *Id.*

15

Petitioners' theory of standing entirely depends on the precedential value of FERC's rationale in upholding the index-based framework, rendering that theory defective under *Wisconsin Public Power*. In the "Standing" section of their brief, Petitioners state that "[FERC's] decisions in all … of these cost justification proceedings concerning sales over the WECC soft offer cap will establish *important future precedent* and market expectations in bilateral markets throughout the WECC and the CAISO's organized day-ahead and real-time energy markets." Pet'rs' Br. 24 (quoting 2020 DMM Comments, Appx. A., R.13 at 1-2 (JA221-222)) (emphasis added). They further assert that "FERC's implementation of the index framework" in the WECC market "could serve to validate higher cost imports into the CAISO" market because CAISO uses price indices to determine its import bid cap. Pet'rs' Br. 24-25.

But under this Court's precedent, "even if … FERC's reasoning in the orders under review would govern subsequent proceedings," such as CAISO bid cap proceedings, "this sort of 'injury' is insufficient to establish standing." *Wisconsin Pub. Power*, 493 F.3d at 268; *see also New England Power Generators Ass'n*, 707 F.3d at 369 ("[N]either a FERC decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact."); *Crowley Caribbean Transp.*, 37 F.3d at 674.

16

## 2. The alleged risk of future injury is too speculative to demonstrate a cognizable or redressable injury.

Even setting aside this fatal defect—that Petitioners' alleged future injuries are not cognizable because they flow from FERC's legal rationale—the injuries alleged are far too speculative and remote in any event. A future harm "must be certainly impending to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Union of Concerned Scientists v. United States Dep't of Energy*, 998 F.3d 926, 929 (D.C. Cir. 2021) (allegation of "possible future injury … implicates the imminence requirement"); *Wisconsin Public Power*, 493 F.3d at 267 (injury must be "not conjectural or hypothetical").

This Court has repeatedly rejected claims of standing when the alleged future injuries were speculative. *See, e.g.*, *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 26 (D.C. Cir. 1995) (allegations that a regulation "might harm [petitioner] in the future" could not show injury where petitioners "fail[ed] even to argue that injury from such potential prejudicial treatment has occurred or is in any way imminent"); *PNGTS Shipper's Grp. v. FERC*, 592 F.3d 132, 137 (D.C. Cir. 2010) ("The potential for 'future economic injury,' even assuming it is 'readily quantifiable' … , is not enough to show the requisite injury for Article III standing.").

17

In *Shell Oil*, for example, the petitioner's "allegations of injury rest[ed] on a hypothetical scenario whereby" capacity sellers "at some point in the future exact excessive … rates, and [] the Commission denies the protection of the [Interstate Commerce Act]." 47 F.3d at 1202. The court held that "[a]lthough such injury is not inconceivable, we are unpersuaded that it is imminent, as it must be under traditional standing analysis." *Id*.

Speculation similarly permeates Petitioners' standing argument. SCE attempts to show injury by claiming the proceeding "may" impact the future function of the western markets and "in turn" impact the "prices paid by SCE's customers." Pet'rs' Br. 21. And CPUC claims that FERC's implementation of the index-based framework "may" result in Californians paying more for imported electricity and "could serve" to validate higher-cost imports. Pet'rs' Br. 24-25. Petitioners offer conjecture that prices above $1,000/MWh outside the CAISO market "may have led" to CAISO's inability to purchase energy in its own market and "may have prevented" load within CAISO from accessing power through bids in the CAISO market. Pet'rs' Br. 23 (quoting SCE Protest, Appx. A., R.15, at 2 (JA242)); *see also* Pet'rs' Br. 22 ("[A] price cap in one market below that of the other *can* cause distortionary effects") (emphasis added). Petitioners do not explain if or when these possibilities would occur, nor do they provide a "readily quantifiable" amount of damages—yet even that would not overcome the lack of

18

imminence. *See PNGTS*, 592 F.3d at 137. In sum, Petitioners' theory "stacks speculation upon hypothetical upon speculation, which does not establish an actual or imminent injury." *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 931 (D.C. Cir. 2018).

Further weakening Petitioners' claims, "any future injury that [Petitioners] might suffer follows from an extended chain of contingencies." *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016); *see also Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (holding injury "too speculative" because the "highly attenuated chain of causation … dooms any attempt to establish probabilistic standing").

For example, Petitioners cite potential dangers that occur "[w]hen the bid caps are not harmonized," namely, "a price cap in one market below that of the other can cause distortionary effects." Pet'rs' Br. 22. But FERC's orders did not modify the soft price cap applicable outside CAISO, which, as discussed in Seller-Marketer Petitioners' opening brief, has remained at $1,000/MWh notwithstanding increases in the CAISO caps. *See* Seller-Marketer Pet'rs' Br. 10-11. CAISO now has an offer cap of $2,000/MWh—*twice* the soft price cap in the WECC market. *See Cal. Indep. Sys. Operator Corp.*, 172 FERC ¶ 61,262, P 47 (2020). Petitioners' claim that the justification findings may funnel sales "into the WECC rather than the CAISO market" (Pet'rs' Br. 24) gets it backwards; if anything, the now higher offer cap in

19

the CAISO market would draw sales out of the WECC and into California, and it can only *benefit* California's consumers to the detriment of WECC buyers and consumers. In any event, Petitioners have not shown a likelihood that the challenged orders will cause further disharmony or distortion, or that the existing distortion due to the mismatch in price caps harms Petitioners. *See Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) ("[W]e may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)."). Insofar as Petitioners' claims of future injury depend on remedying the existing mismatch in offer caps, those claims cannot be redressed by a favorable decision.

### 3. Petitioners' alleged injuries are not redressable because sellers may justify sales above the soft price cap using methods other than the index-based framework.

Finally, invalidating the index-based framework would not redress Petitioners' injuries because Seller-Marketers and others could still make sales at prices above the soft cap and could justify their sales "through other methods." *Renal Physicians Ass'n*, 489 F.3d at 1270; *see also Wisconsin Pub. Power*, 493 F.3d at 267 (Article III standing requires that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

20

In *Renal Physicians Ass'n*, the Centers for Medicare & Medicaid Services ("CMS") issued a rulemaking that "offer[ed] two methods for showing that a physician's hourly rate is at fair market value," thereby permitting the physician to make patient referrals without violating federal law. The rule was not exclusive; CMS emphasized that providers may "establish fair market value through other methods." 489 F.3d at 1270. A physicians association challenged the rulemaking on behalf of its members, alleging that the rule would harm physicians because facilities would limit their compensation to comply with the two safe harbor methods. *Id.* at 1271.

This Court held that the alleged injuries were not redressable because there was no showing that facilities would alter their compensation if the methods were invalidated, given the availability of other methods. *Renal Physicians*, 489 F.3d at 1276. In essence, CMS's rule "identified two 'presumptively reasonable' methods of proof, without restricting parties from relying on other methods of proof." *Id.* at 1272 (quoting *Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*, 422 F. Supp. 2d 75, 84 (D.D.C. 2006)). Thus, "[b]ecause the safe harbor was merely one way that hospitals could determine 'fair market value,' [the Court] noted [in *Renal Physicians*] that 'it is "speculative," rather than "likely," that invalidating the safe harbor will somehow cause these facilities to pay more.'" *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 52 (D.C. Cir. 2016)

21

(relying on *Renal Physicians* to hold that vacating a guidance order under which the government could "find certain billboards permissible" would not redress the plaintiff's injury where the government could "find those billboards permissible for other reasons as well").

Similarly here, Petitioners have not shown that, if the index-based framework were invalidated, Seller-Marketers would cease making sales (or that buyers would cease making purchases) above the soft price cap and up to the relevant index price during extreme heat events. That is because Seller-Marketers may justify those sales using other methods: Like CMS in *Renal Physicians*, FERC did not "restrict[] parties from relying on other methods of proof." 489 F.3d at 1272. In addition to the index-based framework, the Guidance Order provided a production cost-based framework and an opportunity cost-based framework for justifying sales. *See* Guidance Order P 13 (JA258). FERC further emphasized that it did "not intend to preclude sellers from seeking to justify their transactions under approaches different from the ones identified" in the Guidance Order. *Id.* P 13 (JA258); *see id.* P 2 (Danly, Commissioner, concurring) ("[T]he Commission is not dictating that *only* these three frameworks will be acceptable.") (JA265).

Indeed, when extreme weather raises prices, Seller-Marketers will have good reason to make (and seek justification for) sales up to the relevant index price: Index prices are market-based, and "[i]f the market is not a

22

monopolistic one, market-based prices are presumed to be proper." *Process Gas Consumers Grp. v. FERC*, 177 F.3d 995, 1003 (D.C. Cir. 1999); Shell Justification Filing, Appx. A., R.1 8 n.29  ("[I]ndex prices are … reasonable proxies for the cost of traded products and the replacement cost that sellers may face at certain trading locations.") (JA168). Even if a different method is used, such prices would likely be justified.

In fact, prior to the Guidance Order that supplied the three justification frameworks, Seller-Marketers submitted justification filings for the same sales at issue. The CAISO DMM observed, "all of the filings for sales above the soft cap in August 2020 appear to be based on non-generator *costs*." DMM Comments at 2 (emphasis added) (JA222). It does not follow that pricing would change if the index-based framework were invalidated, especially given that Seller-Marketers had previously pursued cost-based methods of justification for the same sales.

"Thus, it is 'speculative,' rather than 'likely,'" that invalidating the index-based framework would redress any injury. *Renal Physicians*, 489 F.3d at 1277. Petitioners have not carried their burden.

23

## II.    Petitioners' challenge is an impermissible collateral attack on FERC's earlier decision.

Petitioners also forfeited any challenge to FERC's index-based reasoning by failing to seek rehearing of the June 2021 Guidance Order, which first set out that reasoning. *See* Guidance Order (JA260-262).

When the spot market sales at issue were made in the summer of 2020, FERC had not yet issued any decision explaining how parties may demonstrate that sales above the soft price cap were justified. Seller-Marketers' justification proceedings were pending when FERC finally issued the Guidance Order in June 2021, establishing three non-exclusive frameworks for demonstrating justification: "(1) a production cost-based framework; (2) an index-based framework; and (3) an opportunity cost-based framework." Guidance Order P 1 (JA253). The order provided that prices are justified under the index-based framework if the seller shows that "the selected price index [is] representative of the seller's market opportunities at the time of the sale." *Id.* P 20 (JA261). It also adopted the "90-day review period" as the window for evaluating index liquidity and required sufficient information to evaluate how a seller's "sales contributed to index formation," noting that indications of market manipulation could be referred for enforcement. *Id.* PP 24-25 (JA262).

24

Despite having intervened in the proceedings, Petitioners never sought rehearing or judicial review of the Guidance Order. Instead, they waited until after FERC issued the first of its justification and refund orders on April 22, 2022, to challenge the index-based framework. As a result, their current petitions—which seek review of the orders issued on and after April 22—amount to collateral attacks on the Guidance Order because they challenge core features of the index-based framework FERC established in the Guidance Order issued 10 months earlier.

"In order for petitioners to preserve their rights to judicial review under 16 U.S.C. § 825*l*(b), they must file a request for rehearing of a challenged order with FERC 'unless there is reasonable ground for failure so to do.'" *W. Area Power Admin. v. FERC*, 525 F.3d 40, 52 (D.C. Cir. 2008); *see Process Gas Consumers Grp. v. FERC*, 912 F.2d 511, 512 (D.C. Cir. 1990) (petitioner was jurisdictionally barred for failure to "petition for rehearing before FERC on the issues it seeks to press before this court"). Petitioners are given thirty days to seek rehearing, and sixty days after denial of rehearing to seek judicial review. *Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589 (D.C. Cir. 2002); 16 U.S.C. § 825*l*(a)-(b). "With few exceptions, a challenge made outside of the statutory period is a collateral attack over which [this Court] ha[s] no jurisdiction." *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 825 (D.C. Cir. 2008).

25

Aggrieved parties thus have the responsibility to challenge an order within the statutory timeline as soon as the "agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content." *S. Co. Servs. v. FERC*, 416 F.3d 39, 44-45 (D.C. Cir. 2005). In other words, a party "must object 'as soon as it could reasonably have become aware of the import' of the order." *Id.* (quoting *Sam Rayburn Dam Elec. Coop. v. FPC*, 515 F.2d 998, 1007 (D.C. Cir. 1975)).[5]

In *Pacific Gas & Electric*, this Court rejected a challenge as "an impermissible collateral attack on [an] earlier" series of orders under circumstances remarkably similar to those here. 533 F.3d at 827. In those orders, FERC had required that standardized large generator interconnection procedures address interconnection studies, studies conducted before generators are connected to the transmission grid. *Id.* at 823. FERC "ruled that, as part of the *pro forma* interconnection procedures, 'Interconnection Studies [are] to be performed by, or at the direction of, the Transmission Provider.'" *Id.* at 825. Subsequent orders reiterated the rule. *Id.* The petitioner did not seek judicial review. Instead, it later submitted a compliance filing proposing that—contrary to FERC's rule—each affected transmission

---

[5]    Courts recognize an exception that, "if the challenged order 'revised' the prior order, then it can be reviewed," but "if it is a mere 'clarification,' then it cannot." *S. Co. Servs.*, 416 F.3d at 44.

owner would conduct the studies in its own service territory rather than the transmission provider.[6] *Id.* at 824. FERC rejected the proposal.

On appeal, the Court held that it lacked jurisdiction. The court reasoned that the "plain language" of the original orders "announced the requirement" that the Transmission Provider must conduct the studies, placing the petitioner on notice. *Pacific Gas & Electric*, 533 F.3d at 825. Because the petitioner had failed to object to those orders despite having notice, the new challenge was "a time-barred collateral attack." *Id.* at 825; *see also City of Nephi v. FERC*, 147 F.3d 929, 931 (D.C. Cir. 1998) (arguments against framework set out in prior order approving tariff revisions constituted "an impermissible collateral attack"); *Georgia Indus. Grp. v. FERC*, 137 F.3d 1358, 1363-1364 (D.C. Cir. 1998) (same).

The Court should similarly reject Petitioners' arguments in this case because Petitioners did not raise them until they sought rehearing in mid-2022 of FERC's orders on the justification filings—almost one year after the June 2021 Guidance Order. The Guidance Order declared that "a seller's

---

[6]   A transmission owner is an owner of transmission facilities that has turned functional control of its transmission facilities over to an independent system operator, like CAISO. *Pacific Gas & Electric*, 533 F.3d at 823-824. A transmission provider may be an entity, like CAISO, that operates the transmission grid in a region on behalf of multiple transmission owners. *Id.* at 822-823.

reference to an appropriate price index could be sufficient to justify sales above the [] $1,000/MWh WECC soft price cap," and it prescribed the 90-day liquidity measure to which Petitioners object. Guidance Order, P 21, 24 (JA261-262). The Guidance Order also did not disqualify indices whose prices were contributed to by sales above the soft cap. To the contrary, it created a mechanism for FERC to "evaluate how a particular seller's sales contributed to index formation," drawing the line at circumstances where "a seller may be intentionally attempting to influence the index price in a manner that could constitute manipulation of that index." *Id.* P 25 (JA262). If that is the case, then FERC "may refer the matter to the Office of Enforcement." *Id.*

FERC thus "announced the requirement[s]" for satisfying the index-based framework in June 2021—including the requirements to show a sale price was "representative of … market opportunities" and to demonstrate liquidity using the 90-day window. *Pacific Gas & Electric*, 533 F.3d at 825. Petitioners were parties to the proceedings in which that order was issued, and SCE even referenced the Guidance Order in its protest filed two months later. SCE Protest 2 (JA425). They now disagree with that framework by claiming that prices which indisputably represented market opportunities should not be accounted for and insisting that a one-day window should be used to demonstrate liquidity. Pet'rs' Br. 44-49, 60-64. But neither

28

Petitioner sought rehearing or judicial review of the Guidance Order that determined those issues. Petitioners had a responsibility to "object 'as soon as [they] could reasonably have become aware of the import' of the order." *S. Co. Servs*, 416 F.3d at 44-45. And because the subsequent refund orders and rehearing orders that were issued beginning in spring of 2022 did not "revise[]" the index-based framework that was announced in June 2021, they do not provide Petitioners with a fresh opportunity for judicial review. *Id.* Instead, their challenge is "an impermissible collateral attack" on the Guidance Order, depriving the Court of jurisdiction. *Pacific Gas & Electric*, 533 F.3d at 827.

To be sure, Petitioners may attempt to argue that they could not have challenged the Guidance Order on the theory that it was a nonbinding statement of FERC's future intentions. But if that were correct, the same principle would require dismissal of these petitions. As described above, Petitioners are not harmed directly by the challenged orders. The only conceivable harms would arise from the application of the same reasoning in other, future situations—but the same is true of the Guidance Order. If petitioners have standing to challenge the orders here, then they could have challenged the Guidance Order on the same basis. The failure to do so renders the current action an impermissible collateral attack. *Pacific Gas & Electric*, 533 F.3d at 827.

29

Petitioners' reliance on *Villages of Chatham & Riverton v. FERC*, 662 F.2d 23, 30 (D.C. Cir. 1981), is misplaced. Pet'rs' Br. 51. In describing the prerequisites to appellate review under 16 U.S.C. § 825*l*(b), the Court did observe that an argument is judicially reviewable even if it was brought "as late as that party's petition for rehearing." *Villages of Chatham & Riverton*, 662 F. 2d at 30. But that presupposed a *timely* petition for rehearing. Here, Petitioners failed to challenge the Guidance Order "within thirty days" as required by § 825*l*(a).[7]

## III. Seller-Marketers' sales at or up to the relevant index price were justified.

On the merits, FERC reasonably concluded that sales at or up to the relevant index prices were justified. As an initial matter, as Seller-Marketer Petitioners' brief explains, *all* prices at issue in the agency proceedings were just and reasonable under the *Mobile-Sierra* doctrine. Seller-Marketer Pet'rs' Br. 24-27. Each sale was agreed upon through bilateral contracts between sophisticated parties, and there was no showing that the prices

---

[7]    Petitioners also make specific arguments that are foreclosed because they were not raised on rehearing. 16 U.S.C. § 825*l*(b). As FERC explains, it was not pressed below that FERC should have analyzed Electric Quarterly Reports. Resp. Br. 43-44; Pet'rs' Br. 53-60. Yet "Petitioners must raise each argument with 'specificity,'" and "objections may not be preserved either 'indirectly,' or 'implicitly.'" *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018).

"seriously harm[] the public interest," nor could there be. *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530, 548 (2008). Therefore, the petitioners cannot overcome the presumption "that the rate set out in a freely negotiated wholesale-energy contract" is just and reasonable. *Id.* at 530.

Regardless, FERC did not act arbitrarily or capriciously in finding that sales at or up to market-representative rates, as measured by reliable and geographically relevant indices, were just and reasonable.

### A. FERC's use of price indices that were calculated in part using sales for which it later ordered refunds was not arbitrary or capricious.

**1.** FERC reasonably endorsed an approach to justification based on index prices that represent the relevant market. "Congress clearly intended to allow the Commission broad discretion in regard to the methodology of testing the reasonableness of rates." *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1520 (D.C. Cir. 1984). And "[i]n competitive markets, 'FERC may rely upon market-based prices in lieu of cost-of-service regulation to assure a 'just and reasonable' result." *Consumers Energy Co. v. FERC*, 367 F.3d 915, 922-23 (D.C. Cir. 2004). In other words, "[i]f the market is not a monopolistic one, market-based prices are presumed to be proper." *Process Gas Consumers Grp.,* 177 F.3d at 1003.

31

The index-based framework is designed to provide market infor-mation relating to a particular location and timeframe to demonstrate that a sale was "representative of the seller's market opportunities at the time of the sale." Guidance Order P 20 (JA261). And the liquidity standards are designed to "determine whether the hub is a reliable measure of the market forces of supply and demand in the area." Rehearing Order P 34 (JA1209). The index-based framework achieved these goals with respect to the sales at issue. And, critically, there is no allegation here—or proof—of market power or market manipulation. Therefore, at a minimum, prices at or up to the relevant index prices were just and reasonable, and FERC's orders were not arbitrary and capricious in refusing to require refunds of those sales.

**2.** In assailing this conclusion, Petitioners argue that FERC should rely on index prices that are *not* representative of the market during ex-treme weather events and other high-demand periods. They assert that the index-based framework suffers a problem of "circular logic" because "the transactions comprising the indices that exceeded the $1,000/MWh WECC Soft Price Cap" had not been determined to be just and reasonable, and that FERC should have "realized that many of the sales included in the indices were simultaneously pending FERC's review for justness and reasonable-ness." Pet'rs' Br. 27.

32

Petitioners misunderstand the purpose of the index-based framework, and it is that misunderstanding, not the framework, that gives rise to the circularity. Their argument also disregards the inherent reasonableness of competitive market pricing more broadly. It is irrelevant whether some of the prices contributing to an index were for sales subject to just-and-reasonable review; what matters is that those sales *were* transactions that occurred in the marketplace at the relevant time and between sophisticated parties, and that are therefore "representative of the seller's market opportunities." Guidance Order P 20 (JA261). Even if a spike in demand drives prices up such that *all* sales in a time window are above the soft cap, those prices should not be excluded from index calculation because they collectively establish the "market-based prices," which are "presumed to be proper." *Process Gas Consumers*, 177 F.3d at 1003. Indeed, that extreme demand will result in high prices is an entirely predictable result of market-based pricing. Petitioners' demand amounts to a denial of this Court's holding that "FERC may rely upon market-based prices … to assure a 'just and reasonable' result." *Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 870 (D.C. Cir. 1993).

Granted, if there were any evidence of "manipulation," that would undercut the presumptive reasonableness of market-based rates. *See California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1014 (9th Cir. 2004). But FERC

33

did not find (and Petitioners offer no evidence) that any manipulation of index prices had taken place, or that any Seller-Marketer exercises market power. In fact, Petitioners disavowed manipulation when discussing two sellers in particular. *See* Pet'rs' Br. 57 ("Petitioners are not alleging that Mercuria or Brookfield acted intentionally or improperly to influence the prices of the indices."). Additionally, the indices relied on are reviewed and checked to prevent manipulation, *see Price Discovery in Natural Gas & Elec. Markets*, 109 FERC ¶ 61,184 at PP 53-54, and the Guidance Order threatens enforcement proceedings upon any indication that market participants "may be intentionally attempting to influence the index price," Guidance Order P 25 (JA262).[8]

**3.** Petitioners also overlook a serious flaw with their proposed alternative to FERC's index-based framework. If Petitioners are correct that "most transactions comprising the indices were also undergoing reasonableness review," Pet'rs' Br. 35, then the exclusion of such prices would dramatically skew the index price downward. Index prices would not be representative of the market, and worse, excluding these prices would prevent the index-based framework from *ever* showing that a price above the higher of the

---

[8] Given the lack of market manipulation, Petitioners' insistence that FERC evaluate the "collective contribution" of the sellers' transactions to the indices is inappropriate. *E.g.*, Pet'rs' Br. 36.

soft price cap or the lowest price in the index range was justified. That is, because prices above the WECC soft price cap are *automatically* subject to justification (indeed, that is the point of a soft cap), excluding prices above an index that would meet Petitioners' standard would necessarily involve an iterative process whereby any price above the average index price would need to be excluded until one hits the soft cap or the lowest transaction price in the range.[9] The resulting index would utterly fail to represent the seller's actual market opportunities. This result would frustrate FERC's market-based method of justification and convert the soft cap into a hard cap, negating the Commission's "broad discretion in regard to the methodology of

_____

[9]  For example, under Petitioners' proposed recalculation of the weighted average clearing price, Pet'rs' Br. 47 & n.42, it would seem the only transaction price included in the index price that could conceivably be justified would be the lowest price of $1,498/MWh. Yet that price bears no resemblance to the market opportunities faced, both by sellers and buyers, during the relevant time period. Making matters worse, Petitioners attempt to exclude *all* prices subject to "reasonableness review before the FERC." Pet'rs' Br. 1; *see also id.* at 35 (objecting to index contribution of prices "undergoing reasonableness review"). That standard would cover the $1,498/MWh figure because that price is *also* above the soft price cap of $1,000/MWh and would be subject to justification proceedings. Petitioners' arguments thus would collapse the index-based framework and deprive sellers of any opportunity to use indices to approximate market-representative prices.

35

testing the reasonableness of rates." *Elec. Consumers Res. Council*, 747 F.2d at 1520.[10]

In sum, FERC's justification of index-based prices above the soft price cap strikes a reasonable balance that protects ratepayers while preserving important incentives for sellers and, in some cases, the sellers' customers.[11] *See Blumenthal v. FERC*, 552 F.3d 875, 884 (D.C. Cir. 2009) (revenue of lower-cost suppliers "charging market rates provide an incentive for the development of new generation facilities as well as increased efficiency on the part of existing generators," and "higher prices are likely to affect consumers' behavior, reducing the strain on the system created by high demand"); *TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 114 (D.C. Cir. 2013) ("Fearing that unexpected decreases in price or demand might thwart cost recovery, power generators may forgo desirable investment in new generation. If needed development fails to occur, supply will eventually dip below demand,

---

[10] Petitioners' reasoning reveals that their disagreement with the index-based framework is fundamental, going generally to the framework itself. Accordingly, they should have brought their challenge when the Guidance Order was initially issued, rather than collaterally attacking that framework through improper challenges to these subsequent orders. *See supra*, Part II.

[11] Certain of the Seller-Marketer Intervenors are vertically integrated utilities that return revenues associated with third-party sales in significant part to their retail customers.

leaving consumers in the dark."). The Federal Power Act requires nothing more.

### B.    FERC adequately considered Petitioners' arguments.

Moreover, contrary to Petitioners' assertion, FERC did not "dismiss[] the parties' concerns without reasoned analysis." Pet'rs' Br. 53; *see, e.g.*, *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 794 (D.C. Cir. 2018) ("An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious."). Even where FERC's explanation is brief, it still provides the reasoned explanation demanded by the APA if "the agency's path may reasonably be discerned," as when it "repeatedly discussed its goal." *Transcon.*, 518 F.3d at 922 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Addressing the so-called circularity problem (even after finding it was procedurally forfeited), FERC explained why it relied on indices that may have accounted for transactions for which justification filings were concurrently pending before the Commission—those prices are not presumed to be unreasonable because they represent competitive market forces. *See* Rehearing Order P 28 (explaining that the index-based framework is "based on the principle that a $/MWh value of a published price index can provide sufficient support to find a given bilateral transaction just and reasonable") (JA1206); *see also id.* P 34 n.87 ("The Commission has recognized that

trading hubs with sufficient liquidity represent competitive market prices at those hubs.") (JA1209).

Petitioners criticize FERC's stated reason as a "false claim," but they fundamentally err in assuming that prices above a soft cap are presumptively unreasonable, much less that they cannot be considered representative of market conditions at the time. Pet'rs' Br. 54. To the contrary, "[i]n a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange *are* reasonable." *Elizabethtown*, 10 F.3d at 870 (quoting *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1004 (D.C. Cir. 1990)) (emphasis added). Indeed, "FERC *must* presume that a rate set by 'a freely negotiated wholesale-energy contract' meets the statutory 'just and reasonable' requirement." *NRG Power Mktg., LLC v. Maine Pub. Utilities Comm'n*, 558 U.S. 165, 167 (2010) (emphasis added) (quoting *Morgan Stanley Capital Group Inc.*, 554 U.S. at 530). The soft price cap, then, can only be understood as a means of triggering automatic FERC review—not creating a presumption of unreasonableness.

Put another way, the justification proceeding imposes on sellers a disclosure requirement, or a burden of production, not a burden of persuasion. Once sellers provide "detailed information to support each transaction" under their selected framework (Guidance Order P 13 (JA258)), then FERC

38

can assess each transaction under the applicable standard. FERC's explanation was sufficient.

Finally, FERC adequately addressed Petitioners' argument that there is an alleged disparity between its use of a 90-day period to assess index liquidity and a two-day period to assess the justification filings. Pet'rs' Br. 60; CPUC Rehearing Request, Appx. A, R.28 at 10 (JA845). As FERC explained, the 90-day period is designed to measure whether a given trading hub is a "location where sufficient numbers of buyers and sellers regularly transact." Rehearing Order P 34 (JA1209-1210). If it is established that an index is *generally* reliable for a particular location, FERC need not require sellers to demonstrate index liquidity on the *exact* date of sale. Instead, FERC explained (Rehearing Order P 33 (JA1209)) that sellers must show index reliability by (1) establishing the locational and temporal relevance of the chosen index, (2) demonstrating their "ability to transact near those hubs" during the periods when prices exceeded $1,000/MWh, and (3) providing information sufficient for FERC to evaluate "how a particular seller's sales contributed to index formation." June 2021 Guidance Order, P 20-25 (JA260-262).

FERC reasonably rejected Petitioners' demand that FERC add another factor to the list—a specified level of liquidity on the very day in question. "So long as FERC performs its responsibility to review rates

39

searchingly in the public interest, within the authority delegated by the Act, and in accordance with its own regulations and precedent, this court should not dictate a particular form or procedure." *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1144 n.13 (D.C. Cir. 1979). And as the Commission explained, its approach to assessing index liquidity was consistent with established precedent. *See* Rehearing Order P 9 (JA1195). For nearly 20 years, the Commission has "allow[ed] for a presumption of just and reasonable tariff rates based on a 90-day liquidity review period." *Id.* P 33 (citing 109 FERC ¶ 61,184 at P 66 (2004)) (JA1209).

In sum, FERC gave a sufficiently reasoned explanation for why it justified sales at or up to the relevant index-price. And while "Petitioners ultimately disagree with the Commission's policy judgment," that "disagreement with the Commission's resolution of th[e] issue does not render the Commission's explanation any less thorough or reasoned." *Ameren Servs. Co.*, 893 F.3d at 795. Petitioners' arguments that FERC dismissed parties' arguments without adequate justification must be rejected, as well.

## CONCLUSION

CPUC and SCE's petitions for review should be dismissed or denied.

Dated: October 30, 2023

Respectfully submitted,

DAVID C. FREDERICK
SCOTT H. ANGSTREICH
COLLIN R. WHITE
  *Kellogg, Hansen, Todd, Figel*
  *& Frederick, P.L.L.C.*
  *1615 M Street, NW*
  *Suite 400*
  *Washington, DC 20036*
  *(202) 326-7900*

*Counsel for Shell Energy North*
*America (US) L.P.*

KENNETH M. IRVIN
BRIAN P. MORRISSEY
  *Sidley Austin LLP*
  *1501 K Street, NW*
  *Washington, DC 20005*
  *(202) 736-8000*

*Counsel for Brookfield Renewable*
*Trading and Marketing LP*

SUEDEEN GIBBONS KELLY
JOHN N. ESTES III
  *Jenner & Block LLP*
  *1099 New York Avenue, NW*
  *Suite 900*
  *Washington DC  20001*
  *(202) 539-6055*

*Counsel for El Paso Electric*
*Company*

*/s/ Paul W. Hughes*
PAUL W. HUGHES
DAVID G. TEWKSBURY
NEIL L. LEVY
ANDREW A. LYONS-BERG
CONNOR J. SUOZZO
  *McDermott Will & Emery LLC*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Tenaska Power Ser-*
*vices Co.*

VINCENZO FRANCO
  *Rock Creek Energy Group*
  *LLP*
  *1 Thomas Circle, NW*
  *Suite 700*
  *Washington, DC 20005*
  *(202) 220-1200*

*Counsel for Brookfield Renewa-*
*ble Trading and Marketing LP*

MARK R. HASKELL
  *Blank Rome LLP*
  *1825 Eye Street, NW*
  *Washington DC  20006*
  *(202) 420-2654*

*Counsel for bp Energy Company*

41

CHRISTOPHER R. JONES
  *Troutman Pepper Hamilton*
  *Sanders LLP*
  *401 9th Street, NW*
  *Suite 1000*
  *Washington DC  20004*
  (202) 662-2181

*Counsel for Public Service Company of New Mexico, PacifiCorp, and Tucson Electric Power Company*

BRIAN B. BELL
  *Dorsey & Whitney LLP*
  *50 South Sixth Street*
  *Suite 1500*
  *Minneapolis, MN 55402*
  (612) 492-6178

*Counsel for Tri-State Generation and Transmission Association, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and D.C. Circuit Rule 32(g)(1), the undersigned counsel for Petitioners certifies that this brief:

(i)    complies with Rule 32(a)(7)(B) and the briefing schedule approved by this Court (*see* Dkt. 1988795) because it contains 8,945 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and D.C. Circuit Rule 32(e); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 365 and is set in New Century Schoolbook in a size equal to 14-point font.

Dated: October 30, 2023                 */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that that on October 30, 2023, I filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case.

Dated: October 30, 2023                    _/s/ Paul W. Hughes_