ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 22-1116 *et al.*

SHELL ENERGY NORTH AMERICA (US), L.P., *et al.*,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petitions for Review of Orders of the Federal Energy Regulatory Commission

## JOINT BRIEF FOR SELLER-MARKETER PETITIONERS

Paul W. Hughes
Neil L. Levy
David G. Tewksbury
Andrew A. Lyons-Berg
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000
phughes@mwe.com

*Counsel for Tenaska Power
Services Co.*

David C. Frederick
Scott H. Angstreich
Collin R. White
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
sangstreich@kellogghansen.com
cwhite@kellogghansen.com

*Counsel for Shell Energy North
America (US), L.P.*

October 31, 2023

*(additional counsel listed on inside cover)*

Kenneth W. Irvin
Brian P. Morrissey
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
bmorrissey@sidley.com

*Counsel for Brookfield Renewable
Trading and Marketing LP, and
Macquarie Energy LLC*

David A. Super
Britt Cass Steckman
BRACEWELL LLP
2001 M Street, N.W., Suite 900
Washington, D.C. 20006
(202) 828-5800
David.Super@bracewell.com
Britt.Steckman@bracewell.com

*Counsel for TransAlta Energy
Marketing (U.S.) Inc.*

**CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Seller-Marketer Petitioners certify as follows:

**A.    Parties and Amici**

Petitioners in these consolidated petitions for review are Shell Energy North America (US), L.P. (Nos. 22-1116, 22-1250); California Public Utilities Commission (Nos. 22-1153, 22-1154, 22-1155, 22-1156, 22-1157, 22-1159, 22-1167, 22-1168, 22-1169, 22-1211, 22-1212, 22-1213, 22-1298, 22-1299, 22-1304, 22-1305, 22-1306, 22-1307, 22-1323, 22-1324, 22-1325, 23-1011, 23-1012, 23-1013); Southern California Edison Company (Nos. 22-1182, 22-1265); Tenaska Power Services Co. (Nos. 22-1121, 22-1259); Brookfield Renewable Trading and Marketing LP (Nos. 22-1243, 22-1319); Macquarie Energy LLC (Nos. 22-1207, 22-1322); and TransAlta Energy Marketing (U.S.) Inc. (Nos. 22-1263, 23-1008).

Respondent in these consolidated petitions for review is the Federal Energy Regulatory Commission.

Intervenors in support of Respondent in these consolidated petitions for review are California Public Utilities Commission, Shell Energy North America (US), L.P., Public Service Company of New Mexico, PacifiCorp, bp Energy Company, Brookfield Renewable Trading and Marketing LP, Tenaska Power

Services Co., El Paso Electric Company, Southern California Edison Company, Tucson Electric Power Company, and Tri-State Generation and Transmission Association, Inc.

## B.  Rulings Under Review

The rulings under review are:

(1)  Order on Justification Filings and Directing Refunds, *Shell Energy North America (US), L.P.*, Docket Nos. ER21-57-000, ER21-57-001, 179 FERC ¶ 61,034 (Apr. 22, 2022) (JA584-606); Order Addressing Arguments Raised on Rehearing, *Shell Energy North America (US), L.P.*, Docket No. ER21-57-002, 180 FERC ¶ 61,182 (Sept. 22, 2022) (JA1191-213) (Nos. 22-1116, 22-1155, 22-1250, 22-1299).

(2)  Order on Justification Filings and Directing Refunds, *Mercuria Energy America LLC*, Docket No. ER21-46-000, 179 FERC ¶ 61,033 (Apr. 22, 2022) (JA509-32); Order Addressing Arguments Raised on Rehearing, *Mercuria Energy America, LLC*, Docket No. ER21-46-001, 180 FERC ¶ 61,184 (Sept. 22, 2022) (JA1172-90) (Nos. 22-1182, 22-1265).

(3)  Order on Justification Filings and Directing Refunds, *Tenaska Power Services Co.*, Docket No. ER21-42-000, 179 FERC ¶ 61,030 (Apr. 22, 2022) (JA485-508); Order Addressing Arguments Raised on Rehearing, *Tenaska Power*

*Services Co.*, Docket No. ER21-42-001, 180 FERC ¶ 61,183 (Sept. 22, 2022) (JA1150-71) (Nos. 22-1121, 22-1157, 22-1259, 22-1298).

(4)  Order on Justification Filings, *Public Service Company of New Mexico*, Docket No. ER21-52-000, 179 FERC ¶ 61,020 (Apr. 8, 2022) (JA448-60); Order Addressing Arguments Raised on Rehearing, *Public Service Company of New Mexico*, Docket No. ER21-52-001, 181 FERC ¶ 61,013 (Oct. 5, 2022) (JA1241-53) (Nos. 22-1153, 22-1304).

(5)  Order on Justification Filings and Directing Refunds, *PacifiCorp*, Docket No. ER21-60-000, 179 FERC ¶ 61,021 (Apr. 18, 2022) (JA461-84); Order Addressing Arguments Raised on Rehearing, *PacifiCorp*, Docket No. ER21-60-001, 181 FERC ¶ 61,014 (Oct. 5, 2022) (JA1254-66) (Nos. 22-1154, 22-1305).

(6)  Order on Justification Filings and Directing Refunds, *Tucson Electric Power Company*, Docket No. ER21-47-000, 179 FERC ¶ 61,032 (Apr. 22, 2022) (JA533-53); Order Addressing Arguments Raised on Rehearing, *Tucson Electric Power Company*, Docket No. ER21-47-001, 181 FERC ¶ 61,011 (Oct. 5, 2022) (JA1214-27) (Nos. 22-1156, 22-1306).

(7)  Order on Justification Filings and Directing Refunds, *bp Energy Company and Mesquite Power, LLC*, Docket Nos. ER21-51-000, ER21-51-001, ER21-51-002, ER21-55-000, ER21-55-001, 179 FERC ¶ 61,031 (Apr. 22, 2022) (JA554-83); Order Addressing Arguments Raised on Rehearing, *bp Energy*

*Company and Mesquite Power, LLC*, Docket Nos. ER21-51-003, ER21-55-002, 181 FERC ¶ 61,012 (Oct. 5, 2022) (JA1228-40) (Nos. 22-1159, 22-1307).

(8)  Order on Justification Filings and Directing Refunds, *Brookfield Renewable Trading and Marketing LP*, Docket Nos. ER21-59-000, ER21-59-001, 179 FERC ¶ 61,119 (May 20, 2022) (JA682-706); Order Addressing Arguments Raised on Rehearing and Providing Clarification, *Brookfield Renewable Trading and Marketing LP*, Docket No. ER21-59-002, 181 FERC ¶ 61,046 (Oct. 20, 2022) (JA1267-91) (Nos. 22-1167, 22-1243, 22-1319, 22-1323).

(9)  Order on Justification Filings and Directing Refunds, *Macquarie Energy LLC*, Docket No. ER21-64-000, 179 FERC ¶ 61,126 (May 20, 2022) (JA707-32); Order Addressing Arguments Raised on Rehearing, *Macquarie Energy LLC*, Docket No. ER21-64-001, 181 FERC ¶ 61,047 (Oct. 20, 2022) (JA1292-312) (Nos. 22-1168, 22-1207, 22-1322, 22-1324).

(10)  Order on Justification Filings and Directing Refunds, *Tri-State Generation and Transmission Association, Inc.*, Docket No. ER21-65-000, 179 FERC ¶ 61,118 (May 20, 2022) (JA733-54); Order Addressing Arguments Raised on Rehearing, *Tri-State Generation and Transmission Association, Inc.*, Docket No. ER21-65-002, 181 FERC ¶ 61,037 (Oct. 20, 2022) (JA1313-26) (Nos. 22-1169, 22-1325).

(11)  Order on Justification Filings and Directing Refunds, *Guzman Energy, LLC*, Docket No. ER21-56-000, 179 FERC ¶ 61,190 (June 16, 2022) (JA857-80); Order Addressing Arguments Raised on Rehearing, *Guzman Energy, LLC*, Docket No. ER21-56-001, 181 FERC ¶ 61,133 (Nov. 17, 2022) (JA1327-47) (Nos. 22-1211, 23-1011).

(12)  Order on Justification Filings and Directing Refunds, *TransAlta Energy Marketing (U.S.) Inc.*, Docket No. ER21-58-000, 179 FERC ¶ 61,192 (June 17, 2022) (JA899-918); Order Addressing Arguments Raised on Rehearing, *TransAlta Energy Marketing (U.S.) Inc.*, Docket No. ER21-58-001, 181 FERC ¶ 61,127 (Nov. 17, 2022) (JA1348-76) (Nos. 22-1212, 22-1263, 23-1008, 23-1012).

(13)  Order on Justification Filings and Directing Refunds, *El Paso Electric Company*, Docket No. ER21-61-000, 179 FERC ¶ 61,191 (June 16, 2022) (JA881-98); Order Addressing Arguments Raised on Rehearing, *El Paso Electric Company*, Docket No. ER21-61-003, 181 FERC ¶ 61,130 (Nov. 17, 2022) (JA1377-99) (Nos. 22-1213, 23-1013).

## C.    Related Cases

The following cases pending in this Court are related to this case:  *Tenaska Power Servs. Co. v. FERC* (No. 23-1101) and *Macquarie Energy LLC v. FERC* (No. 23-1082).

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Seller-Marketer Petitioners respectfully submit the following corporate disclosure statements:

**Brookfield Renewable Trading and Marketing LP.** Brookfield Renewable Trading and Marketing LP is a Delaware limited partnership that is a wholly owned indirect subsidiary of Brookfield Renewable Corporation. Brookfield Renewable Corporation is a corporation organized under the laws of British Columbia, Canada. Brookfield Renewable Corporation has two classes of voting securities, Class A exchangeable subordinate voting shares ("BEPC Exchangeable Shares") and Class B shares. By their terms, the BEPC Exchangeable Shares in the aggregate represent 25% of Brookfield Renewable Corporation's voting securities regardless of the number of BEPC Exchangeable Shares outstanding from time to time. Brookfield Renewable Corporation's Class B shares in the aggregate represent 75% of its voting securities regardless of the number of Class B shares outstanding from time to time.

Brookfield Renewable Partners L.P., a Bermuda limited partnership, indirectly owns 100% of Brookfield Renewable Corporation's Class B shares.[1] The non-voting limited partnership interests in Brookfield Renewable Partners ("BEP LP Units") are publicly traded on the Toronto Stock Exchange and New York Stock Exchange, under the symbols BEP.UN and BEP, respectively. Brookfield Renewable Power Inc., a wholly owned indirect subsidiary of Brookfield Corporation (f/k/a Brookfield Asset Management Inc.), indirectly owns the 0.01% general partnership interest in Brookfield Renewable Partners and has sole responsibility and authority for the management and control of Brookfield Renewable Partners.  The BEP LP Units are held by Brookfield Corporation (approximately 25% indirectly through wholly owned subsidiaries) and public investors (approximately 75%).[2]  No individual public investor (in aggregate

---

[1] Brookfield Renewable Partners also indirectly owns 100% of Brookfield Renewable Corporation's Class C shares, which are non-voting except in limited circumstances prescribed by applicable law.

[2] On a "fully exchanged" basis (i.e., assuming exchange of 100% of all outstanding securities convertible for BEP LP Units), Brookfield Corporation would indirectly beneficially own approximately 48% of the BEP LP Units, and the public would own the remaining approximately 52%.  If only such convertible securities owned by Brookfield Corporation and its affiliates, but not public shareholders, were converted into BEP LP Units, then Brookfield Corporation would indirectly beneficially own approximately 59.9% of the BEP LP Units, and the public would own the remaining approximately 40.%.

together with its associate or affiliate companies) holds 10% or more of the BEP LP Units.

The BEPC Exchangeable Shares are publicly traded on the Toronto Stock Exchange and New York Stock Exchange under the symbol BEPC.[3]  A portion of the BEPC Exchangeable Shares is held by public investors, none of which holds (in aggregate together with its associate or affiliate companies) 10% or more of the outstanding voting securities of Brookfield Renewable Corporation.  Brookfield Corporation indirectly owns the remaining BEPC Exchangeable Shares, which represent approximately 26% of the outstanding BEPC Exchangeable shares as of December 16, 2022.

Brookfield Corporation is an Ontario corporation with its principal place of business in Toronto, Ontario, Canada.  The outstanding Class A shares of Brookfield Corporation are publicly traded on the Toronto Stock Exchange and New York Stock Exchange under the symbol BN.  The outstanding Class B shares of Brookfield Corporation are held by the "BAM Partnership," a trust constituted

---

[3] Each BEPC Exchangeable Share is exchangeable at the option of the holder for one BEP LP Unit (subject to adjustment to reflect certain capital events) or its cash equivalent (the form of payment to be determined at the election of Brookfield Renewable Corporation).  Brookfield Renewable Partners may elect to satisfy its exchange obligation by acquiring such tendered BEPC Exchangeable Shares for an equivalent number of BEP LP Units (subject to adjustment to reflect certain capital events) or its cash equivalent (the form of payment to be determined at the election of Brookfield Renewable Partners).

under the laws of the Province of Ontario, the corporate trustee of which (the "Trustee") is held, directly or indirectly, by certain longstanding individual stockholders of Brookfield Corporation. Two corporations formed under the laws of Bermuda and the Province of Ontario, respectively, each hold 33.3% of the voting interests in the Trustee. The first corporation is wholly owned, directly or indirectly, by Bruce Flatt, a private individual (together with the first corporation, Flatt). The second corporation is wholly owned, directly or indirectly, by Jack Cockwell, also a private individual (together with the second corporation, Cockwell). No other person or entity owns or controls (directly or indirectly and together with its affiliates) a 10% or greater voting interest in the Trustee. The Trustee votes the Class B Shares of the BAM Partnership with no single entity or individual controlling the BAM Partnership. Aside from the BAM Partnership, the Trustee, Flatt, and Cockwell, no person or entity currently owns or exercises control or direction over, directly or indirectly, a 10% or greater voting interest in Brookfield Corporation.

**Macquarie Energy LLC.** Macquarie Energy LLC ("Macquarie") is a Delaware limited liability company that engages in physical and financial electricity transactions pursuant to market-based rate authority granted by the Federal Energy Regulatory Commission. Macquarie transacts in electricity markets administered by the Western Electricity Coordinating Council, which are

the subject of the Commission order listed in the petition for review. Macquarie's parent company is Macquarie Group Limited. No publicly held corporation has a 10% or greater ownership interest in Macquarie, and no member of Macquarie has issued shares or debt securities to the public.

**Shell Energy North America (US), L.P.** Shell Energy North America (US), L.P. ("Shell Energy") is directly owned by Shell (US) Gas & Power M&T Holdings, Inc.; BG Energy Merchants, LLC; Tejas Coral Holding, LLC; and Tejas Coral GP, LLC. Shell plc, which is publicly held, indirectly owns 100% of Shell Energy. Shell Energy is the primary operating entity for Shell's North American gas and power marketing and trading business.

**Tenaska Power Services Co.** Tenaska Power Services Co. ("TPS") is a wholly owned subsidiary of Tenaska TPS, Inc., which is in turn a wholly owned subsidiary of Tenaska Energy, Inc. The equity interests in Tenaska Energy, Inc. are owned by private individuals and trusts formed for the benefit of their family members. Only two individuals, Howard L. Hawks and Thomas E. Hendricks, own an ownership interest of 10% or more in Tenaska Energy, Inc. No publicly held corporation owns an interest of 10% or more in TPS or any of its parents.

**TransAlta Energy Marketing (U.S.) Inc.** TransAlta Energy Marketing (U.S.) Inc. ("TransAlta") is a wholly owned subsidiary of TransAlta Holdings U.S. Inc., which is a wholly owned subsidiary of TransAlta Holdings ULC, a Nova

Scotia unlimited liability company formed under the Companies Act. TransAlta Holdings ULC is owned by TransAlta Corporation, a publicly traded corporation organized under the laws of Canada with its headquarters in Calgary, Alberta. To the best of TransAlta's knowledge, affiliates of Brookfield Corporation hold in aggregate more than 10% of the outstanding common shares of TransAlta Corporation, and RBC Global Asset Management Inc. holds approximately 15% of the total voting equity in TransAlta Corporation but holds less than 1% as principal. TransAlta is a power marketer in the United States.

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENTS ......................................................vi

TABLE OF AUTHORITIES ...................................................................................xiv

GLOSSARY........................................................................................................ xviii

INTRODUCTION AND SUMMARY ....................................................................1

JURISDICTIONAL STATEMENT ........................................................................3

STATEMENT OF THE ISSUES.............................................................................3

STATUTES AND REGULATIONS ........................................................................4

STATEMENT OF THE CASE.................................................................................4

I.     LEGAL BACKGROUND ..............................................................................4

       A.     Statutory Background:  The Federal Power Act and the
              *Mobile-Sierra* Doctrine ......................................................................4

       B.     Regulatory Background:  Tariffs, Market-Based Rate
              Authority, and Price Caps in the Western United States .....................6

II.    FACTUAL BACKGROUND........................................................................11

       A.     Petitioners' Summer 2020 Sales and Initial Justification
              Filings................................................................................................11

       B.     FERC's *2021 Guidance Order* and Petitioners' Supplemental
              Justification Filings ...........................................................................12

       C.     FERC's Refund Orders ......................................................................15

       D.     FERC's Denials of Rehearing and the Proceedings on Appeal..........19

SUMMARY OF ARGUMENT ..............................................................................21

STANDING .................................................................................23

STANDARD OF REVIEW .........................................................23

ARGUMENT ..............................................................................24

I.   FERC'S REFUND ORDERS VIOLATE THE *MOBILE-SIERRA*
     DOCTRINE ...........................................................................24

     A.   FERC May Not Alter Negotiated Contract Rates Without
          Making the Finding *Mobile-Sierra* Requires ....................24

     B.   FERC's Defenses of Its Refund Orders Lack Merit ...........27

II.  FERC'S REFUND ORDERS ARE INDEPENDENTLY
     ARBITRARY AND CAPRICIOUS BECAUSE THEY
     MISAPPLY THE PRICE INDEX BENCHMARK .....................37

     A.   FERC's Application of the Index-Based Justification
          Framework Is Arbitrary and Capricious, and Unsupported by
          Substantial Evidence ..........................................................38

     B.   FERC's Contrary Conclusion Lacks Merit .........................40

III. FERC'S REFUND ORDERS ARE ERRONEOUS IN OTHER
     INDEPENDENT RESPECTS ..................................................44

     A.   FERC Erred in Using the Day-Ahead, 16-Hour Index as the
          Benchmark for Refunds for Hourly Sales During the Super-
          Peak Hours ..........................................................................44

     B.   FERC's Order Applying the Soft Cap to Macquarie's Sales
          at Dave Johnston Is Arbitrary and Capricious ...................48

CONCLUSION ..........................................................................50

CIRCUIT RULE 32(a)(2) CERTIFICATION

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

Page

**CASES**

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) ................24, 46

*ANR Pipeline Co. v. FERC*, 71 F.3d 897 (D.C. Cir. 1995) .....................................47

*Appalachian Power Co. v. Fed. Power Comm'n*, 529 F.2d 342
    (D.C. Cir. 1976) ...........................................................................................6

*Ark. La. Gas Co. v. Hall*, 453 U.S. 571 (1981) .........................................................5

*Atl. City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002) .......................................36

*Blumenthal v. FERC*, 552 F.3d 875 (D.C. Cir. 2009) ..........................................8, 38

*Butte Cnty. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010) ............................................23

*California ex rel. Harris v. FERC*, 809 F.3d 491 (9th Cir. 2015) ..........................26

*Dominion Transmission, Inc. v. FERC*, 533 F.3d 845
    (D.C. Cir. 2008) ....................................................................................32, 36

*Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017) .....................................25, 33

*Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944).........................43

\* *FERC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) .........................................4, 5

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018)........................ 23-24, 44

*Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804
    (D.C. Cir. 2007) ....................................................................................30, 32

*La. Power & Light Co. v. FERC*, 587 F.2d 671 (5th Cir. 1979) ..............................6

*Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955 (D.C. Cir. 2003) .......................43

---

Authorities principally relied upon are designated by an asterisk (\*).

xiv

*Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464 (D.C. Cir. 2008) ...................... 5-6

*Mobil Oil Corp. v. Fed. Power Comm'n*, 417 U.S. 283 (1974) .............................38

\* *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*,
    554 U.S. 527 (2008)...................................................................1, 2, 5, 6, 7, 23,
    24, 25, 26, 29, 32,
    33, 34, 35, 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
    *Ins. Co.*, 463 U.S. 29 (1983) ............................................................48, 49, 50

\* *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*,
    558 U.S. 165 (2010)...........................................................1, 2, 6, 22, 23, 24,
    26, 27, 32, 35

*Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75 (D.C. Cir. 2016).............................23

*Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021)...................7, 30, 32

*Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223 (D.C. Cir. 2018) ...................31

*Permian Basin Area Rate Cases, In re*, 390 U.S. 747 (1968) .................................38

*Potomac Elec. Power Co. v. FERC*, 210 F.3d 403 (D.C. Cir. 2000) ......................26

*Smith Lake Improvement & Stakeholders Ass'n v. FERC*,
    809 F.3d 55 (D.C. Cir. 2015).........................................................................3

*Tenneco Gas v. FERC*, 969 F.2d 1187 (D.C. Cir. 1992) ..................................24, 44

*Texaco Inc. v. FERC*, 148 F.3d 1091 (D.C. Cir. 1998) ...........................6, 25, 35, 36

*Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667
    (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*,
    535 U.S. 1 (2002).....................................................................25, 26, 29, 33

*Transwestern Pipeline Co. v. FERC*, 897 F.2d 570 (D.C. Cir. 1990) ....................31

\* *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*,
    350 U.S. 332 (1956)............................................................................4, 30, 37

*United States v. Abilene & S. Ry. Co.*, 265 U.S. 274 (1924) ............................40, 46

*W. Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) .................47, 48

*Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738
    (D.C. Cir. 2001) ...............................................................................................42


## STATUTES AND REGULATIONS

Federal Power Act, 16 U.S.C. § 791 *et seq.*:

§ 824(b)(1) ......................................................................................4

§ 824d(c) ......................................................................................4, 7

§ 824d(d) ......................................................................................4, 7

§ 824e ............................................................................................4

§ 825*l*(a) .....................................................................................3, 19

§ 825*l*(b) .....................................................................................3, 23

5 U.S.C.:

§ 706(2)(A) ......................................................................................23

§ 706(2)(E) ......................................................................................23

18 C.F.R.:

§ 35.1(a) ......................................................................................7, 32

§ 35.42 ..............................................................................................8

## ADMINISTRATIVE DECISIONS

*Cal. Indep. Sys. Operator*, 114 FERC ¶ 61,135 (2006)
  ("*2006 Order*") ...........................................................11, 28, 42, 47

*Cal. Indep. Sys. Operator Corp.*, 100 FERC ¶ 61,060 (2002)
  ("*July 2002 Order*").........................................................9, 10, 28

*Cal. Indep. Sys. Operator Corp.*, 101 FERC ¶ 61,061 (2002)
  ("*October 2002 Order*") ......................................................10, 28

*Cal. Indep. Sys. Operator Corp.*, 172 FERC ¶ 61,262 (2020) ...............................11

*Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,076 (2021) ...............................47

*Nev. Power Co. v. Duke Energy Trading & Mktg., L.L.C.*,
  99 FERC ¶ 61,047 (2002)..............................................................27

Order No. 697, *Market-Based Rates for Wholesale of Electric
  Energy, Capacity and Ancillary Services by Public Utilities*,
  72 Fed. Reg. 39,904 (2007) ("*Order 697*").....................................8, 9, 31, 32

Order No. 831, *Offer Caps in Markets Operated by Regional
  Transmission Organizations and Independent System
  Operators*, 157 FERC ¶ 61,115 (2016) .......................................................41

*W. Elec. Coordinating Council*, 133 FERC ¶ 61,026 (2010)
  ("*2010 Order*") ...........................................................10, 11, 28, 42

## OTHER AUTHORITIES

Shell Energy North America (US), L.P. Market-Based Rate Tariff,
  https://etariff.ferc.gov/TariffSectionDetails.aspx?tid=772&si
  d=266753 ...........................................................................16, 31, 32

# GLOSSARY

| | |
|---|---|
| *2006 Order* | *Cal. Indep. Sys. Operator Corp.*, 114 FERC ¶ 61,135 (2006) |
| *2010 Order* | *W. Elec. Coordinating Council*, 133 FERC ¶ 61,026 (2010) |
| *2021 Guidance Order* | *ConocoPhillips Co. et al.*, 175 FERC ¶ 61,226 (2021) (JA252-65) |
| CAISO | California Independent System Operator Corporation |
| FERC or Commission | Federal Energy Regulatory Commission |
| *July 2002 Order* | *Cal. Indep. Sys. Operator Corp.*, 100 FERC ¶ 61,060 (2002) |
| *Macquarie Order* | Order on Justification Filings and Directing Refunds, *Macquarie Energy LLC*, 179 FERC ¶ 61,126 (2022) (JA707-32) |
| MWh | megawatt-hour |
| *October 2002 Order* | *Cal. Indep. Sys. Operator Corp.*, 101 FERC ¶ 61,061 (2002) |
| *Order 697* | Order No. 697, *Market-Based Rates for Wholesale of Electric Energy, Capacity and Ancillary Services by Public Utilities*, 72 Fed. Reg. 39,904 (2007) |
| *Shell Energy Order* | Order on Justification Filings and Directing Refunds, *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61,034 (2022) (JA584-606) |

| | |
|---|---|
| *Shell Energy Reh'g Order* | Order Addressing Arguments Raised on Rehearing, *Shell Energy North America (US), L.P.*, 180 FERC ¶ 61,182 (2022) (JA1191-213) |
| *Tenaska Order* | Order on Justification Filings and Directing Refunds, *Tenaska Power Services Co.*, 179 FERC ¶ 61,030 (2022) (JA485-508) |
| *Tenaska Reh'g Order* | Order Addressing Arguments Raised on Rehearing, *Tenaska Power Services Co.*, 180 FERC ¶ 61,183 (2022) (JA1150-71) |
| *TransAlta Reh'g Order* | Order Addressing Arguments Raised on Rehearing, *TransAlta Energy Marketing (U.S.) Inc.*, 181 FERC ¶ 61,127 (2022) (JA1348-76) |
| WECC | Western Electricity Coordinating Council |

## INTRODUCTION AND SUMMARY

Under the "venerable *Mobile-Sierra* doctrine," the Federal Energy Regulatory Commission ("FERC") "must presume that the rate set out in a freely negotiated wholesale-energy contract" is just and reasonable, and may find this presumption "overcome only if FERC concludes that the contract seriously harms the public interest." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530, 548 (2008). That doctrine "is not an exception to the statutory just-and-reasonable standard; it is an application of that standard in the context of rates set by contract." *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 168 (2010). Therefore, it "control[s] FERC itself." *Id.*

FERC has long chafed at that control. The FERC orders before the Court are just the latest effort to slip the leash. The orders involve bilaterally negotiated contracts between sophisticated counterparties for the sale of energy in the western United States during a period of extreme weather in August 2020. FERC "agree[d] . . . that the *Mobile-Sierra* presumption applies" to all those contracts. *E.g.*, *Shell Energy Order* P 36 (JA596); *accord*, *e.g.*, *Shell Energy Reh'g Order* P 8 (JA1195). Yet FERC ordered Petitioners to refund amounts paid under those contracts without finding that the prices seriously harmed the public interest. As the dissenting Commissioner explained, there was "no showing in the record that these . . . prices seriously harmed the public interest," and any claim they did would be

"absurd on its face." *Shell Energy Order* P 10 (JA606) (Commissioner Danly, dissenting).

The Court should vacate the refund orders because FERC exercised authority that Congress did not give it, as *Mobile-Sierra*, *Morgan Stanley*, and *NRG Power Marketing* make clear. FERC's defense is that, before the sales at issue, it had established a "soft" price cap and said that sales at prices above that cap would be "subject to justification and refund." But FERC cannot use a soft cap of its own design to expand its statutory authority over contract rates. What is more, in its orders establishing the soft cap, FERC did not even hint that it meant to remove *Mobile-Sierra* protection from negotiated contracts that set rates above that cap, let alone attempt to make the kind of generic public-interest finding required before it may do so. As the dissenting Commissioner explained, "no precedent . . . suggest[s]" that this (or any) soft cap has that effect and the "majority certainly fails to cite any." *Id.* P 8 (JA605).

FERC's violation of limits that Congress put on it is reason enough to vacate the refund orders and remand. But even if FERC had the authority it now claims, vacatur is warranted for the independent reasons that the refund orders are arbitrary and capricious, and lack support in substantial evidence. In particular, neither evidence nor logic supports FERC's view that prices above the level of a given price index — but within the range of the prices underlying that index — are

2

presumptively unjust and unreasonable.  The index price could not exist without those higher prices, and to ignore the price distribution in the marketplace at issue is to ignore the most essential fact about it:  its chaotic volatility brought about by extreme weather that caused a historic spike in demand.  Moreover, as to certain of the transactions at issue, FERC disregarded evidence making clear that even the above-index prices did not reflect the exercise of market power, but the functioning of ordinary market forces under the conditions in August 2020 in the western United States.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 16 U.S.C. § 825*l*(b) because each of these consolidated petitions for review challenges a final FERC order.  Each Petitioner timely sought rehearing and then timely petitioned for review after rehearing was denied by operation of law.  *See* 16 U.S.C. § 825*l*(a).  Each Petitioner also timely filed a protective, supplemental petition for review after FERC issued its belated orders in response to the arguments in the rehearing requests.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

## STATEMENT OF THE ISSUES

1.    Whether FERC's orders are unlawful because they modify contract rates that FERC agrees are subject to the *Mobile-Sierra* doctrine without making the public-interest finding that doctrine requires.

2.     Whether FERC acted arbitrarily and capriciously, and without support in substantial evidence, when it ordered Petitioners to issue refunds.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the addendum.

## STATEMENT OF THE CASE

### I.     LEGAL BACKGROUND

#### A.     Statutory Background:  The Federal Power Act and the *Mobile-Sierra* Doctrine

Under the Federal Power Act, FERC regulates the "sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b)(1).  All rates for such sales — whether set by contracts or, instead, by tariffs (called "schedules" in the statute) — must be filed with FERC and must be "just and reasonable."  *Id.* § 824d(c), (d). If FERC finds (after a hearing) that a particular rate "is unjust, unreasonable, unduly discriminatory or preferential," FERC must establish the just and reasonable rate to be applied in the future and may order refunds.  *Id.* § 824e.

The Supreme Court authoritatively interpreted this language in two canonical cases decided on the same day in 1956.  In *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, the Court held that, if a FERC-regulated seller negotiates and enters into a sales contract fixing a particular rate, the seller may not unilaterally change that rate merely by filing a new tariff with FERC.  *See* 350 U.S. 332, 343-44 (1956).  And in *FERC v. Sierra Pacific Power Co.*, the Court further

4

explained that FERC cannot hold a contract rate "unjust" or "unreasonable" on the ground that the contract is unprofitable for the seller.  350 U.S. 348, 350, 355 (1956).[4]  Instead, "the sole concern" is whether the rate "adversely affect[s] the public interest"; Congress did not make "the private interests of the utilities" FERC's to protect.  *Id.*

These two cases and their progeny now constitute a cornerstone of modern utility regulation:  the "venerable *Mobile-Sierra* doctrine."  *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 548 (2008).  Under that doctrine, FERC "must presume that the rate set out in a freely negotiated wholesale-energy contract" is just and reasonable, and may find this presumption "overcome only if FERC concludes that the contract seriously harms the public interest."  *Id.* at 530.  FERC may not set aside rates that are subject to *Mobile-Sierra* without finding an "unequivocal public necessity or extraordinary circumstances."  *Id.* at 550 (cleaned up).

Two years after *Morgan Stanley*, the Supreme Court returned to *Mobile-Sierra*, reversing this Court's decision that held the doctrine applied only when a party to the contract challenged a rate.  *See Me. Pub. Utils. Comm'n v. FERC*, 520

---

[4] *Mobile* and *Sierra* addressed "substantially identical" language in the Natural Gas Act and the Federal Power Act, respectively.  *Sierra*, 350 U.S. at 350. Decisions interpreting these provisions may be cited "interchangeably."  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

F.3d 464, 477-48 (D.C. Cir. 2008) (per curiam).  The Supreme Court held instead that *Mobile-Sierra* "is an application of [the statutory just and reasonable] standard in the context of rates set by contract."  *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 168 (2010).  Therefore, it "control[s] FERC itself," which "must presume just and reasonable a contract rate resulting from fair, arm's-length negotiations," no matter who challenges that rate.  *Id.* at 168, 174-75.

Unlike FERC, the parties to a contract are free to "contract out of the *Mobile-Sierra* presumption."  *E.g.*, *id.* at 173 n.3.  "But the *Mobile-Sierra* presumption remains the default rule."  *Morgan Stanley*, 554 U.S. at 534; *see also Texaco Inc. v. FERC*, 148 F.3d 1091, 1096 (D.C. Cir. 1998) ("The law is quite clear:  absent contractual language susceptible to the construction that the rate may be altered while the contract subsists, the *Mobile-Sierra* doctrine applies.") (cleaned up) (quoting *Appalachian Power Co. v. Fed. Power Comm'n*, 529 F.2d 342, 347 (D.C. Cir. 1976)); *see also La. Power & Light Co. v. FERC*, 587 F.2d 671, 675 (5th Cir. 1979) (stating that, if the parties wished to opt out of *Mobile-Sierra*, their "contracts should have stated as much in unambiguous terms").

### B.    Regulatory Background:  Tariffs, Market-Based Rate Authority, and Price Caps in the Western United States

**1.**    Under the Federal Power Act and FERC's implementing regulations, interstate electricity tariffs must "clearly and specifically set[] forth" not only the "rates and charges for" the "sale of electricity," but also any "rules and regulations

6

affecting" those rates and charges.  18 C.F.R. § 35.1(a); *see* 16 U.S.C. § 824d(c).

Moreover, "no change [may] be made . . . in any rule [or] regulation . . . relating"

to those rates and charges "except after sixty days' notice to the Commission and

to the public."  16 U.S.C. § 824d(d).

"These statutory provisions mandating the open and transparent filing of

rates and broadly proscribing their retroactive adjustment are known collectively as

the 'filed rate doctrine.'"  *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C.

Cir. 2021).  This doctrine "is shorthand for the interconnected statutory

requirements that bind regulated entities to charge only the rates filed with FERC

and to change their rates only prospectively."  *Id.*  "When it applies, the filed rate

doctrine is a nearly impenetrable shield and does not yield, no matter how

compelling the equities."  *Id.* at 829-30.

> **2.**    Historically, FERC assessed whether tariff rates were just and

reasonable "under the 'cost-of-service' method, which ensures that a seller of

electricity recovers its costs plus a rate of return sufficient to attract necessary

capital."  *Morgan Stanley*, 554 U.S. at 532.  But, in recent decades, it has carved

out a different regime for sellers of wholesale electricity that FERC finds do not

have or have "adequately mitigated" market power.  *Id.* at 537.  Such sellers may

file tariffs that "simply state that the seller will enter into freely negotiated

contracts with purchasers."  *Id.*  FERC requires sellers with this market-based rate

7

authority to make periodic reports aimed at demonstrating their continued lack of market power.  *See id.*; 18 C.F.R. § 35.42 (setting forth reporting requirements). FERC then engages in "continuing oversight of the market to guard against potential abuses of market power."  *Blumenthal v. FERC*, 552 F.3d 875, 882 (D.C. Cir. 2009).

FERC also has standardized much of the content of market-based rate tariffs. It has done so, as it explained, to eliminate "uncertainty for potential customers" and give all parties a single place to find the information they need at the time of bargaining.  Order No. 697, *Market-Based Rates for Wholesale of Electric Energy, Capacity and Ancillary Services by Public Utilities*, 72 Fed. Reg. 39,904, P 912 (2007) ("*Order 697*"); *see also id.* P 913 ("presenting a uniform set of required provisions that will provide adequate certainty and will be more customer friendly," while leaving sellers flexibility "to include seller specific terms and conditions in their market-based rate tariffs [that] will offer a greater degree of transparency and serve customers by providing for the opportunity to have all terms and conditions identified and in one place"); *id.* P 927 ("We agree with commenters as to the benefits to sellers and customers of having all terms and conditions relevant to a seller's market-based rate power sales available in one document.").

To that end, FERC "adopt[ed] two standard 'required' provisions that each seller must include in its market-based rate tariff:  a provision requiring compliance with the agency's regulations and a provision identifying any limitations and exemptions regarding the seller's market-based rate authority." *Id.* P 914.  It dictated the language tariffs must use in setting forth the first requirement. *See id.* P 915.  As for the second requirement, FERC made clear that a seller must "include a provision identifying all limitations on its market-based rate authority (including markets where the seller does not have market-based rate authority)." *Id.* P 916; *see also* App. C ("Seller should list all limitations (including markets where seller does not have market-based rate authority) on its market-based rate authority and any exemptions from or waivers granted of Commission regulations and include relevant cites to Commission orders.").

**3.**     This case concerns a "soft" price cap that FERC imposed more than two decades ago as part of a broader program to mitigate electricity supply shortfalls in the western United States (especially, California).

In 2002, FERC concluded that "the California wholesale electricity market" had become "dysfunctional and [had] experienced extremely high prices during certain periods." *Cal. Indep. Sys. Operator Corp.*, 100 FERC ¶ 61,060, P 4 (2002) ("*July 2002 Order*").  As relevant here, FERC responded by capping the prices that sellers could offer into organized electricity markets that the California

Independent System Operator Corporation ("CAISO") administers, encompassing almost all of California and a few parts of Nevada, as well as the prices of bilateral spot market transactions in the wholesale power markets administered by the Western Electricity Coordinating Council (or "WECC"), covering much of the rest of the western United States.[5]  *Id.* PP 44-46.  FERC concluded that the cap was "needed at this time to mitigate the potential for market power abuse."  *Id.* P 47.

Three months later, FERC clarified that its cap was not a "hard" cap that makes above-cap bids to sell electricity categorically unlawful.  Instead, it was a "soft" cap, so "sellers may continue to submit bids above the bid cap."  *Cal. Indep. Sys. Operator Corp.*, 101 FERC ¶ 61,061, P 17 (2002) ("*October 2002 Order*").  But sellers must report above-cap sales to FERC, "with the understanding that . . . bids above the cap will be subject to justification and refund."  *Id.*

FERC initially set this WECC soft cap and the CAISO offer cap at $250 per megawatt-hour ("MWh").  *July 2002 Order* P 46.  Over the next decade, FERC increased them in parallel.  *See W. Elec. Coordinating Council*, 133 FERC ¶ 61,026, PP 2-5, 14-15 (2010) ("*2010 Order*").  But, since April 1, 2011, FERC

---

[5] The Council is a nonprofit corporation that coordinates wholesale electricity sales in western North America, including CAISO, but as FERC uses the term in the orders under review, the acronym generally refers to the U.S. portion of WECC outside the CAISO footprint.  *See Shell Energy Order* P 1 n.1 (JA584).  "Spot markets consist of sales that are 24 hours or less in duration and that are entered into the day of or the day prior to delivery."  *Id.*

has left the soft cap for the WECC at $1,000 per MWh, *see id.* PP 1, 14-15, despite increasing the CAISO offer cap to $2,000 per MWh, *see Cal. Indep. Sys. Operator Corp.*, 172 FERC ¶ 61,262, P 47 (2020).

For years, FERC refused to give sellers any guidance about how it would evaluate sellers' justifications for prices above the soft cap. *See Cal. Indep. Sys. Operator*, 114 FERC ¶ 61,135, P 16 (2006) ("*2006 Order*") (because FERC "cannot anticipate all of the possible justifications," it would not "delineate the specific types of documentation a seller might provide" and instead "would consider any such filing on a case-by-case basis."); *2010 Order* P 16 (similarly refusing to offer guidance because the agency "cannot anticipate all of the possible reasons a supplier may exceed the soft cap"). FERC first provided some guidance in June 2021[6] — *after* the sales at issue.

## II.    FACTUAL BACKGROUND

### A.    Petitioners' Summer 2020 Sales and Initial Justification Filings

A severe and extended heat wave across the western United States in the summer of 2020 led to a spike in demand for electricity and to volatile markets, and thus to increased spot market prices. *See Shell Energy Order* P 4 (JA585-86).[7]

---

[6] *See infra* Part II.B.

[7] FERC addressed each Petitioner's sales in a separate docket and issued separate orders as to each. The orders are substantially identical as to the common

In August 2020, each Petitioner sold electricity that it purchased from others; no Petitioner generated the energy it sold. *See id.* PP 7-8 (JA587). Petitioners — all of whom have market-based rate authority — made those relevant sales through bilaterally negotiated contracts with sophisticated counterparties, and at prices that exceeded the $1,000/MWh soft cap. *See id.* P 1 (JA584).

Petitioners timely reported their above-cap transactions to FERC and provided justifications. Chief (though not alone) among them was the *Mobile-Sierra* doctrine. *Id.* P 9 (JA587-88). Because the doctrine governed the spot market contracts at issue, Petitioners explained, FERC could require refunds only if it found that the above-cap prices those contracts set seriously harmed the public interest, which they did not. *See id.* P 11 (JA588).

### B. FERC's *2021 Guidance Order* and Petitioners' Supplemental Justification Filings

**1.** In June 2021, FERC issued a guidance order addressing the soft cap. *See ConocoPhillips Co. et al.*, 175 FERC ¶ 61,226 (2021) ("*2021 Guidance Order*") (JA252-65). FERC acknowledged that sellers had argued that their above-cap sales "are protected under the *Mobile-Sierra* doctrine." *Id.* P 6 (JA256). But FERC did not address those arguments in the *2021 Guidance Order*.

---

issues on appeal. For ease of reference, this brief cites FERC's orders as to Shell Energy, unless some feature of another Petitioner-specific order is relevant.

Instead, FERC set forth three, nonexclusive frameworks under which parties might seek to justify prices above the soft cap. *Id.* P 13 (JA258). The framework relevant here is "index-based." *Id.* As FERC noted, "price indices are widely used in bilateral natural gas and electric commodity markets to track spot and forward prices." *Id.* P 21 (JA261). It explained that "a seller relying on an index-based framework" could not simply "point to price indices as means to justify its transaction," but "must also show the appropriateness of the selected price index as representative of the seller's market opportunities at the time of the sale." *Id.* P 20 (JA260-61). To that end, FERC required "sellers" invoking that framework to "provide the following":

> (1) reference to a price index at a specific hub; (2) an explanation of the relevance of the specified price index to the transaction requiring justification, including locational and temporal relevance and published index price; and (3) a demonstration that the price index met conditions for adequate liquidity at the location based on the Commission's index liquidity standards.

*Id.* P 22 (JA261) (footnote omitted). FERC noted that, where a seller "transacted at a price including a markup of the index price (e.g., *index + \$25/MWh*)," FERC "may either require refunds for the markup or may consider justifications for the markup under a separate framework." *Id.* P 20 n.33 (JA261).

**2.** Petitioners then supplemented their justification filings. Petitioners reiterated that even their above-cap rates remain presumptively just and reasonable under the *Mobile-Sierra* doctrine. They also sought to justify those rates largely

13

using the newly announced index-based framework.  Specifically, they pointed to published indices that reflect weighted averages of the range of actual prices paid for cleared futures trades that were executed at particular locations.  *See Shell Energy Order* PP 10-14 (JA588-89).[8]

Most of Petitioners' sales occurred at rates that were below the highest price for a cleared trade at the relevant index (and were also below the $2,000/MWh CAISO cap).  *See*, *e.g.*, Suppl. to October 7, 2020 Filing at 4-11, *Shell Energy North America (US), L.P.* (July 19, 2021) ("Shell Energy Suppl.") (JA364-71).  But some of Petitioners' transactions were at rates that exceeded the index price; in other words, they were higher than the published, weighted average.

Petitioners' prices were set through contracts that differed in some particulars:  some contracts fixed a particular numeric price, while others used formulas setting prices by adding to a selected index price an additional fixed amount (called an "adder").[9]  In justifying those prices, Petitioners all made the

---

[8] The indices calculate a weighted average using both the price per MWh and the quantity of power sold at those prices.

[9] Adders are typical tools routinely used to allocate risk among sophisticated parties.  *E.g.*, Shell Energy Suppl. at 10 (JA370) (noting Shell's $50/MWh adder, accounting for less than 4% of the purchase price); Suppl. Aff. of William Horton ¶ 2 tbl. 1, *Tenaska Power Servs. Co.* (July 19, 2021) ("Horton Suppl. Aff.") (JA296) (Tenaska witness identifying both prices at fixed rates and prices with specified indices and adders); Suppl. to October 7, 2020 Notice and Justification at 6-7, *TransAlta Energy Mktg. (U.S.) Inc.* (July 19, 2021) ("TransAlta Suppl.") (JA1457-58) (similar).

14

same fundamental point: In a period of known supply uncertainty, Petitioners took on significant risk by committing to supply electricity that — as marketers — they could not generate themselves, and often had not procured in advance of the sales.

Petitioners thus took on the risk that they might not be able to purchase the power to satisfy the contract at a price that made the contract profitable. *See* Shell Energy Suppl. at 10 (JA370). In a period of known supply uncertainty, Petitioners also took on the risk that they might be unable to procure the promised electricity or transmission service at all, or that their suppliers and service providers might not perform their commitments, giving rise to claims for massive liquidated damages. *See id.* Further, Petitioners assumed the risk and expense of physically delivering the power to the points where it was needed during periods of transmission constraints — another factor that made performance uncertain. *See* TransAlta Suppl. at 2 (JA1453).

No counterparty to any contract with any Petitioner intervened to challenge the rate it had agreed to pay.

### C.    FERC's Refund Orders

**1.**    As to each Petitioner, FERC "agree[d] . . . that the *Mobile-Sierra* presumption applies to [the] sales." *Shell Energy Order* P 36 (JA596). But FERC concluded that that doctrine was "not dispositive" of "whether the Commission can order refunds if it finds that the prices for [above-cap] sales are not justified." *Id.*

15

FERC asserted that, in ordering refunds, it was "not modifying the contracts." *Id.* Instead, it was "enforcing requirements incorporated into the contracts via the Commission orders establishing the price cap and provisions in [Petitioners'] market-based rate tariff[s]." *Id.* (footnote omitted); *see also* Shell Energy North America (US), L.P. Market-Based Rate Tariff[10] § 5 ("Shell Energy Tariff") (addressing "*Compliance with Commission Regulations*"). FERC concluded that its price cap "is a restriction or limit on [Petitioners'] market-based rate authority established via Commission orders, as contemplated by [those] tariff[s]." *Shell Energy Order* P 37 (JA597).

Commissioner Danly disagreed, and dissented from each refund order on that ground. Applying the *Mobile-Sierra* presumption, Commissioner Danly concluded that the record contained no evidence "that the public interest is seriously harmed by the contract rate." *Id.* P 1 (JA602) (Commissioner Danly, dissenting). Instead, the record showed that "[b]uyers willingly purchased power during a reliability crisis at a modest premium above prevailing market index prices." *Id.* P 10 (JA605). And he explained that any argument that those "prices seriously harmed the public interest" would be "absurd on its face," as FERC's

---

[10] A copy of the tariff is available on FERC's website, at https://etariff.ferc.gov/TariffSectionDetails.aspx?tid=772&sid=266753.

offer cap for CAISO sales was "much higher" than the contract prices. *Id.*

(JA606).

Commissioner Danly rejected the majority's assertion that ordering refunds does not modify the contracts, reasoning that "[t]here is no more fundamental modification of a contract than to change the sales price" — which is to say, "the first element of any contract, the *offer*." *Id.* P 5 (JA604). He also explained that FERC's decision to order refunds without satisfying *Mobile-Sierra*'s public-interest standard cannot be justified by FERC's decision to set a "soft" cap, rather than a "hard" cap. *Id.* PP 7-8 (JA605). Under a hard cap, "sales above the cap are prohibited," "no contract above the cap is enforceable," and "*Mobile-Sierra* never comes into play" (because it does not apply to unenforceable contracts). *Id.* P 7 (JA605). But a "soft" cap leaves parties "free to negotiate contracts above the cap," and those contracts "enjoy the *Mobile-Sierra* presumption" when the rates are later assessed against the statutory just and reasonable standard. *Id.* P 8 (JA605). Commissioner Danly noted that "no precedent . . . suggest[s] otherwise" and that the "majority certainly fails to cite any." *Id.*

Commissioner Danly also argued that "a Commission-imposed soft cap" cannot be sufficient to remove "an entire class of market-based rate contracts from the *Mobile-Sierra* presumption." *Id.* P 6 (JA604). If that were true, "the Commission could order that any rate above zero in any contract is subject to a

17

'soft' cap, and *just like that*, the pesky *Mobile-Sierra* doctrine would be gone

forever, and the Commission could simply dictate all seller offers." *Id.* (JA605).

But there are "limits to the 'restrictions' the Commission can attach to market-

based rate tariffs." *Id.*

 **2.** Turning to the specific above-cap transactions, FERC accepted

Petitioners' justifications where the sales price was equal to or below the price of

an index that the Petitioner showed to be sufficiently relevant and liquid to satisfy

the index-based framework. *See Shell Energy Order* P 39 (JA598).  But where the

price exceeded the index, FERC required Petitioners to pay refunds of the amount

above the index (and above the soft cap).  *See id.*  FERC relied on the notion that

the index price necessarily reflected the "scarcity conditions" caused by the

extreme weather in the region, and that higher prices required a justification other

than those conditions.  *Id.* P 45 (JA600).  Where FERC found no applicable index,

it ordered refunds down to the soft cap.  *See Macquarie Order* P 51 (JA724-25).

 FERC did not address in its orders whether the contract prices that

Petitioners and their buyers agreed on were lower than the highest actual sales

prices that were averaged to calculate the index price.  Nor did FERC address

arguments that indices based on contracts for "day-ahead" sales, including sales for

non-super-peak hours, set inappropriate price ceilings for sales of hourly products

during super-peak demand hours, for which market prices are naturally higher.

**D.    FERC's Denials of Rehearing and the Proceedings on Appeal**

Each petitioner timely sought rehearing.  Because FERC did not rule on those petitions within 30 days, each petition was deemed denied by operation of law.  *See* 16 U.S.C. § 825*l*(a).

Petitioners then timely filed petitions for review.  The California Public Utilities Commission also petitioned for review of each of those orders; the Court consolidated the petitions from the same order.  *See*, *e.g.*, Order at 1, Nos. 22-1116 & 22-1155 (July 14, 2022).

FERC then moved, and the Court agreed, to delay the filing of the record so that FERC could respond to the rehearing petitions.  *See*, *e.g.*, Order at 1, Nos. 22-1116 & 22-1155 (Aug. 4, 2022).  FERC later issued orders in response to each Petitioner's request for rehearing, without changing the substance of its rulings.

**1.**    FERC continued "to find that the *Mobile-Sierra* presumption applies to [Petitioners'] contracts."  *Shell Energy Reh'g Order* P 8 (JA1195).  But it described the "soft price cap" as a "restriction on [Petitioners'] market-based rate authority" that incorporated the "justification requirement" into Petitioners' contracts and barred Petitioners from "charg[ing] unjustified amounts in excess of the WECC soft price cap."  *Id.* PP 16-17 (JA1199-1200).  Commissioner Danly renewed his dissent.  *See id.* (JA1213) (Commissioner Danly, dissenting).

19

**2.** FERC also continued to reject Petitioners' justifications for above-cap prices that also exceeded the applicable index price. FERC stated that the index price is a "weighted average" of prices "at both the higher and lower end of the range," and so is "fairly 'representative of the seller's market opportunities at the time of the sale' and therefore serves as a reasonable benchmark for competitive pricing." *Shell Energy Reh'g Order* P 23 (JA1202-03). FERC did not explain why this computed average is "fairly representative" but the real-world prices from which that average is computed — including those above the average — are not.

FERC also continued to find that, insofar as the index price already accounted for scarcity conditions, prices above that figure (whether set by adder or fixed price) required independent justification. *Id.* P 24 (JA1203). "To the extent sellers have evidence of costs incurred or include a risk premium," FERC stated, "they can justify their transactions using those costs, but the Commission will not accept rationales for prices above the WECC soft price cap based on unsupported assertions." *Id.* FERC did not explain what showing a seller could make to justify a risk premium that is, by necessity, agreed to before the "costs" at issue are realized.

**3.** At all parties' request, the Court then consolidated challenges to FERC's orders in these five cases with challenges that the California Public Utilities Commission and the Southern California Edison Company brought to

FERC decisions in eight other cases involving the soft cap.  *See* Order at 7, Nos. 22-1116 *et al.* (Mar. 6, 2023).

## SUMMARY OF ARGUMENT

**I.**     FERC violated *Mobile-Sierra* by ordering refunds without finding that any negotiated contract rate seriously threatens the public interest.  FERC agreed that *Mobile-Sierra* applies to these contracts.  As Commissioner Danly explained in dissent, that should have been the end of the inquiry:  the record contained no evidence that would enable FERC to find that the contract rates seriously harmed the public interest and, therefore, were unjust and unreasonable.

FERC nevertheless lowered the rates that Petitioners' sophisticated buyer counterparties agreed to pay and did not challenge.  FERC's justifications for disregarding the limits *Mobile-Sierra* places on its refund authority lack merit.  FERC's reliance on Petitioners' tariff obligations to abide by FERC's orders misconstrues the tariffs, the soft cap orders, and the Commission's authority.  In adopting and increasing the soft cap, FERC never even intimated that "refund and justification" meant that it was removing *Mobile-Sierra* protection from above-cap rates and would apply a different (but unexplained) standard in assessing justifications.  Nor could FERC use a soft cap to hollow out the *Mobile-Sierra* doctrine's protections for negotiated contract rates:  as the Supreme Court makes

21

clear, the doctrine follows from the Federal Power Act, and therefore "control[s] FERC itself." *NRG Power Mktg.*, 558 U.S. at 168.

**II.** FERC's refund orders are independently arbitrary and capricious, and unsupported by substantial evidence, because they condemn rates that were consistent with prevailing market prices. FERC's orders require Petitioners to refund the difference between their contract rates and the index prices, without regard to the distribution of the real-world prices that were averaged to calculate those indices. FERC thus paid no heed to evidence confirming that the rates at issue do not reflect the abuse of market power, but instead the operation of ordinary market forces under the extraordinary conditions of the summer of 2020.

**III.** FERC's treatment of specific transactions is independently arbitrary and capricious, and unsupported by substantial evidence, for additional reasons. It improperly disregarded an obvious explanation for the difference between the prices of some of Petitioners' products and the price indices: Petitioners' products were different from (and more valuable than) the products whose prices were averaged to compute the indices. Further, it offered an insufficient explanation of how market participants can justify prices above the soft cap in remote areas for which an index is unavailable.

## STANDING

Each Petitioner participated in one of the proceedings below that is consolidated for review in this appeal, and the orders at issue require them to pay refunds.  They are thus aggrieved parties, *see* 16 U.S.C. § 825*l*(b), with standing to challenge those orders.

## STANDARD OF REVIEW

The Court must set aside FERC decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or rest on factual findings that are not supported by substantial evidence, *id.* § 706(2)(E); 16 U.S.C. § 825*l*(b).  The Court owes FERC no deference with regard to its reading of *Mobile-Sierra* or the Supreme Court's decisions in *Morgan Stanley* and *NRG Power Marketing* applying it.  *See Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 78 (D.C. Cir. 2016) ("We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle.").

Under the arbitrary-and-capricious standard,[11] FERC "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."  *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312

---

[11] *See Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[I]n their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same.").

(D.C. Cir. 2018); *see also Tenneco Gas v. FERC*, 969 F.2d 1187, 1214 (D.C. Cir. 1992) (per curiam) (finding that FERC's failure "adequately to consider relevant evidence . . . falls afoul of our requirement that an agency engage in reasoned decisionmaking by supporting it conclusions with substantial evidence in the record"). Moreover, the Court must set the orders under review aside if it determines that "the process by which [FERC] reache[d its] result" was not "logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

## ARGUMENT

## I.    FERC'S REFUND ORDERS VIOLATE THE *MOBILE-SIERRA* DOCTRINE

### A.    FERC May Not Alter Negotiated Contract Rates Without Making the Finding *Mobile-Sierra* Requires

FERC "agree[d] . . . that the *Mobile-Sierra* presumption applies to [the] sales" at issue. *Shell Energy Order* P 36 (JA596); *accord Shell Energy Reh'g Order* P 8 (JA1195). That presumption "control[s] FERC itself." *NRG Power Mktg.*, 558 U.S. at 168. And it means that FERC "must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law." *Morgan Stanley*, 554 U.S. at 530; *accord NRG Power Mktg.*, 558 U.S. at 174-75 (explaining that "FERC itself must presume just and reasonable a contract rate resulting from fair, arm's-length negotiations").

24

Yet FERC's refund orders went on to sidestep the *Mobile-Sierra* presumption's sharp limits on its refund authority.  That "presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." *Morgan Stanley*, 554 U.S. at 530.  FERC made no such finding.  Nor could it, because the record contains no evidence that could support it.  On the contrary, as Commissioner Danly explained in dissent, an assertion that the rates in these contracts seriously harmed the public interest would be "absurd on its face." *Shell Energy Order* PP 1, 10 (JA602, 606) (Commissioner Danly, dissenting).  Therefore, FERC acted unlawfully in holding that the contracts here set unjust and unreasonable prices and that it could alter the prices by ordering refunds.

In so holding, FERC ignored this Court's repeated rebukes of prior efforts to evade *Mobile-Sierra*.  For example, the Court has explained that the "public interest" standard requires a "particularized" analysis, and is not satisfied by the simple recitation of "generalized public interest goals." *Emera Maine v. FERC*, 854 F.3d 662, 670 (D.C. Cir. 2017).  Yet FERC offered no analysis of how any of the contracts at issue "harms the public interest" or "the extent to which abrogation or reformation mitigates the contract's deleterious effect." *Texaco*, 148 F.3d at 1097.  The Court also has barred FERC from relying on a "generic" *Mobile-Sierra* finding about a class of contracts (rather than a specific contract) outside "rare circumstances." *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667,

711 (D.C. Cir. 2000) (per curiam), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). But these cases involve no rare circumstances like those in *Transmission Access* (where "FERC-mandated open access transmission" "affect[ed] an entire class of contracts in an identical manner," *id.* at 710), and (again) FERC made no contrary finding in the orders below or in any earlier order about the soft cap.

The effective functioning of the nation's energy markets depends on *Mobile-Sierra*'s gloss on FERC's statutory authority to order refunds. It reflects "the commonsense notion that in wholesale markets, the party charging the rate and the party charged are often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them." *Morgan Stanley*, 554 U.S. at 545 (cleaned up).[12] Further, the doctrine gives sellers an incentive to participate in even volatile markets, secure in the knowledge that agreements with "sophisticated [counter]parties" entered into amidst "market turmoil" will remain enforceable "once the storm has passed." *Id.* at 547; *see also Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 410 (D.C. Cir. 2000) (explaining that this Court "has

---

[12] As the Ninth Circuit has explained, *Morgan Stanley* and *NRG Power Marketing* make clear that the *Mobile-Sierra* doctrine "may be invoked with regard to any contracted-for rate," including for "spot sale contracts." *California ex rel. Harris v. FERC*, 809 F.3d 491, 501-02 (9th Cir. 2015).

repeatedly emphasized the importance of contractual stability in a number of cases involving the *Mobile-Sierra* doctrine" and citing cases).

Marketers like Petitioners, who bring needed supply to markets in times of supply shortages, depend on the fact that their contracts — including those reflecting high market prices during periods of volatility — will not be set aside absent "*extraordinary* circumstances." *NRG Power Mktg.*, 558 U.S. at 174 (quoting *Nev. Power Co. v. Duke Energy Trading & Mktg., L.L.C.*, 99 FERC ¶ 61,047, PP 61,184, 61,190 (2002)). The doctrine thus protects "the essential role of contracts as a key factor fostering stability in the electricity market, to the long-run benefit of consumers." *Id.*

### B.    FERC's Defenses of Its Refund Orders Lack Merit

**1.**    In its initial decisions ordering refunds, FERC asserted that it was "not modifying the contracts," but instead was "enforcing requirements incorporated into the contracts" through FERC's "orders establishing" the soft cap and provisions in the sellers' "market-based rate tariff[s]." *Shell Energy Order* P 36 (JA596). FERC pointed to the provision in the tariffs that states that the seller "must comply with" "orders . . . [that] otherwise restrict[] or limit[] the seller's market-based rate authority." *Id.* P 37 (JA597) (emphasis omitted). And it claimed that its soft cap was "a restriction or limit on [that] market-based rate authority established via Commission orders." *Id.*

27

But, as Commissioner Danly explained, nothing in the orders establishing or modifying the soft cap suggested anything of the kind. *Id.* P 8 (JA605) (Commissioner Danly, dissenting). Although FERC pointed to its *July 2002 Order* and its *2010 Order*, it failed to identify a paragraph of either order supporting its contention. *See Shell Energy Order* P 37 n.48 (JA597). Neither order provides that support. The *July 2002 Order* established a *hard* cap — that is, it "impose[d] a maximum price for all sales in WECC spot markets." *July 2002 Order* P 46. In its *October 2002 Order*, FERC clarified that the cap was a soft one, and stated — without elaboration — that "bids above the cap will be subject to justification and refund." *October 2002 Order* P 17. The *2010 Order* reiterated the *October 2002 Order*'s clarification that "the cap is a 'soft' cap and . . . bids above the cap will be subject to justification and refund." *2010 Order* P 2. But, as in 2006, FERC refused to "define the justification required to exceed the soft price cap." *Id.* P 16 (citing *2006 Order* P 16).

Nothing about the references to "justification and refund" suggested that the soft cap was anything more than an automatic mechanism to trigger FERC review of sales at above-cap rates, without the need for any party to file a complaint. That opaque phrase says nothing about the mode of review that FERC will apply when it reviews sellers' justifications. And it certainly did not give notice that, while *Mobile-Sierra*'s default rule would continue to protect bilaterally negotiated rates

at or below the soft cap, sales at rates above that cap would be reviewed under an entirely different standard — a standard that requires sellers to affirmatively prove the justness and reasonableness of above-cap rates, rather than requiring the challenger to prove that the rates seriously harm the public interest, as *Mobile-Sierra* requires.  Equally important, nothing in that phrase comes close to the sort of disfavored, generic public interest determination that would have been required to remove *Mobile-Sierra* protection from the entire class of contracts that set rates above the soft cap.  *Cf. Transmission Access*, 225 F.3d at 711 (addressing "rare circumstances" allowing for generic findings).

      **2.**     FERC's belated attempt to breathe meaning into "justification and refund" is also contrary to *Morgan Stanley*.  There, the Supreme Court rejected an effort to water down *Mobile-Sierra*'s protections for contract rates thought too high (rather than too low).  *See* 554 U.S. at 549-50 (rejecting standard effectively condemning contract rates exceeding marginal cost, because "[a] presumption of validity that disappears when the rate is above marginal cost is no presumption of validity at all, but a reinstitution of cost-based rather than contract-based regulation").  Put differently, the fact that Petitioners' rates were set by bilaterally negotiated contracts means that FERC may only order a "refund" in response to a seller's "justification" of a contract price above the soft cap upon a finding that the contract price "seriously harms the public interest."  *Morgan Stanley*, 554 U.S. at

530; *see also Mobile*, 350 U.S. at 344 ("[T]he contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest.").

FERC's assertion that Petitioners' tariffs incorporated the orders establishing the soft cap, therefore, provides no support for its conclusion that those orders stripped above-cap sales of *Mobile-Sierra* protection against modification through refunds.  Instead, as Commissioner Danly explained, "contracts above the soft cap, like all market-based rate sales, enjoy the *Mobile-Sierra* presumption," and a "freely negotiated contractual offer price above the cap cannot be modified unless it seriously harms the public interest," with the "burden . . . on protestors to demonstrate that the contract rate harms the public interest."  *Shell Energy Order* PP 8-9 (JA605) (Commissioner Danly, dissenting).

    **3.**    FERC's contrary conclusion is also irreconcilable with the filed rate doctrine and FERC's own market-based rate program.  The "filed rate doctrine" is, as the Court has recognized, "shorthand" for "statutory provisions" that "mandat[e] the open and transparent filing of rates and broadly proscrib[e] their retroactive adjustment."  *Okla. Gas & Elec.*, 11 F.4th at 829.  That is why this Court has held (for example) that a tariff may not incorporate extra-tariff material with only a "vague reference to" it, *Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 810 (D.C. Cir. 2007), and FERC may not "simply announce some formula and *later*

reveal that the formula was to govern from the date of announcement," *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 578 (D.C. Cir. 1990); *accord Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1231 (D.C. Cir. 2018).

Unlike the refund orders here, FERC's implementation of its market-based rate regime reflects those limits. The tariff provision that FERC now relies on to evade *Mobile-Sierra* is one FERC required sellers to include in their tariffs, along with a related "provision identifying all limitations on its market-based rate authority (including markets where the seller does not have market-based rate authority)." *Order 697* P 916. When it imposed those requirements, FERC recognized "the benefits to sellers and customers of having all terms and conditions relevant to a seller's market-based rate power sales available in one document." *Id.* P 927; *see also id.* P 913 (aiming to make tariffs "more customer friendly" and to "serve customers by providing for the opportunity to have all terms and conditions identified and in one place").

FERC's novel reading of Petitioners' tariffs is incompatible with these principles. The tariffs state that "terms and conditions" for purchases of electric energy and capacity, including price, "shall be established by agreement between" buyer and seller. *E.g.*, Shell Energy Tariff §§ 3-4. They also include the required language about regulatory compliance and limitations on Petitioners' market-based

31

rate authority.  *E.g.*, *id.* §§ 5-6.  They do not list the WECC soft cap among the latter.

No buyer who came to Petitioners' tariffs expecting "to have all terms and conditions identified and in one place," *Order 697* P 913, would make the leaps FERC's refund orders require:  from generic and obligatory follow-the-law language in the tariff to unmentioned soft cap orders, and from "justification and refund" in the soft cap orders to the abrogation of *Mobile-Sierra* and notice that FERC could concoct new refund methodologies with retroactive effect.  *See Keyspan-Ravenswood*, 474 F.3d at 810 (rejecting an "unelaborated reference to" extra-tariff material as insufficient to give the 'clear[] and specific[]' notice" required of a tariff, *see* 18 C.F.R. § 35.1(a)); *see also Dominion Transmission, Inc. v. FERC*, 533 F.3d 845, 854-55 (D.C. Cir. 2008) (rejecting FERC's reading of contract because it rendered contract self-contradictory); *Okla. Gas & Elec.*, 11 F.4th at 824-25 ("Once a tariff is filed, the Commission has no statutory authority to provide equitable exceptions or retroactive modifications to the tariff.").

**4.**    On rehearing, FERC reiterated the above reasoning, *see Shell Energy Reh'g Order* PP 13-15 (JA1197-99), while adding rationales that continue to flout the Supreme Court's reading of the Federal Power Act in *Mobile-Sierra*, *Morgan Stanley*, and *NRG Power Marketing*.

First, FERC asserted that the "purpose of the WECC soft price cap [was] to protect against the *potential* exercise of market power." *Id.* P 16 (JA1199) (emphasis added). But, again, the Supreme Court has held that the Federal Power Act "intended to reserve the Commission's contract-abrogation power for those extraordinary circumstances where the public will be severely harmed." *Morgan Stanley*, 554 U.S. at 551. Preventing the posited possibility that some unspecified seller might exercise market power in some unspecified circumstance is, at best for the Commission, a "generalized public interest goal[]," and does not come close to the "particularized" analysis that *Mobile-Sierra* demands. *Emera Maine*, 854 F.3d at 670; *cf. Morgan Stanley*, 554 U.S. at 554-55 (holding that FERC cannot "abrogate a contract on the[] ground[] [that a seller engaged in unlawful activity] without finding a causal connection between unlawful activity and the contract rate").

Further, if FERC had wished to make a "generic" *Morgan Stanley* finding of the sort necessary to abrogate a class of contracts, it would have needed far more than its stated concern about the "potential exercise of market power." Such a finding is "appropriate only in rare circumstances," where it is unnecessary to "impose on [FERC] and the parties the repetitive burden of proving the public interest in each and every case." *Transmission Access*, 225 F.3d at 710-11. But FERC has not made such a finding — not in establishing or raising the soft cap or

33

in the orders under review — and it lacks any basis to make one. FERC found that Petitioners lack market power in authorizing them to operate under market-based rate tariffs in the first place, and acknowledged that there is no suggestion that any Petitioner here exercised market power. *See Shell Energy Reh'g Order* P 28 (JA1207) (acknowledging the "[a]bsen[ce of] evidence of manipulation or the exercise of market power"). As Commissioner Danly explained, "the majority is wrong that a Commission-imposed soft cap is all it takes to eliminate an entire class of market-based rate contracts from the *Mobile-Sierra* presumption." *Shell Energy Order* P 6 (JA604) (Commissioner Danly, dissenting).

Second, FERC contended that requiring a finding that the above-cap price seriously harms the public interest would "turn the Commission-mandated protection of the WECC soft price cap on its head, by forcing wholesale customers to negotiate with sellers to secure that protection." *Shell Energy Reh'g Order* P 17 (JA1200). On the contrary, FERC's reasoning turns the *Mobile-Sierra* doctrine on its head. It is (again) "grounded in the commonsense notion that in wholesale markets, the party charging the rate and the party charged are often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a just and reasonable rate as between the two of them." *Morgan Stanley*, 554 U.S. at 545 (cleaned up). FERC has no authority to "mandate[]" a

34

buyer-favoring "protection" that *Mobile-Sierra* requires FERC to presume to be unnecessary.

FERC's contrary position also ignores the Supreme Court's teaching that "the *Mobile-Sierra* doctrine does not overlook third-party interests; it is framed with a view to their protection." *NRG Power Mktg.*, 558 U.S. at 175. The sophisticated energy buyers that contracted with Petitioners understand that *Mobile-Sierra*'s "default rule," *Morgan Stanley*, 554 U.S. at 534, continues to apply with full force unless the contracting parties otherwise agree. *See Texaco*, 148 F.3d at 1096 ("The law is quite clear: absent contractual language susceptible to the construction that the rate may be altered while the contract subsists, the *Mobile-Sierra* doctrine applies") (cleaned up).

\* \* \*

*Mobile-Sierra* is not FERC's to take or leave. It is instead a statutory limitation on FERC's authority — it "control[s] FERC itself." *NRG Power Mktg.*, 558 U.S. at 168; *see also Morgan Stanley*, 554 U.S. at 544-46 (rejecting appeal to *Chevron* deference because "we conclude that the Commission was *required*, under our decision in *Sierra*, to apply the *Mobile-Sierra* presumption in its evaluation of the contracts here").

FERC has long strained to evade that limitation, and the Supreme Court and this Court have repeatedly been required to hold the agency to it. In prior cases,

the agency has asserted (for example) that a "generic contract clause compelling both parties to adhere to the law" removed a contract from *Mobile-Sierra*'s protections, *Texaco*, 148 F.3d at 1095-97, and that the agency did not modify a contract imposing "precisely defined" filing requirements when it issued an order imposing additional filing requirements, *Dominion Transmission*, 533 F.3d at 853. The Court saw both gambits for what they were — improper efforts to end-run *Mobile-Sierra*. The fiction that FERC "is not modifying the contracts," *Shell Energy Order* P 36 (JA596), when it jettisons "the first element of any contract, the *offer*," by "chang[ing] the sales price," *id.* P 5 (JA604) (Commissioner Danly, dissenting), should meet the same fate. *See also Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 15 (D.C. Cir. 2002) ("While FERC may be becoming hostile to *Mobile-Sierra* and the particularized findings that doctrine requires, the Commission would do well to heed its own admonition and not take contract modification lightly.") (citation omitted).

FERC's error threatens to destabilize energy markets within the WECC, which FERC's refund orders purportedly protect, and beyond. *Mobile-Sierra* is foundational to sophisticated parties' efforts to negotiate prices and allocate risk, because buyers and sellers know that the doctrine applies unless both parties agree to contract around it. That encourages sellers to make electricity available under extraordinary market conditions like those at issue in this very case. FERC's

soft-cap end-run around *Mobile-Sierra* injects regulatory risk that will deter otherwise-willing buyers and sellers from agreeing to above-cap prices during times of market volatility. *Cf. Morgan Stanley*, 554 U.S. at 547 ("[E]nabling sophisticated parties who weathered market turmoil by entering long-term contracts to renounce those contracts once the storm has passed . . . would reduce the incentive to conclude such contracts in the future."); *Mobile*, 350 U.S. at 344 ("By preserving the integrity of contracts, [the *Mobile-Sierra* doctrine] permits the stability of supply arrangements which all agree is essential to the health of the . . . industry."). That will ultimately redound to the detriment of consumers left without power that was there for the purchasing when they needed it most.

Accordingly, the Court should vacate the refund orders and remand for further proceedings in which FERC must find *Mobile-Sierra*'s public-interest standard satisfied before it can order any refunds. That is sufficient to dispose of the petitions, and the Court need go no further.

## II.    FERC'S REFUND ORDERS ARE INDEPENDENTLY ARBITRARY AND CAPRICIOUS BECAUSE THEY MISAPPLY THE PRICE INDEX BENCHMARK

The refund orders also suffer from a separate and independently fatal defect. In them, FERC held that each Petitioner failed to justify any price that was above both the soft cap and the applicable weighted-average index price, despite record

evidence providing reasonable justifications.  The refund orders are thus arbitrary and capricious, and lack support in substantial evidence.

**A.    FERC's Application of the Index-Based Justification Framework Is Arbitrary and Capricious, and Unsupported by Substantial Evidence**

As FERC itself acknowledged, the purpose of its index-based justification framework is to identify a benchmark that is "representative of the seller's market opportunities at the time of the sale." *2021 Guidance Order* P 20 (JA261).  In a concededly volatile market like the one at issue, any sensible analysis of the seller's market opportunities must account for the *distribution* of prices that buyers actually paid — not just a weighted average of those prices, computed after the fact.

The Supreme Court and this Court have long rejected the notion "that there is only one just and reasonable rate possible."  *Blumenthal*, 552 F.3d at 883 (quoting *Mobil Oil Corp. v. Fed. Power Comm'n*, 417 U.S. 283, 316 (1974), and *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 796-98 (1968)).  Moreover, this Court has explained that, "during times of scarce supply," "market rates are expected and permitted to be higher than marginal costs" because "high rates" both "reflect existing scarcity" and "encourag[e] new development that will increase supply." *Id.*

38

This case illustrates the wisdom of those principles. In August 2020, the wholesale electricity market in the western United States was unusually volatile. The circumstances constrained sophisticated players with different risk profiles and risk tolerances (like Petitioners) to make fast decisions under conditions of great uncertainty, which yielded broad price dispersion and differences in approaches to price setting. FERC explicitly acknowledged both that the price spikes in August 2020 resulted from extreme heat and the subsequent impact on supply and demand, *see Shell Energy Reh'g Order* P 4 (JA1193), and that Petitioners do not have market power, *see id.* P 28 (JA1207). Particularly given the *Mobile-Sierra* doctrine's unambiguous endorsement of private contracting's efficiencies, those findings make clear that market forces — not market power — explain the prices observed.

For all these reasons, to identify "the seller's market opportunities at the time of [a given] sale," *2021 Guidance Order* P 20 (JA261), it is necessary to take into account not just the *level* of the index price (a weighted average of reported market pricing), but the *distribution* of the actual prices that make up that index price (some higher, and others lower, than the average). To ignore the latter, as FERC did, is to ignore information that is critical to understand the operation of the volatile marketplace at issue.

### B.    FERC's Contrary Conclusion Lacks Merit

FERC attempts to defend its ruling by asserting that the average index price "necessarily incorporates prices at both the higher and lower end of the range." *Shell Energy Reh'g Order* P 23 (JA1202).  That is no explanation at all:  the problem with FERC's reasoning is precisely that an average by its nature masks variance in the underlying observations.  *Cf. United States v. Abilene & S. Ry. Co.*, 265 U.S. 274, 291 (1924) (noting that "averages are apt to be misleading").

The flaws of FERC's reasoning are particularly well-illustrated by FERC's order that four Petitioners (all but Brookfield) issue refunds for the amount of the "adders" above the index prices included in the contracts.  Petitioners are marketers that did not generate the power they sold.  They therefore incurred substantial risk that they will be forced to choose between unprofitable supply costs and failing to deliver under a contract and paying large liquidated damages.  Indeed, some customers threatened to pursue that very possibility.  *See* Aff. of William W. Horton ¶ 13 & Ex. WWH-1, *Tenaska Power Servs. Co.* (Oct. 7, 2020) ("Horton Aff.") (JA145, 155).  And one Petitioner ultimately had to pay liquidated damages.  *See* TransAlta Suppl. at 4 (JA1455).  Because these and other risks increase in times of market turmoil and uncertainty, adders are standard fare under those conditions — a fact confirmed on this record, because in some instances, buyers affirmatively *offered* adders as risk premiums.  *See id.* at 6-7 & Ex. A

(JA1457-58, 1462-65); Request for Reh'g at 31, *TransAlta Energy Mktg. (U.S.) Inc.* (July 15, 2022) ("TransAlta Reh'g Request") (JA1080).

FERC never meaningfully confronted any of this evidence. Instead, in responding to the arguments for rehearing, it insisted for the first time that sellers justify the level of such adders by reference to a retrospective examination of costs. *See Shell Energy Reh'g Order* ¶ 24 (JA1203). That requirement distorts the purpose of risk premiums. Whether explicit (adders) or implicit (higher fixed prices for the entire transaction), a risk premium compensates a seller for internalizing costs that are subject to uncertainty at the time of contracting. The price of that *ex ante* risk-shifting is not sensibly measured by looking *ex post* at what costs were in fact realized. Indeed, FERC has recognized this same principle in prior orders in which it held that adders of up to $100/MWh are a just and reasonable response to having "imperfect information" about "actual[] costs," without requiring precise risk quantification. Order No. 831, *Offer Caps in Markets Operated by Regional Transmission Organizations and Independent System Operators*, 157 FERC ¶ 61,115, P 207 (2016).[13] The orders under review

---

[13] FERC's response — that Order No. 831 applies to organized markets with market-power mitigation processes, *TransAlta Reh'g Order* P 33 (JA1366) — ignores the conflict with the reasoning in that earlier order. There, FERC held that much larger adders than those at issue here were a reasonable *ex ante* response to

depart from that principle with no sound explanation — instead continuing FERC's decades-long refusal to explain what exactly it expects sellers to provide to justify above-cap prices.  *See 2010 Order* P 16; *2006 Order* P 16.[14]

In rejecting every risk-based argument that every Petitioner presented, FERC thus hollowed out its promise to consider justifications beyond the frameworks it identified in 2021.  *See 2021 Guidance Order* P 13 (JA258); *see Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001) ("[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so.").

Even when presented with concrete and specific evidence of out-of-pocket costs above the relevant price index, FERC still required refunds that turned the contract from profitable to unprofitable.  For example, Tenaska submitted evidence demonstrating that it sold energy to two customers at the rate of the ICE PV Peak Index Price plus $20/MWh and $25/MWh, respectively.  And Tenaska showed that it purchased that energy from another company under a term (i.e., non-spot)

---

imperfect information.  Here, FERC demanded *ex post* support for that *ex ante* response.

[14] Indeed, even now, FERC continues to assert that "unsubstantiated claims are not enough" without giving any examples of what it might find sufficient. *Shell Energy Reh'g Order* P 25 (JA1204).  As in 2010 and 2006, FERC points to its desire "not . . . to limit the types of support sellers can provide to justify the price of transactions above the WECC soft price cap" as a basis for giving no meaningful guidance. *Id.*

contract that set a rate of ICE PV Peak Index Price plus $3.60/MWh.  *See* Horton

Aff. ¶ 18 & tbl. 3 (JA147).  FERC ignored this evidence in its initial order

requiring Tenaska to refund the adder amounts.  *See generally Tenaska Order*

(JA485-508).

In responding to Tenaska's rehearing request, FERC asserted that the

evidence that Tenaska "paid premiums" above the index price was not a

justification for charging premiums when it resold that energy, because its

supplier's "transactions above the price cap are also subject to justification" and so

Tenaska "will be the beneficiary of any refunds."  *Tenaska Reh'g Order* P 29

(JA1163).  But that is false.  The soft cap requires justification only for spot sales,

not those under term (i.e., not spot) contracts, like the supply contract.  *See* Request

for Reh'g at 23, *Tenaska Power Servs. Co.* (May 23, 2022) ("Tenaska Reh'g

Request") (JA777).  FERC's order not only rested on a "clipped view of the

record," *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003),

but also violated the statutory and constitutional requirement that a supplier be

afforded an opportunity to recover its costs, *see*, *e.g.*, *Fed. Power Comm'n v. Hope

Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

FERC's treatment of TransAlta's evidence likewise reflects inadequate

engagement with the record.  TransAlta presented evidence, verified by an

attestation from a knowledgeable witness, specifying the risks that TransAlta

priced into its transactions:  for example, that power deliveries would be curtailed and leave TransAlta liable for damages — an outcome that materialized in due course.  *See* TransAlta Suppl. at 2, 4 (JA1453, 1455).  Yet FERC erroneously dismissed the evidence as mere "unsupported assertions."  *TransAlta Reh'g Order* P 33 (JA1365).

In sum, the fundamental facts of the marketplace under examination were its extraordinary volatility and the related risk that market participants' contracts allocated.  Yet FERC opted to credit an average that deliberately obscures that volatility, mischaracterized the nature of the resulting risks, and ignored marketplace evidence of how sophisticated parties allocate them.  In doing so, it fell well short of its obligation to support its conclusions with substantial evidence, *Tenneco Gas*, 969 F.2d at 1214, and an "adequate explanation" for contrary evidence, *see Genuine Parts*, 890 F.3d at 312.  The orders on review should be set aside on that ground as well.

## III.   FERC'S REFUND ORDERS ARE ERRONEOUS IN OTHER INDEPENDENT RESPECTS

### A.   FERC Erred in Using the Day-Ahead, 16-Hour Index as the Benchmark for Refunds for Hourly Sales During the Super-Peak Hours

The Commission applied a day-ahead, 16-hour index to all the transactions at issue.  This index calculates an average index price based on "day-ahead" sales, i.e., transactions that are negotiated and agreed to the day prior to delivery, on an

hourly basis for the hours between 6 a.m. and 10 p.m.  This index does not provide a reasonable comparison as to some of the sales at issue:  hours known as the "super-peak."  These are afternoon and evening hours when demand is higher and supply is harder to come by due to transmission constraints as well as the fact that sellers may have the opportunity to offer into the CAISO market at prices up to $2,000/MWh.  Accordingly, prices are higher in the super-peak hours than in other hours.  In addition, many of the super-peak sales at issue were made in the "real time" market (i.e., negotiated and agreed on the day of delivery), which buyers use when they have been unable to purchase sufficient electricity in the day-ahead market to serve load.  This need is especially acute in the super-peak hours, when supply and demand can be significantly tighter than in the non-super-peak hours.  The result of these market forces is that prices in the super-peak hours, particularly in real time, are higher than the average calculated by the 16-hour day-ahead market index.  *See* TransAlta Reh'g Request at 37-39 (JA1086-88).  Forcing these prices to be equal inevitably distorts the super-peak hourly prices.

In considering whether Petitioners adequately justified sales in the super-peak hours, FERC applied the same day-ahead, 16-hour index that it used as a point of reference for the other transactions at issue.  This was error for three

45

reasons:  it was illogical on its face, it was inconsistent with FERC precedent, and it failed to address evidence and arguments in the record.[15]

First and foremost, FERC's use of the 16-hour benchmark average as a hard cap for the price of super-peak power is illogical because it ignores the fact that power is consistently more expensive during the super-peak periods due to shifts in supply and demand.  Comparing prices during the periods of highest demand with an average that includes periods of lower demand is illogical, because it is another circumstance in which "averages are apt to be misleading." *Abilene & S. Ry. Co.*, 265 U.S. at 291.  Therefore, FERC's orders with respect to the super-peak sales were arbitrary and capricious. *Allentown Mack Sales*, 522 U.S. at 374 ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.").

Second, FERC's refusal to recognize the difference between super-peak and other hours is at odds with its own prior precedent.  FERC has previously recognized that electricity is more expensive during certain hours of the day. Therefore, in establishing price caps in the adjacent CAISO market, FERC permitted the CAISO to apply a 110% multiplier to the relevant published day-ahead price for certain hours, in order to account for the fact that average index

---

[15] This argument applies to all Petitioners other than Shell Energy, which did not press it on rehearing.

prices may not adequately value individual transactions. *Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,076, PP 7, 9, 42 (2021). That is, FERC recognized that some variation from (and specifically above) day-ahead index prices is to be expected in certain hours. This variation is known as "shaping." FERC's soft cap orders have recognized that the CAISO and WECC bilateral markets are linked. *2006 Order* P 14. In fact, FERC has previously held that, "[g]iven [the] interdependency [between the CAISO market and the WECC], we find that it is unjust and unreasonable to have inconsistent bid caps in the CAISO and the rest of the WECC." *Id.* FERC's refusal to recognize shaping in WECC while embracing shaping in the interdependent CAISO market is a departure from precedent and is arbitrary and capricious. *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is textbook administrative law that an agency must 'provide[] a reasoned explanation for departing from precedent or treating similar situations differently[.]'") (quoting *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995)).

Further, FERC's orders here do not squarely address sellers' arguments based on this prior precedent. FERC stated that it was not foreclosing "application of a shaping ratio or methodology to value peak and super peak energy," but dismissed Petitioners' arguments in favor of such a methodology here as "unsubstantiated claims" and "mere assertions." *TransAlta Reh'g Order* P 37

47

(JA1368). This fails to meaningfully address the arguments and evidence in the record concerning these sales. *See*, *e.g.*, Notice and Justification at 6-8, *TransAlta Energy Mktg. (U.S.) Inc.* (Oct. 7, 2020) (JA1405-07); Tenaska Reh'g Request at 21-22 (JA775-76); Request for Reh'g at 25-26, *Macquarie Energy LLC* (June 17, 2022) (JA943-44) ("Macquarie Reh'g Request"); Request for Reh'g at 16-18, *Brookfield Renewable Trading & Mktg. LP* (June 21, 2022) (JA969-71); TransAlta Reh'g Request at 37-39 (JA1086-88). One Petitioner submitted evidence to FERC in the form of an affidavit explaining the differences between super-peak and other hours. Horton Aff. ¶ 28 (JA150-51). Yet FERC inexplicably dismissed Petitioners' arguments about the super-peak hours as "mere assertions" with no "support to justify . . . [the] proposed adjustment to the index prices for spot sales during super peak hours." *TransAlta Reh'g Order* P 37 (JA1368). This misstates the record, fails to grapple with record evidence, and is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). And FERC's dismissal of citations to its own orders as "mere assertions" is no response at all, and equally arbitrary and capricious. *Id.*; *W. Deptford Energy*, 766 F.3d at 20.

## B. FERC's Order Applying the Soft Cap to Macquarie's Sales at Dave Johnston Is Arbitrary and Capricious

FERC separately erred by failing to provide "a satisfactory explanation for" requiring Macquarie to refund the full difference between the soft cap and the

prices in two contracts for delivery to a remote hub in Wyoming known as Dave Johnston.  *State Farm*, 463 U.S. at 43.

Both contracts' prices were well below the ICE index averages for day-ahead sales at other WECC delivery points, Palo Verde and Mead.[16]  FERC refused to consider these delivery points as appropriate price benchmarks for Dave Johnston because they are located elsewhere in the WECC, and ordered refunds on that basis.  *See Macquarie Order* P 51 (JA724).

But Dave Johnston is not traded with sufficient frequency to have its own ICE index price.  Furthermore, FERC provided no guidance on how market participants can justify sales above the soft cap at such delivery points.  As a result, FERC effectively turned the soft cap into a "hard cap" at any remote locations on the grid that lack an ICE index.  The unavoidable result will be to discourage any sales into such delivery points whenever market forces drive prices above the soft cap, ultimately harming consumers served by these remote hubs in times of severe

---

[16] The first sale, priced at $1,100 MW/h, was made on August 17, 2020, when the ICE index averages for day-ahead sales to Palo Verde and Mead both settled hundreds of dollars higher, at $1,400.50/MWh and $1,333.33/MWh, respectively.  *See* Decl. of Matthew D'Agostino ¶ 12, *Macquarie Energy LLC* (Oct. 7, 2020) ("D'Agostino Decl.") (JA1445); *see* Macquarie Reh'g Request at 27 (JA945).  The second sale, also priced at $1,100 MW/h, was made on August 18, 2020, when the ICE index average for day-ahead sales to Palo Verde and Mead similarly settled hundreds of dollars higher, at $1,639.60/MWh and $1,380.00/MWh, respectively.  D'Agostino Decl. ¶ 20 (JA1448-49); *see* Macquarie Reh'g Request at 27 (JA945).

weather and other scarcity events, when supply is needed most.  FERC's failure to grapple with these fundamental issues fell well short of its obligation to examine the relevant facts and articulate a "satisfactory explanation for its action."  *State Farm*, 463 U.S. at 43.

## CONCLUSION

The Court should vacate each of the orders under review and remand for further proceedings consistent with the Court's opinion.

Respectfully submitted,

 /s/ *Scott H. Angstreich*

Paul W. Hughes
Neil L. Levy
David G. Tewksbury
Andrew A. Lyons-Berg
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000
phughes@mwe.com

*Counsel for Tenaska Power Services Co.*

Kenneth W. Irvin
Brian P. Morrissey
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
bmorrissey@sidley.com

*Counsel for Brookfield Renewable Trading and Marketing LP, and Macquarie Energy LLC*

October 31, 2023

David C. Frederick
Scott H. Angstreich
Collin R. White
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
sangstreich@kellogghansen.com
cwhite@kellogghansen.com

*Counsel for Shell Energy North America (US), L.P.*

David A. Super
Britt Cass Steckman
BRACEWELL LLP
2001 M Street, N.W., Suite 900
Washington, D.C. 20006
(202) 828-5800
David.Super@bracewell.com
Britt.Steckman@bracewell.com

*Counsel for TransAlta Energy Marketing (U.S.) Inc.*

## CIRCUIT RULE 32(a)(2) CERTIFICATION

Pursuant to D.C. Circuit Rule 32(a)(2), I hereby certify that all parties to this joint brief consent to its content.

/s/ *Scott H. Angstreich*

Scott H. Angstreich

*Counsel for Shell Energy North America (US), L.P.*

October 31, 2023

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this joint brief complies with the Court's March 6, 2023 Order granting Seller-Marketer Petitioners 15,000 words for their joint brief because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 11,530 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface (Times New Roman, 14 point).

 /s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Shell Energy North America (US), L.P.*

October 31, 2023

# ADDENDUM

# TABLE OF CONTENTS

Page

<u>United States Code</u>

16 U.S.C. § 824 (excerpt) ................................................................Add. 1

16 U.S.C. § 824d (excerpt) .............................................................Add. 1

16 U.S.C. 824e ...............................................................................Add. 2

16 U.S.C. 825*l* (excerpt) .................................................................Add. 5


<u>Code of Federal Regulations</u>

18 C.F.R. § 35.1 (excerpt).............................................................Add. 7

18 C.F.R. § 35.42 ..........................................................................Add. 8

## 16 U.S.C. § 824

### § 824. Declaration of policy; application of subchapter

* * *

**(b) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line.  The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

* * *

## 16 U.S.C. § 824d

### § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

* * *

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications,

Add. 1

practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public.  Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.  The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

* * *

## 16 U.S.C. § 824e

**§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission**

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.  Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation,

practice, or contract then in force, and the reasons for any proposed change or changes therein.  If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

   Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date.  In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint.  In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date.  Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible.  If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision.  In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant.  At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding.  The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order.  For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:
    (A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).
    (B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

    (A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

    (B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

    (B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

    (C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

## 16 U.S.C. § 825*l*

### § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon

which such application is based.  Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing.  Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied.  No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon.  Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Judicial review**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.  A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28.  Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part.  No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.  If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper.  The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be

conclusive, and its recommendation, if any, for the modification or setting aside of the original order.  The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

* * *

## 18 C.F.R. § 35.1

### § 35.1. Application; obligation to file rate schedules, tariffs and certain service agreements.

   (a) Every public utility shall file with the Commission and post, in conformity with the requirements of this part, full and complete rate schedules and tariffs and those service agreements not meeting the requirements of § 35.1(g), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, the classifications, practices, rules and regulations affecting such rates, charges, classifications, services, rules, regulations or practices, as required by section 205(c) of the Federal Power Act (49 Stat. 851; 16 U.S.C. 824d(c)).  Where two or more public utilities are parties to the same rate schedule or tariff, each public utility transmitting or selling electric energy subject to the jurisdiction of this Commission shall post and file such rate schedule, or the rate schedule may be filed by one such public utility and all other parties having an obligation to file may post and file a certificate of concurrence on the form indicated in § 131.52 of this chapter: *Provided, however,* In cases where two or more public utilities are required to file rate schedules or certificates of concurrence such public utilities may authorize a designated representative to file upon behalf of all parties if upon written request such parties have been granted Commission authorization therefor.

* * *

## **18 C.F.R. § 35.42**

### **§ 35.42. Change in status reporting requirement.**

(a) As a condition of obtaining and retaining market-based rate authority, a Seller must timely report to the Commission any change in status that would reflect a departure from the characteristics the Commission relied upon in granting market-based rate authority.  A change in status includes, but is not limited to, the following:

(1) Ownership or control of generation capacity or long-term firm purchases of capacity and/or energy that results in cumulative net increases (*i.e.*, the difference between increases and decreases in affiliated generation capacity) of 100 MW or more of capacity based on nameplate or seasonal capacity ratings, or, for solar photovoltaic facilities, nameplate capacity, or, for other energy-limited resources, nameplate or five-year average capacity factors, in any individual relevant geographic market, or of inputs to electric power production, or ownership, operation or control of transmission facilities; or

(2) Affiliation with any entity not disclosed in the application for market-based rate authority that:

(i) Owns or controls generation facilities or has long-term firm purchases of capacity and/or energy that results in cumulative net increases (*i.e.*, the difference between increases and decreases in affiliated generation capacity) of 100 MW or more of capacity based on nameplate or seasonal capacity ratings, or, for solar photovoltaic facilities, nameplate capacity, or, for other energy-limited resources, nameplate or five-year average capacity factors, in any individual relevant geographic market;

(ii) Owns or controls inputs to electric power production;

(iii) Owns, operates or controls transmission facilities;

(iv) Has a franchised service area; or

(v) Is an ultimate upstream affiliate.

(b) Any change in status subject to paragraph (a) of this section must be filed quarterly.  Power sales contracts with future delivery are reportable once the physical delivery has begun.  Sellers shall file change in status in accordance with

the following schedule: For the period from January 1 through March 31, file by April 30; for the period from April 1 through June 30, file by July 31; for the period July 1 through September 30, file by October 31; and for the period October 1 through December 31, file by January 31.  Failure to timely file a change in status constitutes a tariff violation.

(c) Changes in status must be prepared in conformance with the instructions posted on the Commission's website.

(d) A Seller must report on a monthly basis changes to its previously-submitted relational database information, excluding updates to the horizontal market power screens.  These submissions must be made by the 15th day of the month following the change.  The submission must be prepared in conformance with the instructions posted on the Commission's website.

## CERTIFICATE OF SERVICE

I hereby certify that, on October 31, 2023, I caused to be filed electronically the final version of the Joint Brief for Seller-Marketer Petitioners with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Shell Energy North America (US), L.P.*